UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT



FILED

2010 OCT 13  P 4: 38

US DISTRICT COURT
HARTFORD CT

| | |
|---|---|
| Sandra Elliott, individually and as the Administratrix of the Estate of Asher Tamara Glace | : <br> : <br> : <br> : |
| **Plaintiffs** | : |
| | : CIVIL ACTION  NO.: 309-cv-00948 |
| vs. | : <br> : |
| Daryl Roberts, Individually and in his Official Capacity as Chief of Police for the City of Hartford, The City of Hartford, and The State of Connecticut's Chief State Attorneys Christopher Morano and Kevin Kane, individually and in their Official Capacities. | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : |
| | October 12, 2010 |
| **Defendants** | : <br> : |

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENSATS' MOTIONS TO DISMISS PURSUANT TO FEDERAWL RULES OF CIVIL PROCEDURE § 12 (b)(6)

The Plaintiffs, Sandra Elliot and the Estate of Asher Tamara Glace respectfully move the court to deny defendants' motion to dismiss the Plaintiffs' second amended complaint. In support of this memorandum, the plaintiffs' assert that (1) Defendants had a duty to protect Plaintiff Asher Glace from harm according to law and failed to perform that duty. (2) Defendants are liable for constitutional violations pursuant to under § 1983. (3) Defendants are not absolutely immune from Plaintiffs' suit. (4) At a status conference held on August 11, 2010, all parties agreed that Plaintiffs would be given an opportunity to serve the within complaint upon the Hartford State Attorney at the time Ms. Glace was murdered. Additionally, Chief States Attorneys Christopher Morano and Kevin Kane would be stricken from the case. Further, that Defendant State of Connecticut Office of the Attorney General filed its' motion to dismiss based

1

the fact that "incorrect parties were sued by the Plaintiffs. (5) Defendants are not entitled to qualified immunity. (6) The Plaintiffs' common law claims against the defendants are proper and are not barred by the Eleventh Amendment or the doctrine of sovereign immunity, because the defendants were sued in their individual capacities. (7) The Plaintiffs did not bring suit against the Defendants under a theory of respondeat superior liability. (8) Plaintiffs suit sought to establish liability against public officials in their personal capacities due to their demonstrated deliberate indifference for the safety of Ms. Glace. (9) Plaintiffs' cause of action was timely filed, as such the statute of limitation pertaining negligent infliction of emotional distress and negligence as against Defendant Roberts was not violated by the Plaintiffs.

## I.    FACTUAL BACKGROUND.

On February 14, 2005, Plaintiff Asher Tamara Glace witnessed a murder at a night club referred to as Cleveland Café, which is located on Main Street in Hartford's North end. At the time of the shooting, the victim fell on top of Ms. Glace, and had to be removed by other patrons. At the time of the shooting, the alleged assailant, Anthony Thompson fled the scene, and subsequently escaped and went into hiding in Jamaica. After the Hartford Police Department (hereinafter HPD) arrived at the scene, no witnesses came forward except Ms. Glace. The Hartford Police thereafter took Ms. Glace into custody and transported her to the Hartford Police Department Headquarters where she was questioned about the events of the shooting. At no point did the HPD personnel inform Ms. Glace that she was free to leave, or decline to give a statement.

Ms. Glace was not allowed to drive her motor vehicle to the HPD despite the fact the HPD Headquarters was located a mile away from the scene of the crime. After Ms. Glace gave a detailed statement about the incident, she was then transported back to the scene where her motor vehicle was collected and driven to her home. Ms. Glace was also transported to her home in another HPD squad car.

2

Anthony Thompson was captured in Jamaica and extradited to Hartford, Connecticut to face justice. While Thompson was incarcerated in connection to the Cleveland killing, his cellmate disclosed to authorities that Ms. Glace's life was in danger due the fact she planned to testify against Thompson. On June 16, 2007, approximately two months before Anthony Thompson's trial was to begin, Ms. Glace's bullet riddled body was discovered in her car in the family's driveway by her mother.

Connecticut General Statutes § 54-82t, 54-82u, and 54-82s mandate an affirmative duty on the Chief State's Attorney to "conduct a review of 'all witnesses' to a serious felony to access their risk of harm." After this risk of harm assessment is made the law further mandates the Chief State's Attorney to determine whether the witness at rick of harm is critical to a criminal . . . prosecution." At no point did the Chief State Attorney, or the Hartford State Attorney conduct their mandatory review; conduct a risk of harm assessment; and they did not make a determination as to whether Ms. Glace's likely testimony was critical to Anthony Thompson's prosecution for murder. The first mention of a state official within the text of Connecticut General Statute § 54-82t (3)(b) is "the prosecutorial official," not the county prosecutor. In fact, the first mention of the "Chief State's Attorney" is made in section (3) (c).

At some point after Anthony Thompson's apprehension and confinement, the Hartford Police Department labeled Ms. Glace on the department's website as the "critical witness" in the Cleveland Café murder allegedly committed by Anthony Thompson.

On August 11, 2010, at a status conference, the parties to this action agreed that Plaintiffs would name the Chief Hartford County Prosecutor as the proper Defendant with respect to the state based claims, and serve a copy of the summons and complain to her. Exactly two weeks later, the Defendants made motions to dismiss, with the state contending that incorrect parties were sued. Also arising from this conference was an agreement to file a joint motion to stay discovery pending disposition of Anthony Thompson's criminal prosecution concerning Ms. Glace's murder.

## II.   STANDARD OF REVIEW FOR F.R.C.P. 12 (b)(6) MOTION TO DISMISS

A court is required to deny a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) when the Plaintiff successfully state a claim upon which relief may be granted. Harris v. Mills, 572 F.3d 66 (2^dCir. 2009). The court must accept all factual allegation, and inferences contained in the complaint as true and draw all reasonable inferences in favor of the Plaintiffs. Scheuer v. Rhodes, 416 U.S. 232 (1974). A motion to dismiss may be granted only when the facts are inconsistent with the allegations, and cannot be proved by the Plaintiffs. Conley v. Gibson, 355 U.S. 41 (957). Given the current problems associated with discovery especially as it pertains to Anthony Thompson's prosecution, the court should be mindful that some allegations will not be proved until conclusion of Anthony Thompson's criminal prosecution in state court.

## III.   ARGUMENT

    **1.**    **Defendants had a duty to protect Ms. Glace right to life and failed to do so, by creating the danger to which she succumbed, after a special relationship had been established by state law.**

    Defendants Morano and Kane were mandated by law to protect Ms. Glace and they failed to protect her in violation of 42 U.S.C 1983.  At a minimum, Connecticut General Statutes § 54-82t, 54-82u, and 54-82s mandate an affirmative duty on the Chief State's Attorney to "conduct a review of 'all witnesses' to a serious felony to access their risk of harm."  Connecticut General Statutes § 54-82t, 54-82u, and 54-82s were passed by the Connecticut legislature in 1999 to protect against the precise harm that befell Ms. Glace (termed a "statutory process for protecting witnesses" by Defendants Morano and Kane).  In fact, § 54-82s is named "The Leroy Brown, Jr. and Karen Clarke Witness Protection Program by the Connecticut Legislature. *Supra*  (Please see Clarke v. Sweeney, 312 F.Supp.2d 277 (D. Conn. 2004).  More specifically, the Chief State's Attorneys as well as the Hartford County Prosecutor are mandated by law:

> In any investigation or prosecution of a serious felony offense, the prosecutorial official shall review all witnesses to the offense and may identify any witness as a witness at risk of harm.  Upon such identification, the prosecutorial official shall then determine whether a witness at risk of harm is critical to a criminal investigation or prosecution. If the witness at risk of harm is determined to be critical to such investigation or prosecution, the prosecutorial official may (1) certify that the witness receive protective services, or (2) if the prosecutorial official finds a compelling need to temporarily relocate the witness, certify that the witness receive protective services including temporary relocation services.

Connecticut General Statutes § 54-82t.  Additionally, under § 54-82t (3) the statute defined a "serious felony as 'any felony' that involve[d] the use, attempted use or threatened use of physical force against another person or results in serious physical injury or death of another person."

In Gan v. City of New York, 996 F.2d 522 (2d Cir. 1993), the Second Circuit Court of Appeals found that a prosecutorial official was required to provide protection to a witness to a robbery after the witness was presented at a face-to-face identification of the assailants. The assailants later threatened the witness against testifying against them; he refused and was subsequently murdered. In the Gan case, there was no state law mandating protection for witnesses under the circumstances, and the police had indicated to the witness that protection would be available to him. The court also found that the constitutional right at issue in the case was the special relationship between law enforcement officials and the witness as it pertained to the witness' protection from harm. Gan, at 528. The court found that the Plaintiff had stated an adequate claim where the prosecutorial official was aware of the existence of a constitutional duty to protect the witness. Id. at 528. Although the Supreme Court held in Parratt v. Taylor, 451 U.S. 527 (1981) that negligent depravation of property without due process of law within the scope of the Fourteenth Amendment was actionable. The Court later overruled aspects of Parratt on the basis that the lack of due care by state officials was enough for a state official to deprive an individual of life, liberty or property under the Fourteenth Amendment." Daniels v. Williams, 474 U.S. 327 (1986). For § 1983 purposes, deliberate indifference has become the standard for attaching liability. City of Canton v. Harris, 489 U.S. 378 (1989). Although deliberate indifference was the governing standard in § 1983 claims, the Supreme Court did not define the meaning until its decision in Farner v. Brennan, In this case, the court held that a prison official who is deliberately indifferent to the risk that one inmate will attack another violates the Eighth Amendment. The court required a showing that the official was aware of the facts from which the inference could be drawn that substantial risk of serious harm exists, and he must also draw the inference. 511 U.S. 825 (1994) Ordinarily "a state's failure to protect an individual against private violence is not actionable under a 1983 regime. DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189 (1989). However, there are two exceptions to the general principle as outlined in DeShaney: where there is a special relationship exception and the state-created danger exception. Id, at 199-201

6

In the present case, the State of Connecticut's Chief State Attorneys Kane and Morano were duty bound to offer protection to Ms. Glace. At a minimum, Connecticut law mandated that the "prosecutorial officials conduct a 'mandatory' review (shall) of 'all' witnesses to the offense, and then to mandatorily determine a witness' risk of harm. Although § 54-82t (3) also defined a "serious felony as 'any felony' that involve[d] the use, attempted use or threatened use of physical force against another person or results in serious physical injury or death of another person,. The facts are that the state prosecutors became aware prior to Ms. Glace's murder that a jail house informant who shared a cell with Anthony Thompson learned that he planned to harm Ms. Glace if she testified against him with respect to the Cleveland Café murder. This fact was totally lost on the state's prosecutorial officials who were mandated to protect her. The facts show that Anthony Thompson was already in state custody at the time the threat was issued. Furthermore, there is no indication, or admission from either Defendant that they conducted the mandatory review of Ms. Glace's risk of harm in accordance with Connecticut law. The Defendants, Kane and Morano failed to review the case of any witness to the case; they failed to make any determination as to the risk of harm Ms. Glace faced; they failed to act upon the tip from Anthony Thompson's cellmate; they failed to "provide appropriate protective services to any of the witness; they failed as was their duty under § 54-82t (3) (c) "to provide appropriate protective services to such witness; and they failed to "mandatorily coordinate the efforts of state and local agencies to provide protective services to [any] witness," including Ms. Glace. The Defendants had monitored Anthony Thompson through his cellmate who provided them with information that Anthony Thompson intended to harm Ms. Glace so she would not testify

7

against him. This information, though known was ignored by the Defendants, Kane and Morano. From this standpoint, the conduct exhibited by these two defendants was very similar to the state official in the Farmer case.

The prosecutorial officials failed to protect Ms. Glace in the exact manner as the prosecutorial officials did in the Gan case. In the Gan case, the witness was sheparded into a face-to-face identification of the assailants`, and was told that he would be protected by law enforcement. In Ms. Glace's case, she provided a statement to the HPD which detailed the events concerning the murder, including the fact that she was in close proximity to Anthony Thompson when he shot the victim. Additionally, the prosecutorial officials were also aware of her risk of harm because Anthony Thompson's cellmate communicated the fact that he intended to harm her. Nevertheless, these prompts were not enough for the state's prosecutorial officials to provide protective services to Ms. Glace as the law mandated.

Defendants Morano and Kane argue that the responsibility to review the risk of harm to Ms. Glace was the responsibility of the Chief State's Attorney for Hartford County. Yet, this assertion is not supported by the facts. The first time the Chief States Attorney is mention in the statute is in section (3), in all other sections preceding section (3) the statute simply refers to "a prosecutorial official," not the Chief States' Attorney for Hartford County. In short, Defendants would like the court to believe that if the "review" had not been conducted by the Chief State's Attorney for Hartford County, then the role of the Defendants Kane and Morano was never implicated because the first step

8

in the process had not been done. If the first step had not been performed, and the state official mandated to perform the first step had not been sued, the counts against Defendants Kane and Morano must be dismissed because the incorrect person was sued. This analysis is not supported by the plain text of the statute, and the Defendants at issue had already agreed that the Chief State's Attorney for Hartford County would be served a summons and complaint arising from the August 11, 2010 status conference.

The <u>Gan</u>. case pales in comparison to Ms. Glace's. In <u>Gan</u>, the witness was not protected by a state law mandating protective services, as in the instant case. In both cases the state officials created the danger in both cases, and they created a special relationship in both cases, although in Ms. Glace's case the relationship was mandated by statute. For the forgoing reasons, the court must find that the Defendants Kane and Morano failed to protect Ms. Glace as mandated by law.

> 2. **Defendants Kane and Morano are not protected by absolute Immunity from suit relative to 42 U.S.C. 1983.**

Absolute immunity protects officials such as judges, legislators, and prosecutors who perform special functions against personal liability under § 1983. The United States Supreme Court has held that whether an official is entitled to absolute or qualified immunity depends on the nature of the function the official carried out. <u>Kalina v. Fletcher</u>, 522 U.S. 118 (1997); <u>Antoine v. Byers & Anderson</u>, 508 U.S. 429 (1993); and <u>Burns v. Reed</u>, 500 U.S. 478 (1991). In the Court's view, "Immunity is justified and defined by the functions it protects and serves, not by the persons to whom it attaches."

Forrester v. White, 484 U.S. 219 (1988). "Officials who carry out administrative and executive functions are normally protected by qualified immunity." Van de Kamp v. Goldstein, 129 S, Ct 855 (2009). In contrast, qualified immunity provides protection only for conduct that does not violate clearly established federal law. Hoper v. Pelzer, 536 U.S. 730 (2002). Although prosecutors may claim absolute prosecutorial immunity for deciding whether to prosecute and for presenting a state's case, they may normally claim only qualified immunity for their investigative and administrative functions. Kalina v. Fletcher, 522 U.S. 118 (1997);  from this standpoint, when a prosecutor engages in investigative work he acts as a detective and so he may only claim qualified immunity such as police officers engaging g in law enforcement functions. Buckley v. Fitzsimmons, 509 U.S. 259 (1993) The Supreme Court holds that qualified immunity is the norm because "as the qualified immunity defense evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335 (1986). The United States Supreme Court regards both qualified immunity and absolute immunity as immunity for law suits rather than defense to liability.

In Imbler v. Pachtman, 424 U.S. 409 (1976), the Court held that absolute immunity covers a prosecutor's actions "intimately associated with the judicial phase of the criminal process, including the decision whether to prosecute and presentment of the state's case." Since *Imbler,* the Van de Kamp Court held that

> Absolute immunity applies when a prosecutor prepares to initiate a judicial proceeding [Burns v. Reed, 500 U.S. 478 (1991), or appears in court to present evidence in support of a search warrant application [Kalina v. Fletcher, 522 U.S. 118 (1997)], [**but not when]** prosecutor gives advise to police during a criminal investigation, Burns, supra, at 496,

10

> when the prosecutor makes statements to the press,
> Buckley v. Fitzsimmons, 509 U.S. 259  277 (1993), or
> when a prosecutor acts as a complaining witness in support
> of a warrant application, Kalina , *supra, at 132,* . . . .[Van
> de Kamp v. Goldstein], unlike these earlier cases, requires
> [the Court] to consider how immunity applies where a
> prosecutor is engaged in certain administrative activities.

Id. at 861

In Gan v. New York, the court found only qualified immunity where a prosecutor engaged in the supervision and interaction of law enforcement agencies in acquiring evidence which might be used in a prosecution. 996 F. 2d at 528. The court distinguished those functions from functions the prosecutor engaged in involving the organization, evaluation, and marshalling of evidence into a form that [would] enable the prosecutor to try a case, seek a warrant, indictment, or order, where absolute immunity instead applied. Id. In Gan the court found that there were essentially three claims against the prosecutor at issue: (1) that he declined to institute a criminal proceeding against one assailant, and he advised the police not to arrest the assailant. (2) That he exposed the victim to an unreasonably unreasonable increased risk of retaliation by causing him to make a face-to-face identification, and (3) that he failed to provide the victim with protection from the assailants. Gan, at 531. The court found that absolute immunity barred the first claim, but claims (2) and (3) were not barred by absolute immunity "to the extent  . . . the prosecutor caused the face-to-face identification, they plainly [were] conduct of an investigative , not prosecutorial, nature; and the claim that the [prosecutor] failed to protect the [witness] asserted conduct that plainly is not integral either to a decision . . . to institute a prosecution or to the conduct of judicial proceedings." Id.

11

In the instant case, there is no indication any prosecutor, whether Chief State Attorney, the Chief State's Attorney for Hartford County, or any subordinate prosecutor engaged in any conduct deemed to be judicial phase or administrative. In fact, it is reasonable to believe they did nothing at all with respect to assessing the mandatory review or assessment of the risk of harm to Ms. Glace. There if no documentary evidence from the Elliot/Glace household to indicate Ms. Glace was contacted by any prosecutor or investigator with respect to providing protective services. Defendants argue that "it is evident that the conduct of assessing and determining one's need for witness protection falls within the scope of a prosecutor's official duty." (Defendants' Kane and Morano's motion to dismiss P8. para 3). This argument borders on the ridiculous in that there is no evidence anyone "conducted an assessment, made any determination with respect to witness protection as it pertained to Ms. Glace, or performed any function with respect to the prosecutors office as it pertained to the mandated protective services of Connecticut General Statute § 54-82t for Ms. Glace. The Defendants' conduct like the defendant in Gan (Prosecutor Rettler) exposed Ms. Glace to an unreasonable increased risk of retaliation, especially as here where the prosecutors knew that a cellmate of Anthony Thompson had forecasted harm to Ms. Glace.


The enactment of Connecticut General Statutes § 54-82t, 54-82u, and 54-82s established a special relationship *de jure* with respect to the protection services to which Ms. Glace was entitled, but for which she never even received a cursory "review" by the Defendants.

Defendants Kane and Morano asserts that "indeed, the statutory language of Connecticut General Statute § 54-82t clearly establishes that the placement of a witness into witness protection is part of the prosecutor's official duty." This argument cannot stand on all fours! The Defendants in effect argue that although the law compelled them to act ("shall"), and even though they failed to act, the court should still find absolute immunity from suit on the mere fact the statutory language of Connecticut General Statute § 54-82t implies "prosecutor's official duty." In other words, prosecutors' official duty never performed specific to Ms. Glace's life.

**3.      Plaintiff did not sued incorrect parties, Kane and Morano.**

At a status conference held on August 11, 2010, all parties agreed that Plaintiffs would be given an opportunity to serve the within complaint upon the Chief Hartford State Attorney at the time Ms. Glace was murdered.  After careful research, it was determined that James Thomas was the Chief Hartford State Attorney at the time Ms. Glace was murdered on June 16, 2007.  The consequence may have been that Chief States Attorneys Christopher Morano and Kevin Kane may have been stricken from the case.

On close examination of Connecticut General Statute § 54-82t (3) (c), Defendants Kane and Morano do remain culpable for their conduct in this case. More specifically, § 54-82t (3) (c) provides that "in any investigation or prosecution of a serious felony, the **prosecutorial official shall review all witnesses to the offense . . . ."** Prosecutorial official as provided for in the statute makes no distinction between the Chief State

Attorney and The Chief State Attorney for Hartford County at the "prosecutorial official," as Defendants argue. **[emphasis added]**

**4.     Defendants, Kane and Morano are not entitled to qualified immunity**

Qualified immunity acts as shield for governmental officials from liability for damages based on their performance of discretionary official functions, "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The defense is generally determined by the "objective reasonableness" of the allegedly unlawful official action "assessed in light of the legal rules that were clearly established at the time it was taken." Anderson v. Creighton, 483 U.S. 635, 639 (1987) To determine if qualified immunity is available to an official, the Supreme Court will look to whether the facts the plaintiff have asserted show a violation of a constitutional right, and whether the right that was allegedly violated was clearly established at the time of the defendants' alleged misconduct. Saucier v. Katz, 533 U.S. 194 (2001).

To determine whether a particular right was clearly established at the time defendants acted, a court will examine (1) whether the right in question was defined with "reasonable specificity" (2) whether the decisional law of the Supreme Court and applicable circuit court support the existence of the right in question, and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful. Jermosen v. Smith, 945 F. 2d 547 (2d. Cir. 1991). The

14

applicable state statute, Connecticut General Statute § 54-82t (3)(b) provides that in any investigation of prosecution of a serious felony offense, the prosecutorial official **shall** review **all** witnesses to the offense and may identify any witness as a witness at risk of harm.  **[Emphasis added]**  The text of Connecticut General Statute § 54-82t (3) (b) contradicts Defendants' assertion that the statute does not mandate that witnesses be placed in protection.  On the contrary, the statute mandates who is to be placed in protection, when, how and by whom.  The intent behind the statute was clearly designed to protect witnesses from threats of harm, harassment, serious injury and death.  As stated previously § 54-82s was named in honor of Leroy Brown, Jr. and his mother Karen Clarke who were both murdered after Leroy was named as a witness to the murder of his step father.  Like Ms. Glace, the assailants tracked Leroy and his mother; invaded their property and shot them to death in cold blood.

In the case at bar, the right at issue is Ms. Glacc's Due Process right to life. Based on the text and legislative intent of Connecticut General Statute § 54-82t, the law was defined with more than "reasonable specificity."  The text of the applicable statute did not make the statute applicable to the general public to act; rather, it was designed specifically for the State of Connecticut's Prosecutors, and law enforcement, serving to enable them to protect prospective witness to serious felonies to harm.  Secondly, it is settled law that the Supreme Court of the United States as well as the Second Circuit Court of Appeals decisional law supports the Fourteenth Amendment of the United States Constitution Due Process right to life within the context of 42 U.S. § 1983 litigation (*Please see* <u>Gan v. City of New York</u>, 996 F.2d 522 (2d Cir. 1993), <u>Walker v. New York,</u>

974 F.2d 293 (2d Cir. 1992), Baez v. Hennessy, 853 F.2d 73 (2d Cir. 1988), cert. denied, 488 U.S. 1014 (1989) Van de Kamp v. Goldstein, 129 S. Ct 855 (2009), Saucier v. Katz, 533 U.S. 194 (2001) Forrester v. White, 484 U.S. 219 (1988)). The law books are replete with decisions affecting 42 U.S. § 1983 actions brought to redress unconstitutional acts committed by state actors. Thirdly, under the circumstances of this case, a reasonable prosecutor would have understood that his conduct was violative of Connecticut General Statute § 54-82t, as well as the United States Constitution. The Connecticut statute is not complicate, because at a minimum, all it required was a cursory "review" of the risk of harm likely to befall Ms. Glace. For the foregoing reasons, Defendants Kane and Morano are not entitled to the defense of qualified immunity.

## 5.    The Chief State Attorneys were sued for their individual failure to protect Ms. Glace, not under a Theory of Respondeat Superior

Defendants Kane and Morano intentionally withheld protective services to Ms. Glace leading to her murder. Governmental officials . . . [are] only liable for their own misconduct within the ambit of constitutional violations. Ashcroft v. Iqbal, 129 S.Ct. 1937 (2009). Connecticut General Statute § 54-82t was enacted to protect witnesses from harm and to ensure conviction with respect to criminal defendants. In so doing, the law requires that any investigation of prosecution of a serious felony offense, the prosecutorial official **shall** review **all** witnesses to the offense and may identify any witness as a witness at risk of harm. § 54-82t (3) (b). Although Chief State Attorneys as well as County Prosecutors are held to their individual constitutional misconduct, Connecticut General Statute § 54-82t mandates an affirmative duty to provide protective

16

services to witnesses to serious felonies. The Defendants did not act consistent with the law's mandates, rather, they withheld protective services from Ms. Glace, and "all" other witnesses in the case. The facts show that a cellmate of Anthony Thompson had passed information to the Defendants informing that she would be harmed by Thompson if she testified against him. Armed with this knowledge, the Defendants still chose to withhold protective services from Ms. Glace and left her to face seasoned criminals on her own. The net result of the Defendants' conduct is that like witnesses will decline to come forward as witnesses in criminal prosecutions involving serious felonies. In short, Ms. Glace cooperated with the state in the prosecution of Anthony Thompson, and the Defendants let her down, resulting in her loss of life, and the devastation of her family. For the foregoing reasons, the court should find that the claims against the Defendants was based on their individual conduct and not on a theory of respondeat superior.

### 6.   The Plaintiff's state law claims are barred by the Eleventh Amendment of the United States Constitution

The Eleventh Amendment to the United States Constitution applies when a federal court plaintiff brings a claim against the state. The Supreme Court has held that "a state official may be sued personally for damages under 42 U.S. § 1983 for conduct engaged in while carrying out official responsibilities." Hafer v. Melo, 502 U.S. 21 (1991). The presence of an indemnification statute, indemnifying state actors with respect to their individual capacities as they pertain to civil judgments does not provide protection under the Eleventh Amendment. The "fact that money judgment against a state officer sued personally would be paid out of [a] state –funded insurance plan does

not implicate the Eleventh Amendment; {the] state's promise of indemnification does not alter [the] personal capacity nature of [the] claim." Duckworth v. Frazen, 780 F.2d 645, 650 (7th Cir. 1985). Cert. denied. 479 U.S. 816 (1986)

A state's litigation activity waives the Eleventh Amendment only when the conduct is unambiguous and evinces clear choice to submit state's adjudication by federal courts. Ramos-Pinero v. Puerto Rico, 453 F.3d 48(1st Cir.2006). But, "a representation made in a judicial proceeding for the purpose of inducing the court to act or refrain from acting satisfies the [waiver] requirements . . . ." Toll v. Poreno, 485 U.S. 1, 17-19 (1982), See also Vargas v. Trainor, 508 F. 2d 485, 495 (7th Cir. 1974) "a state attorney's argument in support of stay of o[an] order of reinstatement of [a] wrongful discharged state employee operated to waive [the] state's Eleventh Amendment immunity from liability for back pay." Barnes v. Bosley, 625 F. Supp. 81 (E.D. Mo. 1985), *appeal dismissed,* 790 FG.2d 718 (8th Cir 1986)

In the instant case, the Defendants, Moreno and Kane would receive no protection from the Eleventh Amendment, because they were sued in federal court in both their official and individual capacities.   Furthermore, their personal activities would be covered by a state-funded insurance plan as the defendant in Duckworth.  Under the Vargas regimen, the state and city's activities in this case should operate as a waiver because they both made two different sets of motions to dismiss, as well as participated in filing a joint motion to stay discovery.  For the forgoing reasons the court should hold that the Eleventh Amendment does not bar the state based claims. ,

7.    **The Plaintiffs' state negligence claims are not barred by Conn. Gen.
Stat. § 4-165.**

The Plaintiffs' claims are not barred by Connecticut General Statute. § 4.-165
because the Defendants, Morano and Kane's conduct were reckless.  Connecticut General
Statute. § 4.-165 provides that " no state officer or employee shall be personally liable for
damages or injury, not wanton, reckless, or malicious, caused in the discharge of his
duties or within the scope of his employment. . . . ."  The defendant's conduct must
demonstrate a reckless disregard of the just rights or safety of others or of the
consequences of the action."   Tuchman v. State, 89 Conn. App. 745, 764 (2005).
Although ordinary negligence is an insufficient basis for imposing liability.    The
Supreme Court decision in City of Canton v. Harris, 489 U.S. 378 (1989) held that
deliberate indifference . . . may give rise to  . . . liability.  In this opinion the Court
rejected lesser standards of fault including gross negligence.


The Defendants conduct rose to the level of reckless and is therefore actionable.
One can reasonably infer from the facts that neither defendant conducted a review of Ms.
Glace's risk of harm.  A cursory review would have yielded the conclusion that Anthony
Thompson intended to seriously harm her, as communicated by Thompson's cellmate
soon after he was extradited from Jamaica.  On this basis and contrary to defendants'
argument that "there is no evidence that the prosecution failed to 'assess' the plaintiffs'
risk level consciously or that they neglected to offer services purposely," the Defendants
acted with reckless indifference to the risk of harm Ms. Glace face as a result of her

cooperation with the state. Under the circumstances, Ms. Glace's right to life and freedom from serious bodily injury was recklessly disregarded by the Defendants, Kane and Morano.

**8.    Counts one, two and three do not state a 42 USC § 1983 claims [sic] against the Defendant Roberts.**

42 U.S.C. § 1983 provides in relevant parts that :

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any state or territory of the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other persons within the jurisdiction thereof to the depravation of any rights, privileges, or immunities secured by the constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

In 42 U.S.C. § 1983 litigation, "deliberate indifference has become the prevailing standard for municipal liability claims as well, such as those based on municipal inaction . . . ." City of Canton v. Harris, 489 U.S. 378 (1989). For years the Supreme Court declined to define deliberate indifference until Farmer v. Brennan. In this case the Court held that a prison official who is deliberately indifferent to the risk that one inmate will attack another violates the Eighth Amendment. 511 U.S. 825 (1994) The Court reasoned that "the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists and he must draw the inference." _Id._ at 837. ) Ordinarily "failure to protect an individual against private violence is not actionable under a 1983 regime. DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189 (1989). However, there are two exceptions to the general

principle as outlined in <u>DeShaney</u>: where there is a special relationship exception and the state-created danger exception. <u>Id</u>, at 199-201 (law already discussed as to Defendants Moreno and Kane). For a substantive due process claim to survive a motion to dismiss, it must allege governmental conduct that is egregious, so egregious, that it may fairly be said to shock the contemporary conscience. <u>Valez v. Levy</u>, 401 F, 3d 75 2d Cir 2005)

Defendant Roberts intentionally placed Ms. Glace's life in jeopardy. After Anthony Thompson was taken into custody around May 2005, there was no reason to publish for the entire world to access the fact that Ms. Glace was the "chief witness against Thompson." Defendant Roberts had direct access to Anthony Thompson's prior criminal record and he published very early in the case that "Thompson was armed and extremely dangerous." Additionally, the very basis upon which Defendant Roberts sought Thompson for arrest served to instruct him on the dangerous propensities of Thompson.

Defendant Roberts created the danger to which Ms. Glace eventually succumbed. There was no good reason for placing Ms. Glace' name on the HPD's website and labeling her "the critical witness in the case against Anthony Thompson with respect to the Cleveland Café murder." Defendant Roberts already had Thompson in custody, and so there was no good reason to publish the name or names of any witness against him. Defendant Roberts's conduct served to directly set up Ms. Glace for retaliatory acts by Thompson and/or his confederates'.

Given the fact that Thompson was already in custody, there was no need for Defendant Roberts to place Ms. Glace's name on his website. This conduct is the type which shocks the "contemporary conscience." There was no legitimate reason defendant Roberts advertise the fact that Ms. Glace was one of the witness, let alone the chief witness against Thompson. As a high ranking police officer, the least the public expected under the circumstances was to withhold Ms. Glace's name form the HPD's website.

On the night of the Cleveland Café shooting, Ms. Glace was taken into custody against her will by the HPD. She was never given a chance to meet with the police on another occasion, but she was taken directly to HPD Headquarters soon after the shooting. While she was at HPD, she was not free to leave.

Under the circumstances, Defendant Roberts's conduct was a clear violation 42 U.S.C. § 1983

9.   **Count Seven fails to state a claim against the defendant Roberts for Gross negligence**

In Parratt v. Taylor, 451 U.S 527 (1981). The court held that negligent depravation of property without due process of law is within the scope of the Fourteenth Amendment. Since Parratt, the Court has taken the position that "whether something less than intentional conduct, such as recklessness or gross negligence is enough to trigger the protections of the due process clause. Daniels v. Williams, 474 U.S. at 334 n.3 *See also* Davidson v. Cannon, 474 U,.S 344, 349 (1986) (Brennan, J., dissenting) (recklessness or

22

deliberate indifference are covered by due process). Federal Rules of Civil Procedure 3 provides that a civil action is commenced by filing a complaint with the court. While FRCP 4 (m) requires service of the summons and complaint within 120 days of filing.

Defendant Roberts' argument is without merit. Although Connecticut may not recognize "gross negligence" as a valid cause of action, the Federal courts ' jurisprudence is replete with 42 U.S.C. § 1983 litigation turning on the basis of gross negligence. Defendant Roberts's conduct as it pertained to Ms. Glace was grossly negligent and is therefore actionable within the ambit of 42 U.S.C. § 1983 litigation.

Defendant's contention that the claims for gross negligence and negligent infliction of emotional distress fails because Ms. Glace was murdered on June 16, 2007 and they were not served before that date confuses FRCP 3. FRCP 3 requires only a timely filing to preserve a statute of limitation. While, FRCP 4 (m) requires services to the defendants within 120 days. Plaintiffs are in compliance with respect to both rules.

## 10.    Count Nine states a Monell Claim against the City of Hartford.

42 U.S.C. § 1983 does not permit suit based on a theory of respondeat superior. However, liability may obtain under 42 U.S.C. § 1983 when the plaintiff successfully shows that the plaintiff's federally protected right was violated due to the enforcement of a municipal policy or custom. Monell v. Department of Social Services, 436 U.S. 658 (1978). In Coon v. Springfield,404 F. 3d 683 (2d Cir 2005), the Second Circuit Court of

Appeals held that "state law cannot authorize respondeat superior liability under § 1983. 'Just as states cannot extinguish municipal liability § 1983 via state law, they cannot enlarge it either." Municipal liability under 42 U.S.C. § 1983 may be premised upon an officially promulgated policy; a **single decision** by an official with final decision-making authority.  Webster v. Houston, 735 F. 2d 838, 841 (5th Cir. 1984) (en banc).  **[Emphasis added]**

The City of Hartford was sued as to count nine on a Monell claim.  Here that courts have consistently held that plaintiffs must successfully shows that the plaintiff's federally protected right was violated due to the enforcement of a municipal policy or custom. In the instant case, Ms. Glace was murdered after the City of Hartford through a pattern, practice, custom, and policy, placed her name on the HPD's website labeling her the chief witness against Anthony Thompson.  Based on the Webster holding, the City cannot escape liability, as a **single decision** by an official with final decision-making authority is enough for purposes of § 1983.  **[Emphasis added]**

**10.    Count thirteen fails to state a claim of negligent infliction of emotional distress**

Defendant's contention that the claims for gross negligence and negligent infliction of emotional distress fails because Ms. Glace was murdered on June 16, 2007 and they were not served before that date confuses FRCP 3.  FRCP 3 requires only a timely filing to preserve a statute of limitation.  While, FRCP 4 (m) requires services to the defendants within 120 days.  Plaintiffs are in compliance with respect to both rules.

**11.     Count Fifteen fails to state a cause of action for loss of affection**

Connecticut law recognized the tort of parental consortium.   Contrary to Defendant Roberts' contention, Connecticut court recognizes a cause of action in bystander emotional distress claims under the rule of reasonable foreseeability provided the bystander satisfies certain limited conditions.   In <u>Clohessy v. Bachelor</u>, supra 237 Conn 56 (1996), the court held that loss of parental consortium is actionable under Connecticut law when "the (1) bystander is closely related to the victim, (2) the emotional injury must be the result of the contemporaneous sensory perception of the tortuous event or conduct,  or by arriving at the scene soon thereafter and before substantial change has occurred in the victims condition or location(3) the victim's injury must be substantial, resulting in death or serious physical injury; (4) the bystander's emotional injury must be serious.

In the case t bar, the Plaintiff, Sandra Elliot's emotional injuries were reasonably foreseeable.   She is the mother of the victim, Asher Tamara Glace; her emotional injuries were the result of contemporaneous sensory perception of her daughter's murder in that she discovered the soon after Ms. Glace was shot and killed; Ms. Glace was killed;  Ms. Elliot's injuries are serious necessitating psychiatric treatment after she discovered her daughter's bullet riddled body in her driveway.

## IV.   <u>CONCLUSION</u>

For the forgoing reasons, the Plaintiffs respectfully requests that Defendants' motions to dismiss be denied.

## CERTIFICATION

This is to certify that on October 13, 2010, a copy of the foregoing

Memorandum of law was filed by hard copy and by CD with the court.

Counsel for the Plaintiffs

BY:  Richard C. Gordon, Esq,
697 Blue Hills Avenue
Hartford, CT 06112
Fed Bar No.:27288
(860) 534-0547
(860) 656-6889 FAX

Terrence M. ONeill, Esq,
Assistant Attorney General
100 Sher5man Street
Hartford, CT 06105

Jonathan H. Beamon, Esq,
Assistant Corporation Counsel
550 Main Street
Hartford, CT 06103