UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - x
SANDRA ELLIOTT                    No.3:09CV00948(AWT)
Individually & as the
Administratrix for the Estate
of Asher Glace

            Plaintiffs
      vs.

CITY OF HARTFORD, ET AL
                                  HARTFORD, CONNECTICUT
            Defendants           FEBRUARY 2, 2012
- - - - - - - - - - - - - - - x

## STATUS CONFERENCE

      BEFORE:

        HON. ALVIN W. THOMPSON, Chief U.S.D.J.

APPEARANCES:

      FOR THE PLAINTIFFS:

            LAW OFFICE OF RICHARD C. GORDON
                  697 Blue Hills Avenue
                  Hartford, Connecticut  06112
            BY:  RICHARD C. GORDON, ESQ.

      FOR THE DEFENDANTS, Hartford, Roberts:

            CITY OF HARTFORD CORPORATION COUNSEL
                  550 Main Street
                  Hartford, Connecticut   06103
            BY:  JONATHAN H. BEAMON, ESQ.

      FOR THE DEFENDANTS, Connecticut, Morano & Kane:

            STATE OF CONNECTICUT
            Office of the Attorney General
            110 Sherman Street
            Hartford, Connecticut  06510
            BY:  TERRENCE M. O'NEILL, ESQ.
                  ZENOBIA GRAHAM-DAYS, ESQ.
                              Corinna F. Thompson, RPR
                              Official Court Reporter

1       **10:09 AM**

2               THE COURT:  Good morning.  Please be seated

3       everyone.

4                       We're here for a status conference in the

5       matter of Elliott versus City of Hartford, et al.  The

6       docket number is 3:09CV948.

7                       Would counsel please state their

8       appearances for the record.

9               MR. GORDON:  Good morning, Your Honor.

10      Richard Gordon on behalf of the plaintiffs.

11              THE COURT:  Thank you.

12              MR. SMITH:  Robert Smith on behalf of

13      plaintiffs.

14              MR. O'NEILL:  Good morning, Your Honor.

15      Terrence O'Neil, assistant Attorney General for the

16      state defendants.

17              MS. GRAHAM-DAYS:  Good morning, Your Honor.

18      Assistant Attorney General Zenobia Graham-Days for the

19      state defendants.

20              MR. BEAMON:  Good morning, Your Honor.

21      Jonathan Beamon for the city of Hartford defendants

22      and Daryl Roberts.

23              THE COURT:  I asked Mr. Hawkins to have you

24      all come see me because I understand there were some

25      motions coming in:  One a motion for leave to amend

1    the Complaint by filing a third amended complaint, and

2    second, a motion to quash certain subpoenas.

3            I just want to sort of review where we

4    are in the case, at least my understanding, and then

5    talk about the motions after that.

6            After our very first conference in this

7    case we had a second amended complaint filed.  The

8    second amended complaint listed as defendants the city

9    of Hartford, Daryl Roberts in his individual and

10   official capacity, and then Christopher Morano, chief

11   state's attorney, and Kevin Kane, both in their

12   individual and official capacities as chief state's

13   attorneys.

14           There were 15 counts in the second

15   amended complaint.  There were motions to dismiss

16   filed.  According to my notes, after the motions to

17   dismiss were ruled on, we had four claims pending:

18   Count 2 against Chief Roberts; Count 9, which is a

19   Monell claim against the city; Count 11, a supervised

20   reliability claim against Chief Roberts; and then,

21   jumping back numerically at least, Count 10, a claim

22   of supervised reliability against the chief state's

23   attorneys.  So one claim against the state defendants

24   and three claims against the city defendants.

25           My understanding was that in addition

1    there would be a motion, a targeted motion for summary

2    judgment, and I did get a chambers copy of the city

3    defendants' motion for summary judgment.

4              The agreed-upon protocol was that,

5    because we couldn't tell how long it would take to

6    really find out how much discovery needed to be done

7    by the plaintiffs, the motion for summary judgment

8    would be served on the plaintiffs and then discovery

9    would be done and the plaintiffs' opposition would be

10   filed and everything would be filed together.

11             Is that pretty accurate statement of

12   where we are?

13             MR. GORDON:  Yes, Your Honor.

14             MR. O'NEILL:  Yes, Your Honor.

15             MR. BEAMON:  Yes, Your Honor.

16             THE COURT:  I will also ask you all to help me

17   recall, but I have a general impression that at one

18   point, I believe just prior to the filing of the

19   second amended complaint, I had a concern primarily

20   because -- well, I had a concern.  I won't go into

21   why, but I had a concern as to whether the plaintiff

22   had -- plaintiffs had named the right defendants in

23   this case.  We had a conference here and I recall my

24   law clerk calling plaintiffs' counsel, even though I

25   didn't think it was our responsibility, I was

1    concerned that an amended complaint wasn't getting

2    filed.  And I understood that the plaintiffs' counsel

3    was investigating and making a determination as to who

4    should be named as defendants in this suit, because I

5    had a lot of questions about that when we started and

6    I had a lot of questions about what investigation had

7    been done by the plaintiff.

8              So that's my recollection of one of our

9    conferences just on the eve of the filing of the

10   second amended complaint.  If anybody recalls it

11   differently, it would be helpful to me if you let me

12   know.

13             Okay.  I don't see anybody recalling it

14   differently.

15             I guess I'd like to talk with the state

16   defendants, too, about the one count that remains to

17   them and how we're going to resolve that, but I guess

18   I'd like to focus first on the city defendants.

19             We do have a motion for summary judgment.

20   I got my copy in May.  That's when I think a copy was

21   sent to plaintiffs' counsel.

22             So maybe I'll ask plaintiffs' counsel to

23   do two things:

24             Number one:  Tell me -- I know you've

25   been reporting to Mr. Hawkins and he's been giving me

1    an update, but it would be nice to hear it directly

2    from counsel -- what's been done by the plaintiff and

3    needs to be done by the plaintiff in order to be able

4    to respond to the motion for summary judgment filed by

5    the city defendants, and why are we getting a motion

6    for leave to amend the complaint?  I only saw it this

7    morning so I have not really had a chance to read it,

8    but I did ask my law clerk to go through and sort of

9    make a list of who he saw as parties who were proposed

10   to be added and it looks as though there are five.

11        MR. GORDON:  Yes, Your Honor.

12        THE COURT:  Maybe you could help orient me

13   there on those two points.

14        MR. GORDON:  Thank you, Your Honor.

15             Good morning again, Your Honor.

16             With respect to your first query, Your

17   Honor, if I may be allowed to give you a brief

18   recitation of the facts, I think it will allay some of

19   the questions that are in the Court's mind.

20             You may recall, Your Honor, that there

21   were two murderers here.  Number one, in February of

22   2005, there was a murder which occurred at the

23   Cleveland Cafe.  Ms. Asher Glace, one of plaintiffs in

24   this matter, was the only direct eyewitness to the

25   events of that murder.

1            In the words of the defendant police

2     department, she witnessed the defendant in that case,

3     Mr. Anthony Thompson, enter the nightclub with a

4     pistol.  She witnessed him shooting three victims,

5     including the person who died in that particular

6     instant, Mr. O'Neil Robinson.

7            Ms. Asher Glace, the plaintiff here, was

8     immediately taken upon arrival by the Hartford police

9     to police headquarters.  She gave a personal statement

10    in which she -- in which her name, date of birth and

11    date of birth were revealed.  The statement was signed

12    within three hours of her having been taken into

13    custody and she picked Mr. Anthony Thompson out of a

14    photo array.

15           At no point in time we have discovered

16    through our investigations did the city of Hartford

17    police department personnel apprise Ms. Asher Glace of

18    witness protection or as her rights pertained to

19    witness protection.

20           Subsequently, in June of 2007, Ms. Asher

21    Glace was gunned down in a hail of bullets in her

22    driveway by what the state contends was by a

23    conspiracy at least between Anthony Thompson's

24    brother, Earl Thompson, who was at large at the time.

25           Between those two murders, Your Honor,

1    we've discovered that, Number 1, Mr. Anthony Thompson

2    fled the jurisdiction and went to Jamaica in February

3    of 2005.  That's 15 hours he committed the murder at

4    the Cleveland Cafe.

5          He was subsequently taken into custody in

6    Jamaica about three months later and one detective,

7    Jerry Bilbo from the Hartford police, made his way to

8    Jamaica, took Mr. Thompson in custody and brought him

9    back to Hartford, Connecticut, where he was arraigned

10   and basically placed into custody at, I believe,

11   Walker MacDougall -- MacDougall Walker facility.

12         Our investigation revealed that while

13   Mr. Thompson was in custody and housed at Walker

14   MacDougall he had a cellmate by the name of Everton

15   Gardner.  Everton Gardner revealed, through trial

16   testimony, that while he was in custody and in the

17   same cell with Mr. Thompson, that Mr. Thompson

18   revealed to him that all five witnesses in the case

19   pertaining to the Cleveland Cafe matter would be

20   killed prior to his trial, to essentially allow him to

21   walk, if I may use that inartful parlance, on a

22   self-defense claim.

23         Mr. Gardner, so his testimony states,

24   revealed the manner in which Ms. Glace and the other

25   witnesses would be killed, particularly Ms. Glace.  In

1       fact, Mr. Gardner testified that there were four bases

2       upon which Mr. Thompson contemplated Mr. Everton

3       Gardner's testimony was specific to the extent that he

4       even revealed who the murderer was supposed to be,

5       that being Earl Thompson, his brother, who was out and

6       about with the rest of us.

7                   Mr. Gardner, the testimony goes,

8       contacted the Hartford police department, the chief's

9       office to be exact.

10                  Subsequently, two police officers, the

11      chief detective on the case, Jerry Bilbo and one of

12      his colleagues, were dispatched to meet with

13      Mr. Gardner.

14                  I won't really go into what was

15      discussed, but in any event, after they left

16      Mr. Gardner, they contacted.

17          THE COURT:  Could you tell me -- you keep

18      referring to Mr. Gardner's testimony.  Where was

19      this -- where and when was this testimony given.

20          MR. GORDON:  This testimony, Your Honor, was

21      given in 2008 at a probable cause hearing after

22      Ms. Glace was murdered by both brothers.

23          THE COURT:  Okay.

24          MR. GORDON:  After the officers, Jerry Bilbo,

25      and one of his colleagues went to the prison, Your

1    Honor, they subsequently called Ms. Glace's mother,

2    who's a plaintiff in this case, on numerous occasions

3    to inquire if Asher was okay.  On one occasion, so an

4    affidavit will reveal, Ms. Elliott got on the phone

5    with one of the detectives to say, Well, is my

6    daughter's life in danger, because you keep calling

7    here week after week?  To which she will also state

8    that the proposed defendants, Jerry Bilbo and his

9    colleague, replied, Well, this is routine.  We just

10   want to know if you see any strange people hanging and

11   the house or any strange cars outside.  If they were

12   routine they wouldn't be asking these questions.

13            But in addition to that, Your Honor,

14   Mr. Gardner did not get anywhere with the Hartford

15   police.  What did he do?  He then sent a letter to the

16   state attorney's office.

17       THE COURT:  What do you mean he didn't get

18   anywhere with the Hartford police?  I thought you said

19   they came out to meet with him.

20       MR. GORDON:  They came out to meet with him,

21   Your Honor, and I will produce discovery which would

22   show that they basically ridiculed him.  They did not

23   take him seriously at all.  But that flies in the face

24   of their subsequent conduct where they were calling

25   Ms. Glace and her mother to see if they were okay.

1          But in any event, having not received any

2     favorable response from the police, Mr. Gardner then

3     contacted the state attorney's office.  We don't know

4     who in particular he contacted and we need to know,

5     Your Honor.

6          We also learned from our investigations,

7     Your Honor, that Mr. Thompson, while he was in custody

8     at Walker MacDougall, ran into another inmate who he

9     was friendly with on the streets, so to speak.  This

10    other inmate was Mr. Stephen Nelson.  Mr. Nelson

11    testified at Mr. Thompson's trial and in the probable

12    cause hearing against Earl Thompson in 2008.

13         Mr. Nelson testified, Your Honor -- and

14    we have those pieces of evidence -- that in 2005 and

15    2006, he wrote to the state attorney's office on more

16    than one occasion.

17         He also followed up those letters with

18    telephone calls.  This is revealed in the transcripts

19    that were elicited by the defendants, not by me.  No

20    depositions.

21         They, the police, wanted -- and the state

22    prosecutors -- wanted Mr. Nelson, Your Honor, to sign

23    a statement consistent with the information he had

24    passed to them.  He refused.  And he refused on the

25    basis that he feared for his relatives who were still,

1    as he said, on the outside.

2                Now, Mr. Nelson revealed in his testimony

3    in both the probable cause hearing and at Mr. Anthony

4    Thompson's trial for the Cleveland murder, that this

5    fear was very real.  And the fear was real, Your

6    Honor, because he had personal knowledge of Anthony

7    Thompson's brother, who was at large, Mr. Earl

8    Thompson's conduct with respect to matters like these.

9    In fact, he pled the Fifth on, I believe, five

10   occasions because of his alleged direct participation

11   with Earl Thompson on these matters.  So he knew what

12   kind of wrongs these defendants were capable of.

13               Now, Your Honor, in 2008, Mr. Steve

14   Nelson subsequently provided an official statement to

15   the prosecutors.  And the only reason why he gave

16   this, Your Honor, he testified, that because he saw

17   that Earl Thompson -- that's Mr. Anthony Thompson's

18   brother -- was already in custody for the murder of

19   Asher Glace.

20               And how did he know this, he was asked?

21   He stated, Because he saw him in the courthouse on a

22   trip he had made -- well, they had made to the same

23   courthouse.

24               Mr. Nelson, Your Honor, reveals that

25   besides calling the prosecutor's office, he also

1    followed up with letters.  We do not have any copies

2    of these letters, but we have his testimony that he

3    sent letters.  Who he sent these letters to, whether

4    or not he received a response or responses, we do not

5    know.  And we believe that these pieces of information

6    are critical to our prosecution of the claims in this

7    matter.

8            We fast forward now, Your Honor, to 2008,

9    where Mr. Anthony Thompson and Earl Thompson were both

10   arraigned for the murder of Ms. Asher Glace. We find

11   that during the course of Mr. Anthony Thompson's

12   murder trial, the state decided to conduct a

13   bifurcated prosecution, if you will, Your Honor,

14   wherein they were attempting to prove that Anthony

15   Thompson was guilty of the murder at Cleveland Cafe,

16   but they also wanted to show that the chief witness in

17   the case, Asher Glace, our client, was unavailable

18   because Anthony Thompson had conspired with his

19   brother, Earl Thompson, to cause her murder.

20           Now, Mr. Anthony Thompson's appeal, Your

21   Honor, with respect to that conviction occurs tomorrow

22   at 10:00 a.m. before the Connecticut Supreme Court.

23   And I intend to be there.  The only issue in that

24   case, Your Honor, is whether or not the judge erred in

25   allowing Asher Glace's statement to the Hartford

1    police on February 15, 2005 as an exception to the

2    hearsay rule.

3              However, Your Honor, the salience of and

4    relevance of the prosecutor's conduct in this matter

5    has to do with the fact that when Asher Glace -- when

6    the application for the arrest warrant against

7    Mr. Anthony Thompson was sworn out on February 25,

8    2005 by Detective Bilbo and Detective Sheldon -- both

9    proposed new parties -- Asher Glace's name, date of

10   birth and address were placed in the application for

11   the warrant.

12             Now, an easy read, if you will, Your

13   Honor, of the legislative history that accompanies the

14   witness protection statute, 54-82(t), reveals that

15   during the debate that went on by the state

16   legislators with respect to this act, it was suggested

17   that names of witnesses pertaining to serious felonies

18   who were at risk of harm should be redacted, should

19   not be provided at all.  In fact, the legislators,

20   Your Honor, went as far as to say that we want to make

21   this a situation where a Freedom of Information

22   inquiry would not cause anyone to reveal the name or

23   identities of these critical witnesses.

24             I won't go into what else was stated,

25   Your Honor, but clearly, the document that was sworn

1     out by Jerry Bilbo and Detective Sheldon violated not

2     just the actual text of this act, but also the spirit,

3     Your Honor, especially in light of the horrific

4     murders that occurred in Bridgeport in 1998, the Karen

5     Clarke and BJ Brown murders by the Peeler brothers.

6                  Now, Your Honor with what has been done

7     with respect -- I'm sorry -- with respect to

8     discovery, it is very clear that we have learned a

9     great deal and we've learned a great deal about the

10    specific conduct of the named defendants in this case

11    and the proposed defendants in this case.

12                 We have learned that the application for

13    the arrest warrant for Mr. Thompson, Your Honor, was

14    basically signed off on by a prosecutor named, I

15    believe, John Fahey.  His duties, after retired, was

16    subsequently taken over by prosecutors Richard Rubino

17    and David Zagaya.  David Zagaya, in particular, Your

18    Honor, is a senior assistant state's attorney.

19                 During the course of Mr. Anthony

20    Thompson's trial, Mr. Zagaya, while directly

21    questioning inmate Steve Nelson, asked him, Who did

22    you contact at the state attorney's office?  To which

23    Mr. Nelson replied, You.  How do you know me, he was

24    asked?  To which he replied, I know you because we had

25    prior dealings.

1          On cross-examination by Mr. Anthony

2    Thompson's attorney, Walter Hussey, he stated I was a

3    victim in a prior case and that's how I knew David

4    Zagaya.

5          At no point in time, Your Honor, not

6    between the murder at Cleveland Cafe on February 15,

7    2005 and February 25, 2005, when the application for

8    the warrant was sworn out by Jerry Bilbo and Michael

9    Sheldon, and was signed off by John Fahey, prosecutor,

10   did Jerry Bilbo, Michael Sheldon or any personnel from

11   the police department inform Ms. Asher Glace of her

12   rights with respect to the Connecticut General Statute

13   that provides for witness protection.

14          At some point in time the state

15   prosecutors would have assumed jurisdiction over the

16   matter and their duties as prosecutors were to inform

17   the witnesses that they were entitled to witness

18   protection.  David Zagaya did not do it, John Fahey

19   didn't do it, and Richard Rubino didn't do it.  None

20   of the defendants, proposed defendants -- I believe

21   John Kelly is his name -- nor his supervisor informed

22   any of the witnesses in this case.  Mr. Morano, the

23   chief state prosecutor, didn't do it, and chief state

24   attorney, Kevin Kane, did not do it.

25          We find also, Your Honor, very glaringly

1      that during the course of this prosecution, we found

2      that the defense attorney for Anthony Thompson was

3      Walter Hussey.  Walter Hussey took over the case from

4      Mr. Freeman, senior, very soon after --

5              THE COURT:  And when was the actual trial?

6              MR. GORDON:  The trial was in April 2008 and

7      carried to June 2008, Your Honor.

8              THE COURT:  When was the probable cause

9      hearing then?

10             MR. GORDON:  The probable cause hearing took

11     place later on in 2008, Your Honor.  I believe in

12     August, if my memory serves me correctly.

13             THE COURT:  After the trial?

14             MR. GORDON:  Yes, Your Honor.  Yes.  Asher

15     Glace was killed, Your Honor, on June --

16             THE COURT:  You're talking about the trial for

17     the Cleveland Cafe murder?

18             MR. GORDON:  Yes, Your Honor.

19             THE COURT:  And now you're talking about

20     probable cause with respect to Ms. Glace?

21             MR. GORDON:  Yes, Your Honor.

22             THE COURT:  Okay.  So when you mentioned the

23     probable cause hearing, you're talking about the

24     probable cause hearing with respect to Ms. Glace's

25     murder.

1        MR. GORDON:  Yes, Your Honor.  Absolutely,

2   Your Honor.

3        THE COURT:  All right.

4        MR. GORDON:  Now, Your Honor, with respect to

5   Prosecutor Zagaya, we found through our investigation

6   that Mr. Anthony Thompson was defended by Walter

7   Hussey.  Walter Hussey spent over 90 percent of the

8   time on the case as the defense attorney.

9            Now, Walter Hussey, we found out, also

10  was the attorney of record for Everton Gardner.  So

11  now you have Anthony Thompson and Everton Gardner as

12  cell mates with competing interests.  Mr. Gardner

13  surreptitiously is providing information that Anthony

14  Thompson is about to murder my client, among other

15  witnesses.  At no point in time was this information

16  dealt with in any responsible or ethical way.  To wit:

17  Mr. Hussey certainly should have withdrawn from one of

18  the cases.  He never did.

19            Now, that's just an ancillary issue, Your

20  Honor, that does not pertain directly to our claims

21  here, but I bring this point up, Your Honor, to

22  illustrate the fact that Mr. Zagaya and Mr. Rubino had

23  at least some modicum, some minimal responsibility to

24  reveal this, shall I say, case-jeopardizing conduct.

25  At no point in time did they do so.

1          I bring this up also, Your Honor, to

2     illustrate the fact that my client is now dead and she

3     is dead because, our investigation reveals, that these

4     defendants were only concerned about one thing:  They

5     were not concerned about informing her, even at a

6     minimum, as the statute requires, for her to be

7     reviewed to see if she was at risk of harm.  They,

8     Your Honor, I assert, were only concerned about making

9     notches on their gun belts, to basically record

10    convictions.  They didn't care about my client's life,

11    or the subsequent pain and suffering that would be

12    suffered by her mother, who I believe is making her

13    way here right now.

14          Those are some of the issues that we have

15    basically discovered from our investigations, Your

16    Honor.  And those are basically the bases underlying

17    our third amended complaint to add new parties and new

18    claims.

19          There is some other stuff -- pardon that

20    word, Your Honor -- some other issues which I could

21    bring forth to the Court, but I would like to

22    underscore the fact, urge -- and I do this with some

23    amount of vehemence -- to the extent that almost

24    everything I told you so far, with the possible

25    exception of Mr. Gardner's representation that he was

1    ridiculed by Jerry Bilbo and his colleague, everything

2    is in the public domain and I have it in my

3    possession.

4            THE COURT:  I guess that's what concerns me.

5    I mean, I haven't gotten -- I was handed up an

6    objection by the city of Hartford.  It's sort of

7    short, but I'm looking for the word "statute of

8    limitations," which I'm expecting to have raised.

9            I recall when we were here for the very

10   first conference and I was pressing you for -- I think

11   at that point the premise of the complaint was that

12   the defendants had caused something to be put on the

13   city of Hartford's website.

14           MR. GORDON:  Yes, Your Honor.

15           THE COURT:  And I was asking you how you knew

16   this, how you found this out.  And my recollection is

17   that you said that it was about third-hand -- well,

18   not third-hand, but maybe secondhand hearsay, hearsay

19   once removed, and it didn't appear that you had done

20   any investigation.  And I was very troubled by that.

21   And I mean, I think --

22           MR. GORDON:  May I address that, Your Honor?

23           THE COURT:  No, because I'm talking.

24           MR. GORDON:  All right.

25           THE COURT:  I believe that I encouraged you

1    strongly to go out and figure out who should be named

2    as defendants in the suit.  And that's -- I think we

3    had a discussion about the fact that we had the

4    statute of limitations to be concerned about.  And if

5    you stand there and tell me this was all in the public

6    domain, that's not helpful.

7              I mean, I did see statute of limitations

8    in your objection, Mr. Beamon.

9              I wasn't requiring -- I wanted to catch

10   this early and make sure that we frame the issues, so

11   I wasn't requiring anybody to file oppositions to any

12   of the motions.  I'm going to give you time to -- each

13   side to file a full memorandum and we'll brief them

14   thoroughly.  But I did want to have a conversation

15   about exactly what it is that we're talking about.

16   Mr. Gordon has sort of spelled out where he's coming

17   from, with one exception, which is:  Why are you just

18   now seeking to add these people as defendants if what

19   you're telling me about are things that happened in a

20   trial and a probable cause hearing in 2008 --

21        MR. GORDON:  Your Honor --

22        THE COURT:  -- before the complaint was filed?

23        MR. GORDON:  Your Honor, because I attended

24   the trial on three days in an attempt --

25        THE COURT:  Which trial?

1          MR. GORDON:  The Anthony Thompson trial.

2          THE COURT:  You were at that trial?

3          MR. GORDON:  I went on three days, Your Honor.

4          THE COURT:  Okay.

5          MR. GORDON:  None of those days -- on none of

6     those days did I learn any of the facts that I've just

7     revealed.  Well, I subsequently learned from my

8     investigations that some of the witnesses who

9     testified in that trial revealed some of the

10    information which I've passed on to the Court, Your

11    Honor, but did I not know at the time.

12         THE COURT:  Did your client, Ms. Elliott,

13    attend the trial?

14         MR. GORDON:  I believe she attended a couple

15    of days also, Your Honor.

16         THE COURT:  And you did say that she was

17    called by two of the officers who are sought to be

18    added as defendants?

19         MR. GORDON:  Yes, Your Honor.

20         THE COURT:  That was back in what year?

21         MR. GORDON:  Your Honor, according to

22    Ms. Elliott -- and she will provide an affidavit to

23    this extent -- that she was called by Jerry Bilbo, I

24    believe, during 2005 and 2006.  These dates precede

25    the murder of her daughter in 2007.

1    With respect to the statute of limitation

2    issue, Your Honor, I believe the defendants, at least

3    the state, cite a case by the name of --

4         THE COURT:  I don't really want to argue that.

5    I want to make sure everybody has a clear

6    understanding of what the situation is and then you

7    all can brief it.

8    As to the city defendants who are

9    currently in the case, you were given a copy of the

10   motion for summary judgment --

11        MR. GORDON:  Yes, Your Honor.

12        THE COURT:  -- that the city defendants would

13   file.

14   Have you completed the discovery that you

15   want to complete so that that motion can be filed and

16   adjudicated?

17        MR. GORDON:  No, Your Honor.

18        THE COURT:  What more do you need to do?

19        MR. GORDON:  Well, Your Honor, I have not been

20   able to depose Chief Roberts or anyone connected with

21   the Monell claim to the extent that I've sent out some

22   subpoenas, Your Honor, and these subpoenas --

23   basically, none of them -- I've made production

24   requests and --

25        THE COURT:  When did you do that?

1          MR. GORDON:  I did that in late October and

2     early November, Your Honor.  And they were

3     subsequently revised and sent in late December with an

4     eye to completing discovery by February 28th.

5          THE COURT:  Let me ask:  Where do we stand on

6     the production requests for the city defendants?

7          MR. BEAMON:  Your Honor, with regards to Chief

8     Roberts, what's the date of the request, may I ask

9     through the Court?

10         THE COURT:  I think he said in the fall.

11         MR. GORDON:  Late October, Your Honor.  And

12    they were subsequently revised, some of them, in

13    November and December.  All the --

14         THE COURT:  Let me just ask --

15         MR. GORDON:  Sure.

16         MR. BEAMON:  Your Honor, I don't recall

17    receiving those.  I certainly can check the file

18    again.

19         THE COURT:  Can you do that and when you meet

20    with Mr. Hawkins again --

21         MR. BEAMON:  Sure.

22         THE COURT:  What other component of discovery

23    is outstanding with respect to the motion for summary

24    judgment with respect to the city defendants?

25         MR. GORDON:  Your Honor, in particular, we

1    made a number of production requests on the city and

2    these were made --

3              THE COURT:  We've just talked about that.

4    We've decided how we're going to resolve that.  That's

5    going to get wrapped up.

6                   What other kinds of discovery requests

7    were made?

8              MR. GORDON:  That was basically it, Your

9    Honor.

10             THE COURT:  Did you seek to conduct any

11   depositions?

12             MR. GORDON:  Absolutely, Your Honor.

13             THE COURT:  When?

14             MR. GORDON:  Well, the initial notices were

15   for early December.  When that did not happen -- I'm

16   sorry.

17                  In November some time, Your Honor, when

18   that did not happen, they were revised by way of

19   agreement with the defendants for them to have

20   occurred in January.  All those dates have passed.

21             THE COURT:  And who did you notice for

22   depositions?

23             MR. GORDON:  On the city side, Your Honor,

24   Chief Roberts, Chief Harnett.  We were able to depose

25   Chief Harnett.

1          THE COURT:  So he's done?

2          MR. GORDON:  Yes.

3          THE COURT:  Who else for the city?

4          MR. GORDON:  On the city side, Robert Davis,

5      lieutenant for the Hartford police department;

6      Detective Jerry Bilbo, who's retired; Detective Robert

7      Davis, who's also retired.

8          THE COURT:  That's different from Lieutenant

9      Davis?

10         MR. GORDON:  Yes, Your Honor.

11         THE COURT:  What's Mr. Davis' first name?

12         MR. GORDON:  Robert also, Your Honor.

13         THE COURT:  Okay.

14         MR. GORDON:  And there is one John Volute

15     (phonetic) from the Farmington police department, then

16     Michael Sheldon from the HPD, and Michael Lopez was

17     also a police officer.

18              On the state side --

19         THE COURT:  I don't want to talk about the

20     state side now.  All of these people that you're

21     seeking to depose are people have that information

22     with respect to the claims against Chief Roberts and

23     your Monell claim?

24         MR. GORDON:  Your Honor, based on our

25     investigation, yes.

1           THE COURT:  Okay.  Let me ask Mr. Beamon.

2           MR. BEAMON:  I want to point out also --

3           THE COURT:  I'd like to know when we're going

4      to get the depositions done?

5           MR. BEAMON:  We did receive a range of

6      subpoenas, but we never got notice of the depositions

7      with the subpoenas.  So I think we're in the process

8      of working that out.

9                We did take Chief Harnett's deposition in

10     New York.  He's no longer with the city of Hartford.

11               Obviously, if the plaintiff would send us

12     the proper documentation to depose Chief Roberts,

13     that's fine.  That's one of their claims.  No problem.

14               I do want to point out that we did

15     provide the plaintiff with all of the city website

16     printouts regarding this case, which directly goes to

17     what the plaintiff is claiming.  And the first time

18     that Ms. Glace's name is mentioned is after she's

19     murdered.  From 2005 and 2006, there's talk about

20     Thompson and going to Jamaica to go get him.  Nothing

21     regarding her being a key witness.  And if you look at

22     the police's website, none of that information is ever

23     there as to who a chief witness is in an

24     investigation.

25               With our motion for summary judgment we

1    provided an affidavit from Chief Roberts that says he

2    did not put her name on the website.

3         I do notice from the third amended

4    complaint that Chief Roberts is now out of the case

5    and now Harnett is substituted.  It sounds to me

6    that's a dead end.  So I just wanted to point that

7    out.

8         Lastly, a lot of these individuals, Your

9    Honor, they have no knowledge obviously of what the

10   chief did, but they have no knowledge of the

11   underlying investigation.  But Chief Roberts obviously

12   is a witness who they certainly can depose, but they

13   are going to get the same answer they got in his

14   affidavit.

15        THE COURT:  Can we get the -- you're saying

16   you haven't gotten any notices of deposition?

17        MR. BEAMON:  We have.  I think the latest

18   notices were in January that were properly done.  I

19   think what we were doing is, in discussions with

20   Attorney Hawkins, we would try to take care of Chief

21   Harnett, because he was leaving New York for a while

22   and coming back again in February, and then we would

23   see which other depositions needed to be done.

24        THE COURT:  Can we get the rest of the

25   depositions done in February?

```
1          MR. BEAMON:  I think so, Your Honor.
2     Obviously, Chief Roberts --
3          THE COURT:  Pick out dates for those.  I'm
4     talking about the city defendants.
5          MR. O'NEILL:  I would like to be heard on that
6     at the appropriate time, Your Honor.
7          THE COURT:  Sure.
8          MR. O'NEILL:  That addresses my motion, Your
9     Honor.
10         THE COURT:  Your motion goes to the city
11    defendants also?
12         MR. O'NEILL:  It does, Your Honor.
13         THE COURT:  Why don't you weigh in now.
14         MR. O'NEILL:  Yes, Your Honor.  Thank you,
15    Your Honor.
16              The protective order, of course,
17    addresses concerns of the prosecutors who still have
18    pending criminal cases against the Thompson brothers,
19    Anthony and Earl Thompson.  The individuals who I've
20    identified in the protective order are expected to be
21    witnesses in that trial, and their testimony will be
22    used to obtain a prosecution against the individuals
23    who are charged with murdering Ms. Glace.
24         THE COURT:  When is that trial going on?
25         MR. O'NEILL:  It's not scheduled, Your Honor.
```

1    It's currently on the docket of the Hartford Superior

2    Court awaiting trial assignment.  I would say, based

3    on experience, and not from any conversation that I

4    had with any of the judges, they are waiting to see

5    what happens with the pending appeal.  Mr. Anthony

6    Thompson received a substantial sentence, and if his

7    conviction of the underlying murder is affirmed, I

8    would suspect that it would make him more inclined to

9    plead out.

10          But certainly as of this time, the cases

11   are active and sitting on the trial docket of the

12   Hartford Superior Court awaiting assignment.

13          THE COURT:  And is Roberts going to be a

14   witness in that case?

15          MR. O'NEILL:  What we -- in our motion, Your

16   Honor, what we've objected to is the deposition of

17   Chief Roberts only to the extent that plaintiff's

18   counsel seeks to elicit any testimony from him

19   regarding his knowledge of the facts and circumstances

20   surrounding the murder.  If he's being asked about

21   what was posted on the website or what was disclosed

22   publicly, we have no objections to that deposition

23   proceeding.  I think that that's what we've always

24   expected would be the focus of the testimony elicited

25   in discovery in this case anyway, so we have no

1    objection to that proceeding.

2         THE COURT:  Okay.  And for the other folks who

3    were on the list that I was given --

4         MR. O'NEILL:  Yes, Your Honor.  And as we've

5    identified --

6         THE COURT:  Are they all going to be witnesses

7    in the murder trial?

8         MR. O'NEILL:  They are expected to be, yes,

9    Your Honor.  In fact, the bulk of them, the two

10   inmates, as plaintiff's counsel has articulated for

11   you, they've described communications that they've had

12   and they'll be testifying.  And then the rest of the

13   folks, the city defendants and the Hartford -- there's

14   one Hartford -- one Farmington police officer, those

15   are all the folks either in the direct criminal case

16   or in the cold case squad that did the underlying

17   criminal investigation that led that the arrest of

18   Anthony and Earl Thompson.

19              I would note on the state side, Your

20   Honor, one individual who we haven't objected to is

21   the person at the chief state's attorney's office

22   who's responsible for overseeing witness protection

23   services.  That seems like a very obvious deposition

24   to take.  It's one that would be outside of the

25   context of the underlying criminal cases, but it's one

1    that certainly would advance plaintiff's discovery

2    needs with respect to the claims against the state and

3    the interrelation between the Hartford state's

4    attorney office, the chief state's attorney office and

5    any local law enforcement agency.

6         THE COURT:  What's the name -- is that person

7    named?

8         MR. O'NEILL:  He's identified a woman by the

9    name of Tracy Kelly.  I would accept a deposition

10   notice that was served on the chief state's attorney's

11   office itself to allow them to designate the person

12   most appropriate.  I think that's a more efficient way

13   to do it.  I would hate to have plaintiff's counsel

14   come in and find that Ms. Kelly doesn't know

15   everything.  So I would suggest we proceed in that

16   fashion.

17        THE COURT:  Okay.  What's the scope of the

18   deposition you want to take with respect to the former

19   Chief Roberts, and then tell me how the depositions

20   you want to take of these other people relates to

21   what's in the current complaint.

22        MR. GORDON:  Yes, Your Honor.

23             Your Honor, just in general, I think the

24   objections as noted by the defendants reveal a red

25   herring.

1          THE COURT:  I don't want to hear that.  I want

2     to hear a precise answer to the question I asked.

3          MR. GORDON:  All right.  With respect to Chief

4     Roberts, Your Honor, we would like to know what his

5     conduct were with respect to publication of Asher

6     Glace's name on the city of Hartford website or any

7     similar type publication to the public.

8               And in addition to Chief Roberts, Your

9     Honor --

10         THE COURT:  It sounds as though we don't have

11    any disagreement there in terms of what the proper

12    scope of the deposition would be.

13         MR. O'NEILL:  Based on my conversations with

14    the prosecutors, Your Honor, we have no objection to

15    any inquiry at all into that area.

16         MR. BEAMON:  No, Your Honor.

17         THE COURT:  So that can get done.

18              And for the rest, Mr. Gordon?

19         MR. GORDON:  An ancillary witness, if you

20    will, Your Honor, is I believe David House, from

21    Channel 3, who we learned, but we're not 100 percent

22    sure about, some information that was revealed to him

23    by Chief Roberts, or vice versa, with respect to the

24    website information, Your Honor.

25         MR. O'NEILL:  We have no objection to that

1      deposition, Your Honor.

2              THE COURT:  Okay.  So House's deposition will

3      be done.

4                  And we also have the person from the

5      state for the witness protection program.  That can be

6      done.

7              MR. O'NEILL:  Yes, Your Honor.

8              THE COURT:  Okay.  And then the other folks

9      that you named?

10             MR. GORDON:  Jerry Bilbo, Your Honor, is

11     retired, a retired police officer.  One of the Robert

12     Davis is also retired.

13             THE COURT:  Let me understand.  He's somebody

14     you want to add as a defendant, right?  There are, I

15     think, at least five people you want to add as a

16     defendant?

17             MR. GORDON:  Yes, Your Honor.

18             THE COURT:  Okay.  Are you looking -- my

19     question is:  For these folks, what subject matter are

20     you seeking to question them about that relates to

21     what's in the current complaint?  I'm trying to decide

22     whether I need to rule on the motion to amend the

23     complaint before we talk about the depositions or not.

24             MR. GORDON:  Okay.  With respect to the

25     complaint which is currently in place, Your Honor,

1    which has the four surviving claims, Jerry Bilbo was
2    the chief detective on the Cleveland Cafe matter.
3    Basically, he could shed some light on the website
4    issue and also on Ms. Glace's name being placed in the
5    warrant application and in the personal statement; her
6    name, her address and other particulars, Your Honor.
7         THE COURT:  When you say -- let's take those
8    separately.
9         MR. GORDON:  Yes.
10        THE COURT:  In terms of the website, what
11   leads you to believe he'd have information about the
12   website?
13        MR. GORDON:  Well, basically, Your Honor, we
14   learned through our investigation that people being
15   sought or people of interest being sought for having
16   committed crimes, Your Honor, the information would be
17   relayed from the actual detectives on the case to a
18   person -- I believe her name is Ms. Mulroy -- who
19   would then actually enter the information on the
20   website.
21        THE COURT:  Mr. Beamon told me a short while
22   ago that all of the information, historical record of
23   what's been on the website has been turned over and
24   that there was no information about the decedent on
25   the website until after she was a murder victim

1    herself.

2              Do you disagree with that?

3         MR. GORDON:  Well, Your Honor, I can't take

4    the city at its word.

5         THE COURT:  How are you going to find out from

6    this detective -- your contention is that you're not

7    accepting the city's information as to what was on the

8    website?

9         MR. GORDON:  No.  Just this representation,

10   Your Honor, that they've turned over everything.

11        THE COURT:  Well, is Detective Bilbo somebody

12   who has knowledge of what's on the website?

13        MR. GORDON:  Well, Your Honor, my

14   investigation reveals that sometimes this information

15   is forwarded by the detective, the chief detective on

16   the case, Your Honor.  And the chief detective on the

17   Cleveland Cafe murder was Detective Bilbo and his

18   partner, Michael Sheldon.

19        THE COURT:  But in order to support your case,

20   at least as I remember the original contention, don't

21   you have to show that the information wound up on the

22   website?

23        MR. GORDON:  Absolutely, Your Honor.

24        THE COURT:  So let's talk about how can

25   Bilbo -- Bilbo can tell you, I may have told 10

1    different people in the department this information.

2    But if it didn't wind up on the website, how is it

3    going to be something that supports your claim?

4        MR. GORDON:  Well, Your Honor, I'm basically

5    placed in the untenable position of having to rely on

6    the --

7        THE COURT:  My question is:  How does Bilbo

8    get connected to whether something appeared on the

9    website or not?

10       MR. GORDON:  Well, I don't know, Your Honor.

11       THE COURT:  Okay.  Then you can't depose him.

12       MR. GORDON:  You're saying with respect to the

13   website?

14       THE COURT:  Well, you're not going to depose

15   him with respect to your third amended complaint until

16   there is one.

17       MR. GORDON:  Okay, Your Honor.

18       THE COURT:  Mr. Smith, what's your role in

19   this?

20       MR. SMITH:  Complementary attorney.  I worked

21   with him on the matter.  I have not yet filed

22   appearance.

23       THE COURT:  Okay.  Thank you.

24           We'll get the three depositions that we

25   talked about done.  Let's get a briefing on the motion

1    for leave to amend the complaint.

2              I have to tell you, Mr. Gordon, I hope

3    you have done some research on this because I expect

4    that it will be -- your motion will be hotly

5    contested.

6         MR. GORDON:  I'm sure, Your Honor.

7         THE COURT:  And you'll have to explain why

8    these people are just being proposed as defendants in

9    this case under the circumstances.

10             Let's get these three depositions done in

11   February.  That's -- we have Chief Roberts, House, and

12   then the person who can talk about the state witness

13   protection program.

14        MR. O'NEILL:  Yes, Your Honor.

15        THE COURT:  At least we'll make some progress.

16   I'll decide what's going on with the complaint and

17   then I'll know exactly what we're dealing with.  I

18   have concerns, but I can't prejudge it because I don't

19   know what Mr. Gordon is going to come up with.  I

20   think he has an idea of what concerns there will be,

21   and I think the defendants now know -- I think all --

22   well, we have both state defendants and city

23   defendants he's seeking to add?

24        MR. O'NEILL:  Yes, Your Honor.

25        THE COURT:  So the defendants sort of know

1    what the background is, so hopefully we can have an

2    efficient and comprehensive briefing on the motion for

3    leave to amend the complaint.

4              Yes, Mr. Gordon?

5         MR. GORDON:  I basically put in for the last

6    two motions for an adjournment.  I think one may be

7    appropriate here, Your Honor, only to the extent that

8    we're already into February and the deadline as it

9    stands right now for summary judgment, if my memory

10   serves me correctly, is February 28th.  At the last

11   status conference I asked both defendants, or at least

12   both defendants' attorneys, if they would put in for

13   an adjournment, given the problems we're encountering.

14        THE COURT:  What you should do is get -- let's

15   get the motion for leave to amend the complaint

16   briefed quickly, get your opposition in to the motion

17   to quash the protective order, I'll see how things

18   look and I'll make sure we have a fair schedule in

19   place.

20        MR. GORDON:  Thank you, Your Honor.

21        MR. O'NEILL:  Is it Your Honor's intention to

22   set some dates or should we just keep the dates that

23   are in place under the rules for responses?

24        THE COURT:  You will be required to file

25   oppositions no later than the deadlines required by

1    the rules.  If you can get them in earlier, that will

2    be good, but I know everybody has other things that

3    they are working on, as do I.

4            MR. O'NEILL:  Thank you, Your Honor.

5            THE COURT:  All right.  Thank you.

6                (Recess followed at 11:07 AM)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2


3       SANDRA ELLIOTT, ET AL V. CITY OF HARTFORD, ET AL

4                      3:09CV00948(AWT)

5


6


7                 I, Corinna F. Thompson, RPR, Official

8      Court Reporter for the United States District Court

9      for the District of Connecticut, do hereby certify

10     that the foregoing pages, pages 1-40, are a true and

11     accurate transcription of my shorthand notes taken in

12     the aforementioned matter on February 2, 2012, to the

13     best of my skill and ability.

14


15


16


17

                    /s/_____
18
                      CORINNA F. THOMPSON, RPR
19                     Official Court Reporter
                      450 Main Street, Room #225
20                    Hartford, Connecticut 06103
                         (860) 547-0580
21


22


23


24


25