# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT



FILED

2012 FEB 24  P 4: 54

US DISTRICT COURT
HARTFORD CT

| | |
|---|---|
| **Sandra Elliott, individually and as the Administratrix of the Estate of Asher Tamara Glace** )<br>)<br>)<br>)<br>) | |
| **Plaintiffs** ) | **CIVIL NO.:  309-cv-00948 (AWT)** |
| )<br>**vs.** )<br>) | |
| **CITY OF HARTFORD, DARYL ROBERTS, Individually and in his official capacity as Chief of Police of the City of Hartford Police Department; CHRISTOPHER MORANO Individually and in his official capacity as Chief State's Attorney of the State of Connecticut; and KEVIN KANE, individually and in his official capacity as Chief State's Attorney of the State of Connecticut,** )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **MOTION TO TAKE LEAVE TO FILE AMENDED COMPLAINT**<br><br>**February 24, 2012** |
| **Defendants.** )<br>) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE TO FILE A THIRD AMENDED COMPLAINT

**COMES NOW** the Plaintiffs Sandra Elliot, individually and as the Administratrix of the estate of Asher Tamara Glace by and through their undersigned counsel moves, and respectfully submit this memorandum of law in support of their motion for leave to file a third amended complaint.  Plaintiffs seek amendment to add parties with respect to certain claims pursuant to Federal Rules of Civil Procedure 15.

## RELEVANT HISTORY AND OVERVIEW

On June 16, 2007, Asher Tamara Glace was ambushed and violently murdered in her driveway by Anthony Thompsons and his brother Earl Thompson. **[EXHIBIT #17 Judge Elliot Solomon's decision on the state's motion to admit Asher Glace's voluntary statement because Anthony Thompson made her unavailable for his trial. Decided 5/28/2008, P21, L5-20, P22-24]** Ms. Glace had witnessed the murder of O'Neil Robinson (Walla) on February 14, 2005 at the Cleveland Café. On the night of the Cleveland Café killing, O'Neil Robinson along with two other persons was shot by Antony Thompson at the Cleveland Café, a nightclub which is located in North Hartford. **[EXHIBIT #1 Asher Glace's Voluntary Statement to HPD 2/14/2005]** Mr. Robinson was shot in the head at close range by Anthony Thompson and he succumbed to his injury. The other two victims Barrington Delisser and Ranata Fair survived their injuries, after they were treated at two local Hartford Hospitals. Approximately fifteen hours after the murder of Mr. Robinson, Anthony Thompson fled to Jamaica where he was apprehended three months later and extradited to Connecticut to stand trial.

On the night Mr. Robinson was murdered by Anthony Thompson, Plaintiff Asher Glace was standing about eight feet from Anthony Thompson when he used a pistol to open fire on the three victims. **[EXHIBIT #1 Asher Glace's Voluntary Statement to HPD 2/14/2005]** After the victims fell inside the club, the Hartford Police Department (hereinafter HPD) was summoned to the scene, and they immediately began garnering

2

witnesses and securing the crime scene. Plaintiff Asher Glace was identified as, or identified herself as a witness to the shootings. Immediately thereafter, Ms. Glace was taken into custody by HPD and transported to its' headquarters in Hartford and interrogated as to the events of the shooting at the Cleveland café. Ms. Glace provide what the HPD termed a "voluntary statement" between 3:30 a.m. and 5:15 a.m. to HPD Detectives Michael Sheldon, and Jerry Bilbo; **both Detectives also acted as witnesses to the "voluntary statement Ms. Glace signed which also depicted her name, address, and date of birth which they knew or should have known would have been provided to the defendant Anthony Thompson." [EXHIBIT #1 Asher Glace's Voluntary Statement to HPD 2/14/2005] [Emphasis added]**

Neither Detective Bilbo nor Detective Sheldon conducted a review of Ms. Glace's risk of harm as a witness, nor did they inform Ms. Glace about her rights as a witness to a serious felony in accordance with state law.

In the voluntary statement Ms. Glace recounted that while she was at the Cleveland Café, "two guys began having words one [sic] of them she knew as Marcel, the other person she did not know at the time but he was later identified as Semmy." **[EXHIBIT #1 Asher Glace's Voluntary Statement to HPD 2/14/2005]** Semmy was identified as an associate of Anthony Thompson, and Marcel was a friend of O'Neil Robinson, the murder victim. At some point, Semmy stepped on Marcel's foot twice and a fight ensued between Mr. Robinson and Anthony Thompson; **[EXHIBIT #1 Asher Glace's Voluntary Statement to HPD 2/14/2005]** other friends or associates of Marcel

3

and Mr. Robinson allegedly joined the fight and at some point, a man identified as Clayton Leroy Anderson-"Hollywood" stabbed Anthony Thompson in his mouth with a knife. **[EXHIBIT # 15 Paulette Shelton's Testimony at Anthony Thompson's trial 6/4/2008, P18, L17-22]**

Mr. Anderson was later shot to death on Wednesday August 4, 2005 on Windsor Street in Hartford, and his death is unsolved at this writing. **[EXHIBIT # 2 Clayton Anderson-Hollywood Murder Notice from HPD, 8/4/2005]**

After Anthony Thompson was stabbed in the mouth, he ran to his car which was parked outside the Cleveland Café; when he got to the car, he asked another occupant of the car to "hand him the machine, after he had removed the license plate from the vehicle and placed it in the car's trunk;" Anthony Thompson then ran back to the nightclub, with a gun in hand. **[EXHIBIT # 3 James Castellani, trial testimony on 6/4/2008, P.53-55]**

Ms. Glace stated in her voluntary statement that "she saw Anthony Thompson shooting the gun and after he fired the shots he ran outside with Semmy and another black male who was standing in the doorway, at the time of the shooting." **[EXHIBIT # 1 Asher Glace's Voluntary Statement to HPD 2/14/2005]** She then noticed "Walla was shot down on the floor and he had blood coming out of his mouth and nose. Marcel's brother was also shot and she noticed a female who had also been shot." **[EXHIBIT # 1 Asher Glace's Voluntary Statement to HPD 2/14/2005]**

4

While at HPD, Ms. Glace was showed a photo array of eight black males and she "identified Anthony Thompson as the person who had shot the victims inside the Cleveland Café; she also disclosed that she had known Anthony Thompson for two and one half years." **[EXHIBIT # 1 Asher Glace's Voluntary Statement to HPD 2/14/2005]**

"Ms. Glace was the only witness who provided a voluntary written statement, and was the contemporaneous with respect to the events at the Cleveland Café, which was testament to the reliability of her statement, especially given that other witnesses refused to 'come forward.'" **[EXHIBIT # 16, Prosecutor David Zagaja's argument to Judge Solomon to admit Asher Glace's voluntary statement because Thompson had made her "unavailable" 5/16/2008, P70-71]** In the view of HPD Detective Christopher Sullivan (the lead detective on the Asher Glace Murder case.), **Ms. Glace was the "only direct/eye witness to the murder of O'Neil Robinson . . . she was the sole witness whom specifically identified Anthony Thompson as the shooter in the case." [EXHIBIT # 4 Arrest warrant for Earl Thompson by HPD] [Emphasis Added]**

During the ensuing weeks of 2005, after the murder of O'Neil Robinson, HPD Detectives, Jerry Bilbo and Michael Sheldon interviewed six other witnesses, including the two surviving victims, but no one other than Ms. Glace identified Anthony Thompson as the shooter inside the nightclub. All six witnesses subsequently identified Anthony

5

Thompson at trial, only after he and his brother-Earl Thompson were charged with killing Ms. Glace in June 2007.

Around May 11, 2005, HPD Detective Bilbo travelled to Jamaica to collect Anthony Thompson, after he had been taken into custody by Jamaican Law enforcement. Anthony Thompson was extradited back to Connecticut to stand trial for the murder of O'Neil Robinson, and he was held in custody at Walker Correctional Institute (hereinafter Walker) in Suffield, Connecticut. While at Walker, Anthony Thompson became Everton Gardner's cellmate from May 2005 until November 2005. Mr. Gardner testified under oath at a probable cause hearing for Earl Thompson on August 21, 2008 that Anthony Thompson admitted to him that he had shot Mr. Robinson in the Cleveland Café. **[EXHIBIT # 5 Everton Gardner's testimony at Earl Thompson's probable CAUSE Hearing of 8/21/2008]** More significantly, Gardner testified that Anthony Thompson had discussed with him a "hit list" he had compiled with respect to his pending murder trial for Mr. Robinson's death. Mr. Gardner also testified that he called the HPD and he sent letters to the State Attorney's Office in an attempt to alert them to the planned assassination of Ms. Glace. **[EXHIBIT # 5 Everton Gardner's testimony at Earl Thompson's probable cause hearing of 8/21/2008, P-34-38]** Mr. Gardner also stated that he had informed the HPD that Ms. Glace was targeted for death by Anthony Thompson. The HPD subsequently sent Detective Bilbo and another detective to interview him. Mr. Gardner complained that after he informed the detectives that Ms. Glace's murder was imminent, but they spent the time ridiculing him because of his stuttered speech pattern. Mr. Gardner's information to the HPD detectives provided specific information that Ms. Glace's murder would be done by Earl Thompson, and that

after seeing television coverage of Ms. Glace's murder on June 16, 2007, he knew Anthony Thompson was responsible." **[EXHIBIT # 5 Everton Gardner's testimony at Earl Thompson's probable cause Hearing of 8/21/2008, P34, P35, L1-26, P44-45]** Mr. Gardner also testified to the three manner of killing Ms. Glace Anthony Thompson contemplated, but this information fell on deaf ears. **[EXHIBIT # 5 Everton Gardner's testimony at Earl Thompson's probable CAUSE Hearing of 8/21/2008, P35, L1-26]**

One can only imaging, the delight Anthony Thompson must have felt on June 16, 2007, the day after television coverage had reported that Asher Glace had died in her driveway, and his knowing that the chief witness as identified by the HPD and the State's Attorneys Office against him had been slaughtered by his brother. He must have felt his chances of self defense with respect to the Cleveland Café murder had significantly increased. Alternately, one can only imagine the consternation the State Attorney's Office and the HPD must have felt knowing they aided in Ms. Glace's ambush killing as a result of her name being published as the key witness against Anthony Thompson.

At no point did either detective forward the information Mr. Gardner passed to them pertaining to the imminent assassination of Ms, Glace by Anthony Thompson to the State Attorneys' Office for review of her risk of harm; neither was this information passed to Ms. Elliot so she could protect her daughter by sending her to her father in Orlando, or to St. Lucia, as Shalom's parents had done. **[EXHIBIT # 6 Affidavit of Sandra Elliott, 2/20/2012]** Neither the prosecutors from the State Attorneys' Office or

the HPD detectives conduct with respect to protecting Ms. Glace comported with state
law.

At no point did either detective or prosecutors from The States' Attorneys' Office
examine any of Anthony Thompson's hundreds of telephone calls to the outside to glean
information related to the imminent death of Ms. Glace consistent with Mr. Gardner's
warnings, for almost three years.  Detective Bilbo for his part called Asher Glace on at
least three occasions in 2005 at her home which coincided with his visit to Everton
Gardner at Walker.  **[EXHIBIT # 6 Affidavit of Sandra Elliott, 2/20/2012]**   At one
point, and out of concern for the safety of her daughter, Ms. Elliot took the telephone
from her daughter during one of Detective Bilbo's calls and asked him "if she needed to
send her daughter away from Hartford because she was in danger?"  Detective Bilbo
replied "no, he just wanted to know if they had seen any strange cars or persons hanging
around her home."  **[EXHIBIT # 6 Affidavit of Sandra Elliott, 2/20/2012]**

Only after Ms. Glace was murdered in her driveway on June 16, 2007, did the
State Attorneys' Office finally sought and obtained Anthony Thompson's telephone calls
to the outside.  At Thompson's subsequent trial for the murder of O'Neil Robinson, the
State of Connecticut presented translations (because the calls were spoken in Patois, the
Jamaican Dialect) of four specific telephone conversations between Anthony Thompson
and his brother Earl Thompson, among other unidentified persons.  At trial, the state
placed these telephone calls before the trial judge as evidence of consciousness of guilt-
proof that the Thompson brothers had planned Ms. Glace's murder on Walker's recorded

8

line, just as inmates Gardner and Steve Nelson had previously warned law enforcement personnel. Three of the conversations occurred close to the time Everton Gardner was visited by detective Jerry Bilbo and his colleague: July 16, 2005, **[EXHIBIT # 7 Anthony Thompson's telephone call to the outside]**   July 19, 2005,   **[EXHIBIT # 7 Anthony Thompson's telephone call to the outside]**   and July 23, 2005.   **[EXHIBIT # 7 Anthony Thompson's telephone call to the outside]**   The fourth related telephone call occurred on June 2, 2007, just two weeks prior to Ms. Glace's ambush murder, and two months after Earl Thompson had finally, and for no good reason been approved to visit his brother Anthony Thompson at Walker.   **[EXHIBIT # 8 Anthony Thompson's telephone call to the outside]**


Another inmate, Stephen Nelson also testified independent of Everton Gardner on April 23, 2008 that "he met Anthony Thompson at Walker, having previously known him from the streets." **[Exhibit # 9, Steven Nelson's Testimony on 4/23/2008, P75-76]** He also testified that while he was at Walker, Anthony Thompson admitted to him that he was responsible for the murder at the Cleveland café on February 14, 2005. **[Exhibit # 9, Steven Nelson's Testimony on 4/23/2008,  P 29-30, Exhibit # 11, 8/21/2008, P76-77]** Mr. Nelson provided specific information that Anthony Thompson had discussed by name (including Ms. Asher Glace) persons he identified as witnesses against him in his upcoming trial, and that his brother earl would kill them.   **[Exhibit # 9, Steven Nelson's Testimony on 4/23/2008,  P31-32, Exhibit #11, 8/21/2008, P77-78]** Nelson corroborated Everton Gardner's statements to the HPD Detectives Bilbo and his colleague from 2005 about the fact that Ms. Glace and was targeted for death by Anthony

Thompson (before she was killed). Mr. Nelson further testified that he had

communicated this information to the Hartford Police Department and specifically to

State Attorney, David Zagaja, who he knew from another criminal case. **[Exhibit # 9,**

**Steven Nelson's Testimony on 4/23/2008, P32-35, Exhibit #11, 8/21/2008, P79-81]** and

**[Exhibit #10, Steven Nelson's Testimony on 4/24/2008, P41, L18-27, P58-59]** <u>Nelson</u>

<u>also stated on more than one occasion at trial that Ms. Glace was still alive when he</u>

<u>met several times with HPD Detectives and the State Attorneys' Office and</u>

<u>informed them that Anthony Thompson had targeted Ms. Glace for death</u>, **and that**

**he had shot O'Neil Robinson. [Exhibit # 10, Steven Nelson's Testimony on**

**4/23/2008, P34, L4-27, P43, 44, 45] [Emphasis added]**


On June 9 2008, at Anthony Thompson's trial, Ms. Christlynn Semmelrock from

the State of Connecticut Security Division Intel Unit testified that Anthony Thompson

and Stephen Nelson were inmates at Walker Correctional Institute at the same time, and

had used the facility's telephone around the same time as Nelson had testified truthfully.

**[Exhibit # 12, Christlynn Semmelrock's trial testimony on 4/23/2008, P18-21] and**

**[Exhibit # 13, Visitation Denial for earl Thompson]** Between May 18, 2005 and April

2007, Earl Thompson twice attempted to gain private visits with his brother Anthony

while he was incarcerated at Walker. Both applications that were submitted by Earl

Thompson were denied, but the application was mistakenly approved in April 2007.

**[Exhibit # 12, Christlynn Semmelrock's trial testimony on 4/23/2008]** Just prior to

gaining approval to visit his brother at Walker, Earl Thompson had approached HPD

Detective Richard Salkeld and "requested to inform on local Hartford drug dealers in

exchange for a private visit with his brother Anthony Thompson" who by this had told two other inmates that he intended to kill Asher Glace so she could not testify against him. **[Exhibit # 14, HPD Detective Richard Salkeld] [Emphasis Added]**

On February 23, 2005, approximately two weeks after Anthony Thompson had fled to Jamaica, HPD Detectives Jerry Bilbo and Michael Sheldon swore out an Arrest Warrant Application for Anthony Thompson which was "signed off" by States Attorney John Fahey. **[Exhibit # 4, Arrest warrant for Anthony Thompson]** In this warrant application, both the HPD detectives and State's Attorney John Fahey provided Anthony Thompson a "second bite of the apple" by publishing Asher Glace's name in a public document. All three men were deliberately indifferent to the likely danger Ms. Glace would face from Anthony Thompson and his confederates, especially by their individual and joint failure to inform Asher Glace about her rights as a witness to a serious felony pursuant to state law. **Neither party conducted the mandatory review that the law required; and both parties affirmatively sanctioned publication of Ms. Glace's name, and date of birth in the Arrest Warrant Application they knew would have been provided to Anthony Thompson.** An easy reading of the Arrest Warrant Application indicates that Asher Glace was the only person who witness the fight between Anthony Thompson and O'Neil Robinson; she was the only witness who placed the gun in Anthony Thompson's hands inside the nightclub; she was the only witness who saw Anthony Thompson discharge the weapon and see the victims fall; and she was the only witness who provided a signed written statement contemporaneously with the events at the Cleveland Café on February 14, 2005; **[Exhibit # 4, Arrest warrant for**

**Earl Thompson]**   As HPD Detective Christopher Sullivan stated in his Arrest
Application for Earl Thompson in 2008: Ms. Glace was the "only direct/eye witness to
the murder of O'Neil Robinson . . . she was the sole witness whom specifically identified
Anthony Thompson as the shooter in the case." **[Exhibit # 4, Arrest warrant for Earl
Thompson]   [Emphasis added]**


Despite placing Ms. Glace on this tragically lofty pedestal, none of the Detectives
assigned to the investigation into the Cleveland café murder, nor the subsequent
prosecutors who were assigned to prosecute the case conducted a cursory review into Ms.
Glace's risk of harm to a serious felony as Connecticut law required.


At a status conference held before the Honorable Alvin Thompson, U.S.D.J. on
May 17, 2010 the court inquired about discovery. At that time the Plaintiffs informed the
court that "they had received Ms. Glace autopsy, and some damage related documents."
When the same inquiry was put to the defendants, they stated on the record that
**"documents were not yet available for discovery because of the pending criminal
cases**." At a subsequent status conference on June 3, 2010 which was presided over by
Para-judicial Officer James Hawkins the Defendants again stated that **"the prosecution
will only provide information when the prosecution of Anthony Thompson and Earl
Thompson are completed." [Emphasis added]**

On June 16, 2010 at 4:09 p.m. Plaintiffs filed their second amended complaint where Defendants Daryl Roberts, Chief of Police for The City of Hartford, Christopher Morano, and Kevin Kane as State of Connecticut Chief State Attorneys were impleaded into the suit. In paragraph number sixteen the Plaintiffs alleged that ". . . The Chief States Attorneys, as well as, the City of Hartford's Police department learned from [a] jailhouse informant that . . . Asher Tamara Glace's life was. . . in danger, because she was required to testify against Anthony Thompson about the Cleveland Café shooting." Based on this single paragraph, the defendants were clearly aware, or they should have been aware of the persons who had knowledge about the facts alleged in paragraph number sixteen. In paragraph seventeen and eighteen, the Plaintiffs' allegations implicated the Chief of Police, Daryl Roberts as well as other HPD officers by way of publishing Ms. Glace's name "for the entire world to see," particularly Anthony Thompson. Although the Plaintiffs had previously mistakenly alleged that the publication was only made by way of the City of Hartford Police Department web-cite. In actuality, the publication was made jointly by two City of Hartford Police Department Detectives-Jerry Bilbo and Michael Sheldon, and tragically assisted by Prosecutor John Fahey with respect to the "Application for Arrest Warrant" sworn on February 23, 2005 for Anthony Thompson's arrest. Mr. Fahey's also violated the witness protection law as did the other proposed parties David Zagaja, Richard Rubino, Patrick Harnett, and the Chief State's Attorney for the Hartford Judicial District by their failure to conduct the mandatory review of Ms. Glace's risk of harm as a witness to a serious felony as Connecticut law required.

13

All of the factual allegations noted above have been, or should have been in the possession of the Defendants, and at no point did any of the Defendants provide any of this discovery information, names of individuals or documents pursuant to F.R.C.P 26 mandate for initial disclosures.

The defendants knew or should have known the actors implicated by Plaintiffs' pleadings even by a cursory investigation into the allegations asserted by the Plaintiffs. Federal Rules of Civil Procedure 26(a) (1) Initial Disclosures provides in pertinent parts that:

> Except to the extent otherwise stipulated or directed by order or local rule, a party shall, without awaiting a discovery request, provide to other parties:
>
> (A) the name and, if known, the address and telephone number of each individual likely to have discoverable information relevant to disputed facts alleged with particularity in the pleadings, identifying the subjects of the information; (B) a copy of, or a description by category and location of, all documents, data compilations, and tangible things in the possession, custody, or control of the party that are relevant to disputed facts alleged with particularity in the pleadings; (C) a computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered; and (D) for inspection and copying as under Rule 34 any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment. Unless otherwise stipulated or directed by the court, these disclosures shall be made at or within 10 days after the meeting of the parties under subdivision (f). A party shall make its initial disclosures based on the

14

> information then reasonably available to it and is not
> excused from making its disclosures because it has not
> fully completed its investigation of the case or because it
> challenges the sufficiency of another party's disclosures or
> because another party has not made its disclosures.

**[Emphasis Added]**

At a status conference held before the Honorable Alvin Thompson, U.S.D.J. on May 17, 2010 the court inquired about discovery. At that time the Plaintiffs informed the court that they had received Ms. Glace autopsy, and some damage related documents. When the same inquiry was put to the defendants, they stated that on the record that **"documents were not yet available for discovery because of the pending criminal cases."** This statement was made to the court in the full knowledge by the defendants that substantial discovery materials were available to the Plaintiffs derivable from State v. Anthony Thompson, (Docket No.: HHDCR05-0590279). The Defendants did not educate the court or the Plaintiffs as to the scope of discovery that was available as a result of the prosecution of Anthony Thompson, though they could have because they knew, or should have known that the information existed. In keeping with their mandated responsibilities pursuant to F.R.C.P 26 (a) (1), the Defendants could have disclosed that there were discoverable materials available from the Anthony Thompson/Cleveland Café murder trial. Instead, they chose to advance a categorical disclaimer that **"all documents were unavailable for discovery because of the pending criminal cases." [Emphasis added]**

At a subsequent status conference on June 3, 2010 which was presided over by Para-judicial Officer James Hawkins the Defendants again stated that **"the prosecution will only provide information when the prosecution of Anthony Thompson and Earl Thompson are completed." [Plaintiffs Notes from the Status Conference of June 3, 2010] [Emphasis added]**

## **ARGUMENT**

Rule 15(a) provides a permissive standard that "a party may amend the party's pleading only by leave of court . . . and leave shall be freely given when justice so requires." Mitsui Foods, Inc. v. United States, 867 F.2d 1401, 1403 (Fed. Cir. 1989) (holding that the grant or denial of an opportunity to amend pleadings should be exercised liberally to permit such amendments). "[L]eave shall be freely given when justice so requires." Id at 1403  In Forman v. Davis, 371 U.S. 178 (1962), The Court found that "if the underlying facts or circumstances relied upon by a party may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." Id. at 182.  The court noted that Rule 15(a) declares that leave to amend shall be "freely given" when justice so requires and that "this mandate is to be heeded." Id. at 230. The court noted that a plaintiff ought to be afforded the opportunity to amend a complaint so long as there is no apparent undue delay, bad faith or dilatory motive on the part of the movant or repeated failure to cure deficiencies by amendments previously allowed. The amendment will not cause any undue prejudice. Although the District Court has discretion to grant an amendment, "outright refusal to grant the leave without any justifying reasons appearing for the denial is not an exercise of discretion." Id.

Rule 15(c) of the Federal Rules of Civil Procedure governs when an amended pleading "relates back" to the date of a timely filed original pleading and is thus itself

timely even though it was filed outside an applicable statute of limitations. Where an amended pleading changes a party or a party's name, the Rule requires, among other things, that "the party to be brought in by amendment . . . knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." Krupski v. Costa Crociere, 130 S.Ct 2485 (2010). The case concerned Ms. Krupski, the plaintiff tripped and fractured her leg while she was on board the cruise ship Costa Magica. Upon her return to the United States, she hired a lawyer who unsuccessfully attempted to settle the case, but when those attempts failed he sued. Id. at 2490. Thereafter, Ms. Kruski passenger ticket outlined the fact that it was the sole contract between each passenger and the carrier . . . . In case of suit, the ticket required an injured party to submit written notice of the claim . . . to the duly authorized agent within 185 days after the date of the injury. Id. The ticket also required any lawsuit to be filed within one year after the date of injury and to be served upon the carrier within 120 days after filing. Id. The ticket also provided the United States District Court for the Southern District of Florida Broward County as the exclusive forum for a lawsuit. Id.

> Three weeks before expiration of the one year statute of limitation, the Plaintiff filed a negligence suit against Costa Cruise by invoking the diversity jurisdiction. . . . The complaint alleged that Costa Cruise "owned, operated, managed, supervised and controlled" the ship on which Krupski had injured herself; that Costa Cruise had extended to its passengers an invitation to enter onto the ship; and that Costa Cruise owed Krupski a duty of care, which it breached by failing to take steps that would have prevented her accident. . . . Over the next several months—after the limitations period had expired—Costa Cruise brought Costa Crociere's existence to Krupski's attention three times. . . . , Costa Cruise filed its answer, asserting that it was not the proper defendant, as it was merely the North

18

> American sales and marketing agent for Costa Crociere,
> which was the actual carrier and vessel operator. . . . [Some
> months later]  Costa Cruise listed Costa Crociere as an
> interested party in its corporate disclosure statement.
> Finally, . . . Costa Cruise moved for summary judgment,
> again stating that Costa Crociere was the proper defendant.

Id. at 2490-91

Plaintiff observed that Costa cruise's "claims administrator had responded to her

claims notification without indicating that Costa Cruise was not a responsible party. With

her response, Krupski simultaneously moved to amend her complaint to add Costa

Crociere as a defendant. Id.

At the trial court, Costa Cruise was dismissed from the case, and Contra Crociere

moved for dismissal of the complaint on the basis that the amended complaint filed by

Plaintiff after the limitations period was untimely and therefore Rule 15 (c) did not permit

relation back.  The court explained that Rule 15 (c) imposed

> three requirements before an amended complaint against a
> newly named defendant can relate back to the original
> complaint. First, the claim against the newly named
> defendant must have arisen "out of the conduct, transaction,
> or occurrence set out—or attempted to be set out—in the
> original pleading." Fed. Rules Civ. Proc. 15(c)(1)(B), (C).
> Second, "within the period provided by Rule 4(m) for
> serving the summons and complaint" (which is ordinarily
> 120 days from when the complaint is filed, see Rule 4(m)),
> the newly named defendant must have "received such
> notice of the action that it will not be prejudiced in
> defending on the merits." Rule 15(c)(1)(C)(i). Finally, the
> plaintiff must show that, within the Rule 4(m) period, the
> newly named defendant "knew or should have known that
> the action would have been brought against it, but for a
> mistake concerning the proper party's identity." Rule

15(c)(1)(C)(ii).The first two conditions posed no problem, the court explained: The claim against Costa Crociere clearly involved the same occurrence as the original claim against Costa Cruise, and Costa Crociere had constructive notice of the action and had not shown that any unfair prejudice would result from relation back. But the court found the third condition fatal to Krupski's attempt to relate back, concluding that Krupski had not made a mistake concerning the identity of the proper party. Relying on Eleventh Circuit precedent, the court explained that the word "mistake" should not be construed to encompass a deliberate decision not to sue a party whose identity the plaintiff knew before the statute of limitations had run. Because Costa Cruise informed Krupski that Costa Crociere was the proper defendant in its answer, corporate disclosure statement, and motion for summary judgment, and yet Krupski delayed for months in moving to amend and then in filing an amended complaint, the court concluded that Krupski knew of the proper defendant and made no mistake.

Id. at 2491-92

The Eleventh Circuit Court of Appeals took the case and found on other basis that

Because the ticket clearly identified Costa Crociere as the carrier, the court stated, Krupski either knew or should have known of Costa Crociere's identity as a potential party. It was therefore appropriate to treat Krupski as having chosen to sue one potential party over another. Alternatively, even assuming that she first learned of Costa Crociere's identity as the correct party from Costa Cruise's answer, the Court of Appeals observed that Krupski waited 133 days from the time she filed her original complaint to seek leave to amend and did not file an amended complaint for another month after that. In light of this delay, the Court of Appeals concluded that the District Court did not abuse its discretion in denying relation back.

Id. at 2493

> Under the Federal Rules of Civil Procedure, an amendment
> to a pleading relates back to the date of the original
> pleading when:"(A) the law that provides the applicable
> statute of limitations allows relation back;"(B) the
> amendment asserts a claim or defense that arose out of the
> conduct, transaction, or occurrence set out—or attempted to
> be set out—in the original pleading; or"(C) the amendment
> changes the party or the naming of the party against whom
> a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if,
> within the period provided by Rule 4(m) for serving the
> summons and complaint, the party to be brought in by
> amendment:"(i) received such notice of the action that it
> will not be prejudiced in defending on the merits; and "(ii)
> knew or should have known that the action would have
> been brought against it, but for a mistake concerning the
> proper party's identity." Rule 15(c)(1).

Id.

The court held that the determinative question under Rule 15(c)(1)(C)(ii) is not

whether Krupski knew or should have known the identity of Costa Crociere as the proper

defendant, but whether Costa Crociere knew or should have known that it would have

been named as a defendant but for an error. Id. 2493  The onus of Rule 15(c)(1)(C)(ii)

asks what the prospective *defendant* knew or should have known during the Rule 4(m)

period, not what the *plaintiff* knew or should have known at the time of filing her original

complaint. Information in the plaintiff's possession is relevant only if it bears on the

defendant's understanding of whether the plaintiff made a mistake regarding the proper

party's identity. Id. 2493-94

The court outlined the underlying policy behind relation back which is intended to "balance the interests of the defendant protected by the statute of limitations with the preference expressed in the Federal Rules of Civil Procedure in general, and Rule 15 in particular, for resolving disputes on their merits. Id. *citing* Advisory Committee's 1966 Notes 122; 3 Moore's Federal Practice §§ 15.02[1], 15.19[3][a] (3d ed.2009).

On the issue of undue delay, the court found that the Rule plainly sets forth an exclusive list of requirements for relation back, and the amending party's diligence is not among them. Moreover, the Rule mandates relation back once the Rule's requirements are satisfied; it does not leave the decision whether to grant relation back to the district court's equitable discretion. Id. at 2496  Moreover, the speed with which a plaintiff moves to amend her complaint or files an amended complaint after obtaining leave to do so has no bearing on whether the amended complaint relates back.  Krupski, at 130 S. Ct. at 2496 *citing* Cf. 6A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1498, pp. 142-143, and nn. 49-50 (2d ed.1990 and Supp.2010).

Prior to the landmark decision in krupski, the Third Circuit Court of Appeals "endorsed the position that lack of knowledge of a Defendant' s identity-particularly in § 1983 civil cases involving alleged police misconduct may qualify as a 'mistake' under Rule 15 if the Defendants had the information as to [the] correct names but withheld that information from the Plaintiffs." Archibald v. City of Hartford, 274 F.R.D. 371, 379

22

(2011) *Citing* Singletary v. Penn. Dep't of Corrections, 266 F.3d 186, 202 n. 5 (3d Cir.

2001)

In Connecticut, when the relation back law is at issue, it is the strictures of the

F.R.C.P. 15 (c) that is controlling, not state law:

> `While state law must be applied in a diversity case to
> determine whether an action is barred by the statute of
> limitations, *Guaranty Trust Co. v. York,* 326 U.S. 99, 65
> S.Ct. 1464, 89 L.Ed. 2079 (1945), most courts considering
> the issue have held that the federal rule as to relation back
> applies even in a diversity case, since the question of
> relation back of amendments to pleadings is properly a
> matter of practice and procedure and is specifically dealt
> with in the Federal Rules of Civil Procedure.' *Holdridge v.
> Heyer-Schulte Corp. of Santa Barbara,* 440 F.Supp. 1088,
> 1093 (N.D.N.Y.1977) (citations omitted); *see also* 6 Wright
> & Miller, *Federal Practice and Procedure:* Civil § 1503 at
> 535 (1971). `In general, if a question is covered by a
> provision of the Federal Rules of Civil Procedure, the
> federal rule rather than state law will control. *Holdridge,*
> 440 F.Supp. at 1093 n. 2, *citing Hanna v. Plumer,* 380 U.S.
> 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965).
>
> Bouchard v. DHL Express (USA), Inc., 716 F. Supp.2d 202
> (D.Conn. 2010)

In the instant case, the defendants received notice from the

Plaintiffs' pleading as to the likely parties who were implicated by the

facts alleged in the original suit. Absent an opportunity to amend the

complaint, the Plaintiffs would have very little grounds for relief as

provided for in Forman. Plaintiffs' opportunity to amend their complaint

reveals no apparent undue delay in the case especially given the

23

defendants statement that "the discovery documents will not be available until the Thompson brothers' prosecutions are complete." On the contrary, this statement reveals the defendants' willingness to stall the case, while at the same time they were in full knowledge that significant discovery documents were already in the public domain and therefore should have been made available to the Plaintiffs.

The issues of bad faith and dilatory motive on the Plaintiffs part are also equally non-existent. Here, F.R.C.P. 26 (a) (1) mandates Defendants provide documents and information to the Plaintiffs, fourteen days after initiation of the suit. Yet, at this writing, neither Defendant has made or attempted to provide any documents or any information relevant to the suit and in keeping with the dictates of Rule 26.

Given the defendants pronouncements on the record that "there will be no discovery until the prosecution of the Thompsons are completed is clear evidence an amended complaint will not cause undue prejudice to the Defendants.

The original complaint was filed on June 16, 2009, thereafter, a second amended complaint was filed on June 16, 2010. Under the circumstances both complaints were timely within the strictures of F.R.C.P. 15, because the statute of limitation had not run until June 17, 2010. Nevertheless, with ion the strictures of Krupski, expiration of the statute of limitation is not determinative as to whether of not relation back applies. On the contrary, once the complaint was timely filed, the inquiry centers on whether the defendants knew or should have known the unidentified parties implicated by the Plaintiffs' pleadings. All three complaints filed by the Plaintiffs implicated all the proposed necessary and previously unidentified parties needed to be added in this case, as outline previously in the case overview. None of the facts of this case has changed, except slight amplification of the facts, especially as they pertain to specific defendants. A cursory investigation as F.R.C.P 26 mandates would have revealed the defendants implicated by Plaintiffs' pleadings. Additionally, all proposed defendants conduct arises from the same transaction and occurrence set out in the original pleadings.

It is clear from the facts that the Plaintiffs chose to sue the present defendants because these were the only known defendants. From this standpoint, Plaintiffs would also have filed suit against the proposed defendants had they known the identity of the defendants, who by their

conduct caused Ms. Glace's untimely death-HPD Detectives, Jerry Bilbo, and Michael Sheldon, HPD Chief Patrick Harnett, State Attorneys David Zagaja, Richard Rubino, and John Fahey, and the Chief State's Attorney for The Hartford Judicial District. As the Supreme Court found in Krupski, the dispositive issue is not what the Plaintiffs knew, but what the defendants knew or should have known as a result of the pleadings.

In the case at bar, the Plaintiffs proposed amendment clearly meets the three requirements outlined in F.R.C.P. 15 to facilitating relation back. In this matter, as in the Bouchard case, it is the Federal Rules of Civil Procedure 15 (c) that is controlling with respect to relation back, not state law.

FRCP 26 required initial disclosures of the names and documents arising from Anthony Thompson's case the defendants knew or should have known had direct bearing on the Plaintiffs' case, especially given that the case concluded in August 2008. The documents were available for disclosure or discovery almost one year after Thompson's conviction in the Cleveland Café murder. Rather than meet their obligations pursuant to FRCP 26 with respect to initial disclosures, the Defendants willfully engaged in a game of deception. Defendants made motions to dismiss the complaints well after Thompson's trial had concluded, but more significantly in the full knowledge that the documents existed in the public

domain which indicated the specific defendants implicated in Plaintiff's pleadings. In short, defendants, intentionally withheld information that was necessary and critical to plaintiffs' claims in showing the specific proposed new parties, and their specific conduct arising from the transactions and occurrences pleaded in all three of the Plaintiffs' complaints (1. complaint, 2. first amended complaint, and 3. second amended complaint). In the end, the Defendants made motions to dismiss the Plaintiffs' case, while withholding the identities of the persons they knew were implicated by the allegations contained in the complaints.

## **CONCLUSION**

For the forgoing reasons, the Plaintiffs' motion for leave to file a

Third Amended Complaint should be granted.

BY Richard C. Gordon, Esq.

_____

/s/Richard C. Gordon, Esq.
Counsel for Plaintiffs
697 Blue Hills Avenue
Hartford, CT 06112
(860) 534-0547
(860) 656-6889 FAX
Juris No.: 27288

## CERTIFICATION OF MAILING

I certify that a copy of the foregoing documents was mailed to the

Defendants on February 25, 2012.

BY Richard C. Gordon, Esq.

_____

/s/Richard C. Gordon, Esq.
Counsel for Plaintiffs
697 Blue Hills Avenue
Hartford, CT 06112
(860) 534-0547
(860) 656-6889 FAX
Juris No.: 27288

## LIST OF EXHIBITS

1.  Asher Glace, Voluntary Statement to HPD witnessed by Dets. Bilbo and
    Sheldon.

2.  Clayton Leroy Anderson (Hollywood) Hartford Police Confirm Identity of
    Homicide Victim, killed 8/4/2005 (Stabbed Anthony Thompson in the mouth
    at the Cleveland Café on 2/14/2005.

3.  James Callianti, testified at Anthony Thompson's trial. He was outside the
    Cleveland Café when Anthony Thompson stated, "hand me the machine and
    ran back to the club with the pistol in hand."

4.  Earl Thompson's Application for Arrest Warrant witnessed by HPD det.
    Christopher Sullivan where he referred to Ms. Glace as the "sole direct/eye
    witness who identified the shooter."

5.  Inmate Everton Gardner, and cellmate of Anthony Thompson who informed
    Det. Bilbo that Ms. Glace was targeted for death by Anthony Thompson. He
    also disclosed the person who was to execute the killing of Ms. Glace-Earl
    Thompson.

6.  Ms. Sandra Elliott, mother and Plaintiff and mother of Asher Glace.

7.  Anthony Thompson's telephone calls submitted at trail as proof of his plan to
    kill Ms. Glace (3 calls in July 2005, approximately two months after his
    extradition from Jamaica)

8.  Anthony Thompson's telephone call to earl Thompson on June 2, 2007,
    informing that he was on the firm-trial list for his trial to begin in a few days
    (6/11/2007).

9.  Inmate Steven Nelson's testimony at Anthony Thompson's trial informing
    that he planned to use his brother-Biggs (Earl Thompson) to kill Ms. Glace.

10. Inmate Steven Nelson's testimony at Anthony Thompson's trial informing
    that he planned to use his brother-Biggs (Earl Thompson) to kill Ms. Glace.
    He also informed that he met with law enforcement on "a few occasions
    before Ms. Glace was murdered." He testified he did not sign a statement
    because he feared for his relatives on the outside because he had "done things

with Earl before and he knew how dangerous he is." He signed a written statement on 4/5/2008 only after earl Thompson was in custody.

11.    Inmate Steven Nelson's testimony at Early Thompson's Probable Cause Hearing on 8/21/2008, informing that Anthony Thompson had admitted to him that he intended to kill Asher Glace and other witnesses.

12.    Chrystlynn Semmelrock, employed by DOC Intel Unit testified that Anthony Thompson and Steven Nelson were in the same prison, in the yard, and had chow at the same times, thereby corroboration his testimony that Anthony Thompson admitted to him that he shot Mr. Robinson at the Cleveland café and he planned to kill Ms. Glace and other witnesses prior to his trial.

13.    Earl Thompson's application for prison visits to see his brother. Two applications evidencing differing signatures were submitted and denied by DOC.

14.    HPD Det. Richard Salkeld testified on 8/21/2008 at earl Thompson's probable cause hearing that earl Thompson had approached him with an offer to turn in local drug dealers in exchange for and arranged private visit with his brother Anthony in prison. He also testified that he had never gotten a request of that sort before.

15.    Paulette Shelton, civilian witness who was a friend of Hollywood and witnessed Anthony Thompson being stabbed in the mouth by Hollywood.

16.    Senior State's Attorney, David Zagaja's argument before Superior Court Judge, Solomon at Anthony Thompson's trial on May 16, 2008. He argued for admission of Ms. Glace's statement to come in at trail because "Anthony Thompson had made her unavailable.

17.    Judge Solomon's opinion on admitting Asher Glace's statement.