UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Sandra Elliott, individually and as the Administratrix of the Estate of Asher Tamara Glace )<br><br>Plaintiffs )<br><br>vs. )<br><br>CITY OF HARTFORD POLICE DEPARTMENT, ET AL )<br><br>Defendants. ) | ) <br> ) <br> ) <br> ) <br> ) CIVIL NO.: 309-cv-00948 <br> )         (AWT) <br> ) <br> )     SUPPLEMENT TO <br> ) PLAINTIFFS' OPPOSITION <br> )  TO DEFENDANTS MOTION TO <br> ) QUASH AND PROTECTIVE ORDER <br> ) <br> )      March 12, 2012 |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' OPPOSITION TO STATE DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF ITS MOTION TO QUASH**

The Plaintiffs' Sandra Elliott, individually and as the Administratrix of the Estate of Asher Tamara Glace hereby submit a supplement to their opposition to the State Defendants' Reply Memorandum in Support of Their Motion to Quash and Protective Order, filed on February 24, 2012.

**FACTS**

Plaintiff Asher Glace was a witness to a murder which occurred at the Cleveland Café, a nightclub located in the North end of Hartford, Connecticut on February 14, 2005. The murder was witnessed by Ms. Glace and a number of other witnesses, but Ms. Glace was the only witness who provided a statement to the police which place the gun used in

1

the killing in Anthony Thompson hands. Ms. Glace's statement also detailed the injuries suffered by two other victims who were also felled by Anthony Thompson. Ms. Glace's statement was given contemporaneously with the events of the murder. A friend of Ms. Glace, Shalom (last name unknown) was also a witness to the killing, but she did not provide a statement. Two weeks after the murder, her parents sent her to St. Lucia to ensure her safety, from Anthony Thompson and his confederates. Although the police interviewed six other persons who were present at the shooting, none of them was willing to provide a statement. All six individuals later changed their positions and testified against Anthony Thompson at his trial, but only after his brother were taken into custody for an unrelated criminal matter. The specific facts recounted by Ms. Glace made her the main witness in the subsequent trial of Anthony Thompson, the person who was later convicted of the murder in July 2008.

Personnel at the Hartford Police Department and personnel at the State Attorneys' Office were informed on at least five occasions by two inmates of Anthony Thompson that he was planning to kill Ms. Glace, so she would not testify against him with respect to the Cleveland Café murder. The warnings provided by the inmates occurred well in advance of Ms. Glace's murder.

Ms. Glace was violently murdered by Anthony Thompson and his confederates in her driveway on June 15, 2007.

Hartford Police Detectives Jerry Bilbo and Michael Sheldon were the chief detectives assigned to the Cleveland Café Murder investigation. When Ms. Glace provided the statement to the two detectives, they caused her to place her name, telephone number, date of birth, and address in the statement which they knew would have been provided to Anthony Thompson.

Two weeks later, the same two detectives swore out an arrest warrant application for Anthony Thompson and the document was signed off by State Attorney, John fahey. The arrest warrant application also contained Ms. Glace's name, address, date of birth and a detailed account of the Cleveland Café murder. Thereafter, John fahey retired from the State Attorneys' Office and the case was assigned to David Zagaja and Richard Rubino for prosecution. Neither newly assigned prosecutor, nor John fahey apprised Ms. Glace as to her rights to witness protection in accordance with state law. Detective Jerry Bilbo nor Michael Sheldon apprised Ms. Glace as to her rights to witness protection in accordance with state law.

City of Hartford Chief of Police, Patrick Harnett was responsible for the supervision and overall operation of the City of Hartford Police Department at the time of the Cleveland café murder. Chief Harnett was therefore responsible to provide training, enforce the laws of the state, local ordinances, and supervision of his police officer in accordance with state law.

3

The Defendants in the case has never provided any documents or the names or conduct of the six individuals referenced above to the Plaintiffs, despite the fact the Defendants are mandatorily required to produce this information by the Federal Rules of Civil Procedure 26 (hereinafter, FRCP 26).  Additionally, after the Anthony Thompson murder trial, the Defendants were aware that an abundance of documentary and testimonial evidence which are material and relevant to Plaintiffs' case were available, but they held those pieces of evidence from the court and the Plaintiffs in violation of FRCP 26.

Around late January 2012, the Defendants filed a motion to quash subpoenas and protective order after they discovered the Plaintiffs had obtained the documentary and testimonial evidence from the Anthony Thompson trial.  All the documentary evidence as well as the testimonial evidence from the Anthony Thompson murder trial has been in the public domain since 2008.  The documentary evidence as well as the testimonial evidence implicate the above six individuals the Plaintiffs' intend to add as new parties in their motion for leave to file a third amended complaint.

**ARGUMENT**

The defense's contention is that discovery should be limited to the two remaining claims in the Plaintiffs' initial complaint, which are the supervisory liability claim against the state's states attorneys, Christopher Morano and Kevin Kane, and the duty Daryl Roberts, the City of Hartford Chief of Police had in protecting Ms. Glace after his department disclosed her identity.

The Defendants fail to mention or address the fact that there is an abundance of testimonial and documentary evidence that are in the public domain, as well as, in the Plaintiffs' possession.  The Defendants in effect argues that the court should ignore this very telling fact.  Yet, they argue tongue-in-cheek that the instant case is "just like Dinler v. The City of New York, *et al*  607 F.3d 923 (2nd Cir. 2010) ." The fact is the Dinler case is absolutely dissimilar to the instant matter on a number of levels.  The most glaring dissimilarity is that the facts and circumstances between the instant case and the Dinler case are contextually different.   For starters, the evidence the Dinler defendants sought to shield by the law enforcement privilege was at all times cloaked in a veil of secrecy.  In the instant case, everything and all things with the exception of some documents allegedly sent from one witness to another witness are already in the Plaintiffs' possession as well as the public's domain.  What then are the Defendants in the instant case seeking to protect, and what among the documentary evidence and testimonial evidence the Defendants requests the court to protect?  What the Defendants are asking the court to do is to "unring a bell that they themselves have ringed" or to engage in a "court sanctioned take back" with respect to everyone who obtained a copy of any piece

5

of paper relating to the Anthony Thompson Cleveland Café murder trial, or everyone who has heard any testimonial evidence implicating the Defendants, as well as the proposed new defendants.  The Defendants would like the court to ignore the "minute fact" that the Plaintiffs already have approximately 95% of the documents and testimonial evidence needed to prove their case with respect to the Defendants, as well as the new and proposed defendants."

In the instant case, the Defendants argue that the evidence already in the Plaintiffs'' possession comes under the rubric of the law enforcement privilege, and therefore needs to be protected, despite the fact the evidence arose from a public trial and is already in the public domain.  How ironic that the defendants published Ms. Glace's name to the entire world, as well as to the Thompson brothers, and now they seek the very remedy they should have accorded Ms. Glace, and which commonsense demanded for the protection of Ms. Glace's life.

The public policy the defendants seek to uphold is for the court to bar any Plaintiff from obtaining any discovery on any case, even after the case is concluded because disclosure would endanger future investigations, confidential witnesses, and confidential informants.  Never mind the fact, that in the present case, there are no confidential informants; no police procedures or techniques to protect; and no confidential witnesses to protect.

The Defendants assert that " . . . opposing counsel seeks to compel the testimony of key witnesses and prosecutors, directly involved in the Cleveland Café murder investigation and prosecution, as well as, the Asher Glace murder investigation and prosecution, in the civil matter."   **[Defendants' Motion page 4, L. 7-19**]

The defendants has cleverly clouded and mudded the waters in an attempt to confuse the issues by merger of the facts of the Cleveland Café murder and the murder of Ms. Glace.  Although some of the actors are common to both cases, it is the specific conduct of the actors with respect to the Cleveland Café murder that is at issue.  It is Detective Bilbo's and Detective Sheldon's conduct during the course of the Cleveland Café murder, especially the time frame spanning February 14, 2005 and June 16, 2007.  Similarly, it is the conduct of State's Attorneys Fahey, Zagaja and Rubino' conduct from February 14, 2005 through June 16, 2007 that are at issue.  The Plaintiffs do not seek to try the matter of the State of Connecticut versus the Thompson brothers; rather, the Plaintiffs seek to litigate the culpable conduct of the Defendants as well as the proposed new parties as their conduct pertained to their failure to protect Ms. Glace arising from the Cleveland Café murder in accordance with state law.  The Plaintiffs have no interest in the Defendants'' conduct as they pertain to the pending trial of the Thompson brothers.

The criminal litigation concerning the Cleveland Café murder concluded almost four years ago, yet the Defendants insist that ". . . opposing counsel seeks to compel the testimony of key witnesses and prosecutors, directly involved in the Cleveland café murder investigation and prosecution. . . ."  In light of the fact that the Cleveland Café murder concluded four years ago, when, if ever, do the defendants propose is the right

7

time to depose or compel the testimony of these witnesses?  All the while, the Defendants were in full knowledge that these witnesses and the documents derivable from the Cleveland Café murder were already in the public domain, and yet they conveyed to the court and to the plaintiffs "that no discovery is available until the twin murder cases of the Thompson brothers are concluded." **[State Defendants' counsel's statement to the court on May 17, 2010]**

The state offers that "it is willing to produce witnesses in furtherance of the plaintiff's discovery.  An individual from the Chief State's Attorney's Office can testify about the Witness Protection Program in a general sense . . . . [They] would allow them to designate the most knowledgeable person and ensure efficiency. . . . Although defendants are opposed to revealing the customs, procedures and training utilized. . . ." So, Defendants have now hidden discovery from the Plaintiffs and has mislead the court on the record as to the availability of discovery, and now they propose to tell the Plaintiffs who to depose, and what to depose their proposed witnesses about in furtherance of Plaintiffs' proving their case.  Notwithstanding the Defendants generous offer to dictate who and what the Plaintiffs' depositions subject matter should comprise, the Defendants at the same time, make no mention about the Plaintiffs' pending motion for, or right to amend their complaint to strengthen their case, based on discovery of information defendants were mandatorily responsible to disclose.  The Defendants would very much like the Plaintiffs' case confined to the weakest counts against the existing Defendants, those being the surviving counts arising from the Plaintiffs' second amended complaint in order to deny the Plaintiffs' justice.

From this backdrop, Plaintiff Sandra Elliott continues treatment for psychological and emotional trauma arising from discovering her daughter's cold dead body on June 16, 2007. She doesn't sleep well anymore; she has recurring nightmares; and she suffers from anxiety, and post traumatic stress disorder, all arising from the Defendants unlawful conduct in presenting her daughter for slaughter without protection from February 14, 2005 through her eventual death on June 16, 2007. Ms. Glace's father from time to time has also been hospitalized for high blood pressure and stress, where he never suffered from these medical conditions prior to his daughter's untimely and violent death. Other Family members including Ms. Glace's brother have also sought medical treatment arising from this tragedy. When will the Plaintiffs and their extended family members obtain justice and closure? When will these people obtain the relief they seek in order to move on with their lives? If the Defendants' present ploy is granted it would essentially stall the Plaintiffs' case, and thus their search for justice for years, where no good basis are present.

The Defendants have failed to carry their burden to show that the documents and testimony sought by the Plaintiffs falls within the ambit of the law enforcement privilege. In their original motion to quash, the Defendants relied exclusively upon <u>Dinler v. The City of New York</u>, *et al* 607 F.3d 923 (2nd Cir. 2010) which is dissimilar to the instant case. <u>Dinler</u> was decided in a post 9/11 climate, where the country was still paralyzed from the fear of future terror attacks. In that case, the police infiltrated the organizations of the protestors and demonstrators on the basis they thought persons desiring to attack

9

the United States may have cloaked their designs and attacks within the context of the political demonstrations at the 2004 Republican National Convention. The police procedures and techniques about which <u>Dinler</u> stands and served to protect were therefore confined to the specific facts and circumstances involving police utilizing confidential sources and confidential witnesses to thwart potential terror attacks:

> In February 2003, Mayor Michael Bloomberg announced that the 2004 Republican National Convention would be held in New York City. Immediately thereafter, the NYPD began developing plans to maintain order and safety during the event. The NYPD was mindful of the City's status as a prime target of international terrorism, and the NYPD was keenly aware that a large political event could attract anarchist violence and unlawful civil disobedience. To address those concerns, David Cohen, the NYPD's Deputy Commissioner of Intelligence ("Commissioner Cohen"), researched the security threat posed by violent protests at other large political events. Based on his analysis of the chaos and violence caused by recent protests in other metropolitan areas, including recent large-scale protests in Seattle and Miami, Commissioner Cohen concluded that even a small extremist element could trigger spiraling violence at large political demonstrations. Accordingly, Commissioner Cohen and the NYPD's Intelligence Division recognized that the NYPD needed a strategy to avoid disorder and violence during the RNC. Commissioner Cohen and the Intelligence Division began to form that strategy by researching potential extremist groups and their plans for disrupting the RNC. Much of the research consisted of combing through publicly available information on the Internet for plans to disrupt the RNC with violence or unlawful civil disobedience. The Intelligence Division compiled the results of that research into 600 pages of so-called "End User Reports." Additionally, some members of the Intelligence Division went undercover and infiltrated various organizations to determine whether these organizations had devised plans to disrupt the RNC. The undercover officers prepared the Field Reports to memorialize what they had learned in various meetings and discussions with members of the infiltrated organizations.

10

Dinler, 607 F.3d at 929-30.

Where therefore is the threatened terror attacks, and possible compromise of confidential sources and witnesses in the instant case.  What secret police procedures and techniques are at issue that needs protection for future law enforcement cases?   The facts are undisputed and it is already public knowledge that the police and the prosecutors published and caused Ms. Glace's name, address, date of birth, and account of the events about the Cleveland Café murder to be published to Anthony Thompson, and subsequently to his confederates.

From this standpoint, no amount of shifting shells in a game of shells, or misdirection by the Defendants can change the established and recorded conduct of the Defendants.   They were warned about Ms. Glace' killing on at least five occasions almost two years in advance of her murder; they were informed who the killer would be; they were given the reason for the hit upon Ms. Glace (so Anthony Thompson could claim self defense); they were informed that the killer or killers contemplated using a silencer to avoid attention if the hit occurred in her neighborhood; they were informed about the manners of the murder as contemplated by Anthony Thompson (kidnapping, drive by shooting etc.,); and all they did was ask Ms. Elliott "if she had seen any strange cars or persons lurking around her home."

All the while, Ms. Elliott could have sent her daughter to the safety of Ms. Glace's father's home in Orlando, Florida, or away to St. Lucia as Shalom's parents did for their daughter  (**Plaintiffs investigations revealed that Shalom (last name**

**unknown) as well as Ms, Glace witnessed the murder of O'Neil Robinson by Anthony Thompson; she was one of the persons who called the police to the scene of the crime, and she was sent away by her mother to St. Lucia for her safety, days after the Cleveland Café murder. She has never returned to the United States, despite the fact Anthony Thompson's legal team attempted to have her return to testify on his behalf)** immediately after the Cleveland Café murder. The Defendants went one step further by confining Ms. Glace in place for the Thompson brothers to kill her, by giving her assurance Ms. Elliot she did not need to send her daughter to safety away from Hartford. The testimonial evidence elicited at Anthony Thompson's trial by the very proposed Defendants show that they were verbally warned by two inmates about the pending murder of Ms. Glace; they were also notified by letter by the same two inmates, but the inmates' warnings were only acted upon after Ms. Glace was murdered. **[Emphasis added]**

Plaintiffs' desires to see and review the letters sent by the inmates, and the context memorialized in the letters as they pertain to the warning that Ms. Glace would be killed by the Thompson brothers.

> When assessing a claim of law enforcement privilege, a district court must first determine if the law enforcement privilege applies to the documents at issue. We adopt the holding of the District of Columbia Circuit that the party asserting the law enforcement privilege bears the burden of showing that the privilege applies to the documents in question. In re Sealed Case, 856 F.2d 268, 271-72 (D.C.Cir.1988). To meet this burden, the party asserting the law enforcement privilege must show that the documents contain information that the law enforcement privilege is intended to protect. Such protected information

> includes information pertaining to "law enforcement techniques and procedures," information that would undermine "the confidentiality of sources," information that would endanger "witness and law enforcement personnel [or] the privacy of individuals involved in an investigation," and information that would "otherwise interfere with an investigation."
>
> Dinler, at 944-45

The defendants made no mention of these letters and as such, they do not ask the court to protect any specific document(s) in the case. They have simply made a perverse request for a blanket order on the basis that any and all things associated with the Cleveland Café murder case should come under the law enforcement privilege, and therefore should be protected.

What more did this motley crew of incompetent Defendants require to save Ms. Glace from the peril they brought upon her by their own conduct. All the while the Defendants possessed the knowledge of Ms. Glace's impending doom. Where then are, and were the confidential police procedures and techniques employed by the Defendants and the proposed new Defendants with respect to the Cleveland Café murder open to discovery to the Plaintiffs'? When were they used? Where are the confidential informants and confidential witnesses who would be compromised by Plaintiffs discovery about Anthony Thompson's long concluded murder trial? Based upon the demonstrated and recorded conduct of the Defendants, the only thing that could have saved Ms. Glace would have been for the Thompson brothers to actually call the Defendants and informed them of the exact time, place, and date they intended to kill Ms. Glace. Even a chat with one of the Thompson brothers may have spooked them enough

to forgo killing Ms. Glace. What then are these police procedures and techniques, confidential informants and confidential witnesses the Defendants are trying to protect that were employed in this case? The Defendants have not identified any, and so the court as well as the Plaintiffs is left to guess.

## CONCLUSION

In short, the Defendants by their conduct placed Ms. Glace in the perfect position for the Thompson brothers to twice identify as "the only direct eye witness in the case," and then murder. All the while, the Defendants engaged in demonstrated bad faith of the worse kind by misleading the court and the Plaintiffs as to the availability of existing discovery from the Cleveland Café murder. The Defendants have therefore sought to attack the Plaintiffs' case, channel and shape the issues they knew or should have known about the Defendants' unlawful conduct, while abrogating their responsibilities to provide this mandatory information pursuant to the Federal Rules of Civil Procedure 26.

Now that the defendants' conduct in aiding in the death of Ms. Glace, and their bad faith in covering up this conduct, they suddenly claim a law enforcement privilege on information they recently discovered that is already in the public's domain. The underlying rationale the Defendants put forth in defense of their motion to quash and protective order is that once the complaint, the first amended complaint and the second amended complaints were filed, they did not even conduct a cursory examination of the police officers who performed the investigation into the Cleveland Café murder. In short, they learned nothing from these investigations triggering mandatory disclosure pursuant

to F.R.C.P. 26.  So, although the defendants have "unclean hands," they still requests the court protect discovery of testimony and documents already made available to the public.

For the foregoing reasons, the Defendants motion to quash and protective order should be denied.

BY:  Richard C. Gordon, Esq.,


/RICHARD C. GORDON ESQ./_____
Counsel for Plaintiffs
697 Blue Hills Avenue
Hartford, CT 06112
(860) 534-0547
(860) 656-6889 FAX
Juris No.: 27288

**CERTIFICATION OF MAILING**

I certify that a copy of the foregoing documents was mailed to the Defendants on March 13, 2012.

BY Richard C. Gordon, Esq.

/RICHARD C. GORDON ESQ./ \_\_\_\_\_
Counsel for Plaintiffs
697 Blue Hills Avenue
Hartford, CT 06112
(860) 534-0547
(860) 656-6889 FAX
Juris No.: 27288