# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| Sandra Elliott, individually and as the Administratrix of the Estate of Asher Tamara Glace <br><br> Plaintiffs <br><br> vs. <br><br> CITY OF HARTFORD, DARYL ROBERTS, Individually and in his official capacity as Chief of Police for the City of Hartford Police Department; CHRISTOPHER MORANO Individually and in his official capacity as Chief State's Attorney for the State of Connecticut; and KEVIN KANE, individually and in his official capacity as Chief State's Attorney for the State of Connecticut, <br><br> Defendants. | CIVIL NO.: 309-cv-00948 (AWT) <br><br><br><br><br> August 30, 2012 |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**COMES NOW** the Plaintiffs Sandra Elliot, individually and as the Administratrix of the estate of Asher Tamara Glace by and through their undersigned counsel moves, and respectfully submit this memorandum of law in opposition to Defendants' motions for summary judgment, pursuant to Local Rule 56(a) and The Federal Rules of Civil Procedure.

1

## RELEVANT HISTORY AND OVERVIEW

On June 16, 2007, Asher Tamara Glace was ambushed and violently murdered in her driveway by Anthony Thompsons and his brother Earl Thompson. **[EXHIBIT #17 Judge Elliot Solomon's decision on the state's motion to admit Asher Glace's voluntary statement because Anthony Thompson made her unavailable for his trial. Decided 5/28/2008, P21, L5-20, P22-24]** Ms. Glace had witnessed the murder of O'Neil Robinson (Walla) on Sunday, February 13, 2005 at the Cleveland Café. On the night of the Cleveland Café killing, O'Neil Robinson along with two other persons was shot by Anthony Thompson at the Cleveland Café, a nightclub which is located in North Hartford. **[EXHIBIT #1 Asher Glace's Voluntary Statement to HPD 2/13/2005]** Mr. Robinson was shot in the head at close range by Anthony Thompson and he succumbed to his injury. The other two victims Barrington Delisser and Ranata Fair survived their injuries, after they were treated at two local Hartford Hospitals. Approximately fifteen hours after the murder of Mr. Robinson, Anthony Thompson fled to Jamaica where he was apprehended three months later and extradited to Connecticut to stand trial.

On the night Mr. Robinson was murdered by Anthony Thompson, Plaintiff Asher Glace was standing about eight feet from Anthony Thompson when he used a pistol to open fire on the three victims. **[EXHIBIT #1 Asher Glace's Voluntary Statement to HPD 2/13/2005]** After the victims fell inside the club, the Hartford Police Department (hereinafter HPD) was summoned to the scene, and they immediately began garnering witnesses and securing the crime scene. Plaintiff Asher Glace was identified as, or identified herself as a witness to the shootings. Immediately thereafter, Ms. Glace was

taken into custody by HPD and transported to its' headquarters in Hartford and interrogated as to the events of the shooting at the Cleveland Café. Ms. Glace provide what the HPD termed a "voluntary statement" between 3:30 a.m. and 5:15 a.m. to HPD Detectives Michael Sheldon, and Jerry Bilbo on February 13, 2005; **both Detectives also acted as witnesses to the "voluntary statement Ms. Glace signed which also depicted her name, address, and date of birth which they knew or should have known would have been provided to the defendant Anthony Thompson." Exhibit # 1 Asher Glace's Voluntary Statement to HPD 2/13/2005] [Emphasis added]**

Neither Detective Bilbo nor Detective Sheldon conducted a review of Ms. Glace's risk of harm as a witness, nor did they inform Ms. Glace about her rights as a witness to a serious felony in accordance with state law. At the time, both Detectives were members of the HPD Major Crimes Unit, and this unit was supervised by Assistant Chief of Police Daryl Roberts. **Exhibit #  Deposition Transcript of Daryl Roberts, P.30, L-11-25, and P.33, L3-25.**

In the voluntary statement Ms. Glace recounted that while she was at the Cleveland Café, "two guys began having words one [sic] of them she knew as Marcel, the other person she did not know at the time but he was later identified as Semmy." **[EXHIBIT #1 Asher Glace's Voluntary Statement to HPD 2/13/2005]** Semmy was identified as an associate of Anthony Thompson, and Marcel was a friend of O'Neil Robinson, the murder victim. At some point, Semmy stepped on Marcel's foot twice and a fight ensued between Mr. Robinson and Anthony Thompson; **[EXHIBIT #1 Asher**

**Glace's Voluntary Statement to HPD 2/13/2005]** other friends or associates of Marcel and Mr. Robinson allegedly joined the fight and at some point, a man identified as Clayton Leroy Anderson-"Hollywood" stabbed Anthony Thompson in his mouth with a knife.  Mr. Anderson was later shot to death on Wednesday August 4, 2005 on Windsor Street in Hartford, and his death is unsolved at this writing. **[EXHIBIT # 2 Clayton Anderson-Hollywood Murder Notice from HPD, 8/4/2005]**

Chief Roberts testified under oath at a deposition held on June 21, 2012 without rebuttal that he was in charge of the Major Crimes Unit at the HPD, and he always "came in' when there was the occurrence of a major crime.  More specifically, he went to the Cleveland Café crime scene February 13, 2005.  **Exhibit # 18  Deposition Transcript of Daryl Roberts, P.31, L-41-20.**  Chief Roberts further testified that he went to the scene "because he was 'accountable,' and although he did not conduct the actual investigations, he managed the cases . . . . to make sure the investigators did their jobs properly" **Exhibit # 18  Deposition Transcript of Daryl Roberts, P.30, L-11-25, and P.33, L3-25.**  Chief Roberts also testified that "he was personally responsible to see that the investigators were properly trained, including but not limited to witness protection." **Exhibit # 18 Deposition Transcript of Daryl Roberts, P.33L-9-24.**

Defendant Chief Roberts further testified without rebuttal that he had developed the HPD's "Crime Stoppers Program." **Exhibit # 18 Deposition Transcript of Daryl Roberts, P.18, L-3-25,  and P.19, L1-25.**  "This program allowed members of the community to provide tips to the police to apprehend suspects involved in crimes."  In the

Defendant's view, "he did not want 'snitches' he instead wanted members of the community to aid in the policing of their community." **Exhibit # 18 Deposition Transcript of Daryl Roberts, P.20, L2-13.** defendant Roberts also expressed his concerns for retaliation by persons identified by members of their community with respect to the Crime Stoppers Program. **Exhibit # Deposition Transcript of Daryl Roberts, P.19, L-2-24 and 20, L-4-8.** Despite the fears, Defendant Roberts contemplated with respect retaliation from persons identified as suspects, by members of their community, the Chief failed to institute a corresponding witness protection component to the program. **Exhibit # 18 Deposition Transcript of Daryl Roberts, P.34, L-9-25 and P.35, 36, 37, and 38.** When Ms. Glace's name, address, and date of birth were entered on the HPD Personal Statement, there were no redactions of these vital pieces of information by the HPD. Despite defendant Roberts being in charge of the Major Crimes Unit, and his "managing the cases," he exhibited deliberate indifference by his gross failure in allowing Ms. Glace's vital information to be published to Anthony Thompson.

Defendant Roberts admitted without rebuttal that "Ms. Glace should have been provided witness protection on the basis of her 'closeness' to Anthony Thompson (she knew him for 2 1/2 years prior to the Cleveland murder)." **Exhibit # 18  Deposition Transcript of Daryl Roberts, P.39, L-18-25, and P. 40, L-1-15.**

In fact, Defendant Roberts admitted that it is the HPD's responsibility to alert the State's Attorney's Office to the possibility of retaliation based on "closeness," because it

is the HPD that is present during the 'time interval" between the initiation of an investigation, and the time the case is turned over to the State's Attorney's Office for prosecution.  Neither referral nor review was conducted by the HPD at the request of Defendant Roberts or by the State's Attorney's Office.  It is undisputed that Defendant Roberts admitted that Asher Glace should have been referred for witness protection, especially given her personal statement to HPD, and her closeness to Anthony Thompson. **Exhibit # 18 Deposition Transcript of Daryl Roberts, P.38, L-1-6, and L-9-25, P.39, L-17-22, and P.40, L-1-10.**

To make matters worse, although state law requires coordination between local law enforcement authorities and those of the State, Chief Roberts testified without opposition that he had never read the Connecticut Law on Witness Protection, nor had he ever received any training from state law enforcement officials, including defendants Marano-the actual author of the law, or Defendant Kane.  Both of who he had met on numerous occasions over the past decade.  **Exhibit # 18  Deposition Transcript of Daryl Roberts, P. 24, L-13-23, and P.12, L-5-8.**

For the state's part, it has never provided any training to local law enforcement officials despite the mandates of the law.  Tracey Kelly, the State Witness Protection Coordinator testified without opposition that "they do not train anyone, they simply send out a 'policy manual' on the program . . . ."  **Exhibit # 19 Deposition Transcripts of Tracey Kelly, P.12, L-9-25, and P.13, L1-20.  "It is simply an informational tool." Exhibit # 19 Deposition Transcripts of Tracey Kelly, P.13, L-1-7, P.47, L-25, P.48, L-**

**1-25, and P.49, L1-3.** Although the Connecticut Witness Protection Law requires that "all witnesses to serious felonies be reviewed by the Chief State Attorney's Office," neither Defendant Kane or Morano conducted, or authorized anyone to review Ms. Glace's risk of harm until January 2009, upon the direction of her immediate supervisor, Mr. Murry, and only after the instant suit had been brought against the state's actors Kane and Morano. **Exhibit # 19 Deposition Transcript of Tracey Kelly, P.31, L-1-25, P.32, L-1-25, and P.33, L-1-25.** Not only did the defendants Kane and Morano fail to properly supervise or train their personnel as to the mandates of the state's witness protection law, but in the words of Tracey Kelly, the state's coordinator, "we did not 'interpret' the law to require us to conduct a review as to 'all' witnesses at risk of harm." **Exhibit # 19 Deposition Transcript of Tracey Kelly, P.18, L-12-25 and P.19, L-1-15.** When the error in "their" interpretation was pointed out, Ms. Kelly replied, "well in practice that does not happen." In essence, the custom, policy and practice of the State's Attorney's Office are to provide discretionary reviews with respect to witnesses at risk of harm, despite the fact the law mandates reviews as to "all" such witnesses.

Ms. Kelly admitted without rebuttal that "again, my response to that statement is in practice and policy that is not how the program is operated . . . . Not every witness to every serious felony, no we do not review them." **Exhibit # 19 Deposition Transcript of Tracey Kelly, P.19, L-1-25**

During the incident which resulted in the death of O'Neil Robinson, Anthony Thompson was stabbed in the mouth; he ran to his car which was parked outside the Cleveland Café; when he got to the car, he asked another occupant of the car to "hand him the machine, after he had removed the license plate from the vehicle and placed it in the car's trunk;" Anthony Thompson then ran back to the nightclub, with a gun in hand. **[EXHIBIT # 3 James Castellani, trial testimony on 6/4/2008, P.53-55]**

Ms. Glace stated in her voluntary statement that "she saw Anthony Thompson shooting the gun and after he fired the shots he ran outside with Semmy and another black male who was standing in the doorway, at the time of the shooting." **[EXHIBIT #1 Asher Glace's Voluntary Statement to HPD 2/14/2005]** She then noticed "Walla was shot down on the floor and he had blood coming out of his mouth and nose. Marcel's brother was also shot and she noticed a female who had also been shot." **[EXHIBIT #1 Asher Glace's Voluntary Statement to HPD 2/14/2005]**

While at HPD, Ms. Glace was showed a photo array of eight black males and she "identified Anthony Thompson as the person who had shot the victims inside the Cleveland Café; she also disclosed that she had known Anthony Thompson for two and one half years." **[EXHIBIT #1 Asher Glace's Voluntary Statement to HPD 2/14/2005]**

"Ms. Glace was the only witness who provided a voluntary written statement, and it was contemporaneous with respect to the events at the Cleveland Café, which was

testament to the reliability of her statement, especially given that other witnesses refused to 'come forward.'" **[EXHIBIT # 16, Prosecutor David Zagaja's argument to Judge Solomon to admit Asher Glace's voluntary statement because Thompson had made her "unavailable" 5/16/2008, P70-71]** In the view of HPD Detective Christopher Sullivan (the lead detective on the Asher Glace Murder case.), **Ms. Glace was the "only direct/eye witness to the murder of O'Neil Robinson . . . she was the sole witness whom specifically identified Anthony Thompson as the shooter in the case."** **[EXHIBIT # 4 Arrest warrant for Earl Thompson by HPD] [Emphasis Added] [Emphasis Added]**

During the ensuing weeks of 2005, after the murder of O'Neil Robinson, HPD Detectives, Jerry Bilbo and Michael Sheldon interviewed six other witnesses, including the two surviving victims, but no one other than Ms. Glace identified Anthony Thompson as the shooter inside the nightclub. All six witnesses subsequently identified Anthony Thompson at trial, only after he and his brother Earl Thompson were charged with killing Ms. Glace in June 2007.

Around May 11, 2005, HPD Detective Bilbo travelled to Jamaica to collect Anthony Thompson, after he had been taken into custody by Jamaican Law enforcement. Anthony Thompson was extradited back to Connecticut to stand trial for the murder of O'Neil Robinson, and he was held in custody at Walker Correctional Institute (hereinafter Walker) in Suffield, Connecticut. While at Walker, Anthony Thompson became Everton Gardner's cellmate from May 2005 until November 2005. Mr. Gardner

testified under oath at a probable cause hearing for Earl Thompson on August 21, 2008 that Anthony Thompson admitted to him that he had shot Mr. Robinson in the Cleveland Café. **[EXHIBIT # 5 Everton Gardner's testimony at Earl Thompson's probable CAUSE Hearing of 8/21/2008]** More significantly, Gardner testified that Anthony Thompson had discussed with him a "hit list" he had compiled with respect to his pending murder trial for Mr. Robinson's death. Mr. Gardner also testified that he called the HPD and he sent letters to the State Attorney's Office in an attempt to alert them to the planned assassination of Ms. Glace. **[EXHIBIT # 5 Everton Gardner's testimony at Earl Thompson's probable CAUSE Hearing of 8/21/2008]** Mr. Gardner also stated that he had informed the HPD that Ms. Glace was targeted for death by Anthony Thompson. The HPD subsequently sent Detective Bilbo and another detective to interview him. Mr. Gardner complained that after he informed the detectives that Ms. Glace's murder was imminent, but they spent the time ridiculing him because of his stuttered speech pattern. Mr. Gardner's information to the HPD detectives provided specific information that Ms. Glace's murder would be done by Earl Thompson, and that after seeing television coverage of Ms. Glace's murder on June 16, 2007, he knew Anthony Thompson was responsible." **[EXHIBIT # 5 Everton Gardner's testimony at Earl Thompson's probable CAUSE Hearing of 8/21/2008]** Mr. Gardner also testified to the three manner of killing Ms. Glace Anthony Thompson contemplated, but this information fell on deaf ears. **[EXHIBIT # 5 Everton Gardner's testimony at Earl Thompson's probable CAUSE Hearing of 8/21/2008]**

One can only imaging, the delight Anthony Thompson must have felt on June 16, 2007, the day after television coverage had reported that Asher Glace had died in her driveway, and his knowing that the chief witness as identified by the HPD and the State's Attorneys Office against him had been slaughtered by his brother. He must have felt his chances of self defense with respect to the Cleveland Café murder had significantly increased. Alternately, one can only imagine the consternation the State Attorney's Office and the HPD must have felt knowing they aided in Ms. Glace's ambush killing as a result of her name being published as the key witness against Anthony Thompson.

At no point did either detective forward the information Mr. Gardner passed to them pertaining to the imminent assassination of Ms, Glace by Anthony Thompson to the State Attorneys' Office for review of her risk of harm; neither was this information passed to Ms. Elliot so she could protect her daughter by sending her to her father in Orlando, or to St. Lucia, as Shalom's parents had done. **[EXHIBIT # 6 Affidavit of Sandra Elliott, 2/20/2012]** Neither the prosecutors from the State Attorneys' Office or the HPD detectives conduct with respect to protecting Ms. Glace comported with state law.

At no point did either detectives or prosecutors from The States' Attorneys' Office examine any of Anthony Thompson's hundreds of telephone calls to the outside to glean information related to the imminent death of Ms. Glace consistent with Mr. Gardner's warnings, for almost three years. Detective Bilbo for his part called Asher Glace on at least three occasions in 2005 at her home which coincided with his visit to

Everton Gardner at Walker. **[EXHIBIT # 6 Affidavit of Sandra Elliott, 2/20/2012]** At one point, and out of concern for the safety of her daughter, Ms. Elliot took the telephone from her daughter during one of Detective Bilbo's calls and asked him "if she needed to send her daughter away from Hartford because she was in danger?" Detective Bilbo replied "no, he just wanted to know if they had seen any strange cars or persons hanging around her home." **[EXHIBIT # 6 Affidavit of Sandra Elliott, 2/20/2012]**

Only after Ms. Glace was murdered in her driveway on June 16, 2007, did the State Attorneys' Office finally sought and obtained Anthony Thompson's telephone calls to the outside. At Thompson's subsequent trial for the murder of O'Neil Robinson, the State of Connecticut presented translations (because the calls were spoken in Patois, the Jamaican Dialect) of four specific telephone conversations between Anthony Thompson and his brother Earl Thompson, among other unidentified persons. At trial, the state placed these telephone calls before the trial judge as evidence of consciousness of guilt-proof that the Thompson brothers had planned Ms. Glace's murder on Walker's recorded line, just as inmates Gardner and Steve Nelson had previously warned law enforcement personnel. Three of the conversations occurred close to the time Everton Gardner was visited by detective Jerry Bilbo and his colleague: July 16, 2005, **[EXHIBIT # 7 Anthony Thompson's telephone call to the outside]** July 19, 2005, **[EXHIBIT # 7 Anthony Thompson's telephone call to the outside]** and July 23, 2005. **[EXHIBIT # 7 Anthony Thompson's telephone call to the outside]** The fourth related telephone call occurred on June 2, 2007, just two weeks prior to Ms. Glace's ambush murder, and two months after Earl Thompson had finally, and for no good reason been approved to

visit his brother Anthony Thompson at Walker.  **[EXHIBIT # 8 Anthony Thompson's telephone call to the outside]**

Another inmate, Stephen Nelson also testified independent of Everton Gardner on April 23, 2008 that "he met Anthony Thompson at Walker, having previously known him from the streets."  **[EXHIBIT # 9, Steven Nelson's Testimony on 4/23/3008, P75-76]** He also testified that while he was at Walker, Anthony Thompson admitted to him that he was responsible for the murder at the Cleveland café on February 13, 2005.  **[EXHIBIT # 9, Steven Nelson's Testimony on 4/23/3008, P 29-30, Exhibit #11, 8/21/2008, P76-77]**  Mr. Nelson provided specific information that Anthony Thompson had discussed by name (including Ms. Asher Glace) persons he identified as witnesses against him in his upcoming trial, and that his brother Earl would kill them.  **[EXHIBIT # 9, Steven Nelson's Testimony on 4/23/3008, P 31-32, Exhibit #11, 8/21/2008, P77-78]**   Nelson corroborated Everton Gardner's statements to the HPD Detectives Bilbo and his colleague from 2005 about the fact that Ms. Glace and was targeted for death by Anthony Thompson (before she was killed).  Mr. Nelson further testified that he had communicated this information to the Hartford Police Department and specifically to State Attorney, David Zagaja, who he knew from another criminal case.  **[EXHIBIT # 9, Steven Nelson's Testimony on 4/23/2008, P 31-32, Exhibit #11, 8/21/2008, P79-81]** and **[EXHIBIT # 10, Steven Nelson's testimony on 4/24/2008, P 41, L18-27, P58-59]** **<u>Nelson also stated on more than one occasion at trial that Ms. Glace was still alive when he met several times with HPD Detectives and the State Attorneys' Office and informed them that Anthony Thompson had targeted Ms. Glace for death</u>**, and that

**he had shot O'Neil Robinson.  [EXHIBIT # 10, Steven Nelson's testimony on 4/24/2008, P 34, L4-27, P43, 44, and 45] [Emphasis added]**

On June 9 2008, at Anthony Thompson's trial, Ms. Christlynn Semmelrock from the State of Connecticut Security Division Intel Unit testified that Anthony Thompson and Stephen Nelson were inmates at Walker Correctional Institute at the same time, and had used the facility's telephone around the same time as Nelson had testified truthfully. **[Exhibit # 12, Christlynn Semmelrock's trial testimony on 4/23/2008, P18-21] and [Exhibit # 13, Visitation Denial for Earl Thompson]** Between May 18, 2005 and April 2007, Earl Thompson twice attempted to gain private visits with his brother Anthony while he was incarcerated at Walker.  Both applications that were submitted by Earl Thompson were denied, but the application was mistakenly approved in April 2007. **[Exhibit # 12, Christlynn Semmelrock's trial testimony on 4/23/2008]** Just prior to gaining approval to visit his brother at Walker, Earl Thompson had approached HPD Detective Richard Salkeld and "requested to inform on local Hartford drug dealers in exchange for a private visit with his brother Anthony Thompson" who by this had told two other inmates that he intended to kill Asher Glace so she could not testify against him. **[Exhibit # 14, HPD Detective Richard Salkeld] [Emphasis Added]     [Emphasis Added]**

On February 23, 2005, approximately two weeks after Anthony Thompson had fled to Jamaica, HPD Detectives Jerry Bilbo and Michael Sheldon swore out an Arrest Warrant Application for Anthony Thompson which was "signed off" by States Attorney

John Fahey. **[Exhibit # 14, HPD Detective Richard Salkeld]** In this warrant application, both the HPD detectives and State's Attorney John Fahey provided Anthony Thompson a "second bite of the apple" by publishing Asher Glace's name in a public document. All three men were deliberately indifferent to the likely danger Ms. Glace would face from Anthony Thompson and his confederates, especially by their individual and joint failure to inform Asher Glace about her rights as a witness to a serious felony pursuant to state law. **Neither party conducted the mandatory review that the law required; and both parties affirmatively sanctioned publication of Ms. Glace's name, and date of birth in the Arrest Warrant Application they knew would have been provided to Anthony Thompson**. An easy reading of the Arrest Warrant Application indicates that Asher Glace was the only person who witness the fight between Anthony Thompson and O'Neil Robinson; she was the only witness who placed the gun in Anthony Thompson's hands inside the nightclub; she was the only witness who saw Anthony Thompson discharge the weapon and see the victims fall; and she was the only witness who provided a signed written statement contemporaneously with the events at the Cleveland Café on February 14, 2005; **[Exhibit # 14, HPD Detective Richard Salkeld]** as HPD Detective Christopher Sullivan stated in his Arrest Application for Earl Thompson in 2008: Ms. Glace was the "only direct/eye witness to the murder of O'Neil Robinson . . . she was the sole witness whom specifically identified Anthony Thompson as the shooter in the case." **[Exhibit # 4, Arrest warrant for Earl Thompson] [Emphasis added]**

Despite placing Ms. Glace on this tragically lofty pedestal, none of the Detectives assigned to the investigation into the Cleveland café murder, nor the subsequent prosecutors who were assigned to prosecute the case conducted a cursory review into Ms. Glace's risk of harm to a serious felony as Connecticut law required.  Nor did defendant Roberts recommend that Ms. Glace be placed in witness protection despite the fact he stated that "he managed the cases; saw to it that investigators did their jobs properly; and that Ms. Glace should have been placed in witness protection . . . . "

On June 16, 2010 at 4:09 p.m. Plaintiffs filed their second amended complaint where Defendants Daryl Roberts, Chief of Police for The City of Hartford, Christopher Morano, and Kevin Kane as State of Connecticut Chief State Attorneys were impleaded into the suit.  In paragraph number sixteen the Plaintiffs alleged that ". . . The Chief States Attorneys, as well as, the City of Hartford's Police Department learned from [a] jailhouse informant that . . . Asher Tamara Glace's life was. . . in imminent danger, because she was required to testify against Anthony Thompson about the Cleveland Café shooting."  Although the Plaintiffs had previously mistakenly alleged that the publication was only made by way of the City of Hartford Police Department web-cite.  In actuality, the publication was made jointly by two City of Hartford Police Department Detectives-Jerry Bilbo and Michael Sheldon from the HPD Major Crimes Unit (The same unit Defendant Roberts testified he supervised, and admitted he provided no training on witness protection) by way of Ms. Glace's personal statement, and tragically assisted The State's Attorney's Office by way of an unedited arrest warrant for Anthony Thompson's following the Cleveland Café murder of O'Neil Robinson.

## ARGUMENT

The Federal Rules of Civil Procedure Rule 56 motion for summary judgment may be granted if the court determines that the moving party is entitled to judgment as a matter of law because there are no genuine issues of material fact to be tried. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment. Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995). After discovery, if the party against whom summary judgment is sought "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

When considering a Rule 56 motion, the court's responsibility is not to resolve disputed issues of fact, but rather to assess whether there are any factual issues to be tried, while resolving all ambiguities and drawing all reasonable inferences against the moving party; Eastway Constr. Corp. v. City of New York, 762 F.2d 243, 249 (2d Cir. 1985)). The substantive law governing a particular case identifies those facts that are material with respect to a motion for summary judgment.  See Anderson, 477 U.S. at 248.  A court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact . . . ."  Miner v. Glen Falls, 999 F.2d 655, 661 (2d Cir. 1993)

"Dispute regarding a material fact is genuine `if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Aldrich v. Randolph

Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson, 4770U.S. at 248).

Therefore, "[o]nly when reasonable minds could not differ as to the import of the

evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.

1991).

## Count Nine, Monell Claim as Against The City of Hartford

The City of Hartford is liable for the acts or omissions of the Individual

Defendants under § 1983 when it failed to train its police officers on the proper procedure

with respect to witness protection, as it pertains to publication of witnesses personal

information.  It is well established that a municipality may be liable "under § 1983 for

monetary, declaratory, or injunctive relief where . . . the action that is alleged to be

unconstitutional implements or executes a policy statement, ordinance, regulation, or

decision officially adopted and promulgated by that body's officers." Monell v.

Department of Soc. Serv., 436 U.S. 658, 690 (1978).

In establishing Monell liability, The Second Circuit Court of Appeals has held

that liability may be premised on a municipality's failure to train its officers when such

inaction amounts to a "deliberate indifference to the rights of the persons with whom the

police come into contact." Anthony v. City of New York, 339 F.3d 129, 139 (2d Cir.

2003).  In order to establish a failure to train constituting deliberate indifference, a

plaintiff must satisfy three elements:

19

(1) that a policymaker of the municipality knows to a moral certainty that its employee/officers will confront a given situation; (2) that the situation either presents the employee/officer with a difficult choice of the sort that training or supervision will make less difficult, or that there is a history of employees/officers mishandling the situation; and (3) that the wrong choice by the employee/officers will frequently cause the deprivation of a citizen's constitutional rights. Nicholson v. Scoppetta, 344 F.3d 154, 166 (2d Cir. 2003). Additionally, the plaintiff must demonstrate that the inadequate training actually caused the violation of the plaintiff's federally protected right. See City of Canton v. Harris, 489 U.S. 378, 391 (1989).

In the case at bar, Defendant Roberts testified in his deposition that he was directly responsible for the Major Crimes Unit at the time Ms. Glace's name was released to Anthony Thompson. He further testified that he had never read the state's witness protection law, despite its' mandates that the State's Chief State's Attorneys' Office was required to work with, and coordinate the efforts of "local law enforcement." Defendant Roberts testified that when he worked under Chief Harnett on February 13, 2005, he actually went to the scene of the Cleveland Café shooting, to see that "investigators were doing their jobs properly." **Exhibit # 18 Deposition Transcripts of Daryl Roberts, P.31, L-1-20.** As he stated, "he was ultimately responsible," Defendant Roberts admitted at his deposition that given Ms. Glace's "closeness" to Anthony Thompson (closeness to a suspect being one of the qualifying criteria at HPD for witness protection) that she was never referred for witness protection, even though "she should have been provided the service." **Exhibit # 18 Deposition Transcripts of Daryl Roberts, P.33, L-9-24.**

Defendant's Roberts' only defense to his failure to provide witness protection to Ms. Glace has been that "it is the state's responsibility." **Exhibit # 18 Deposition Transcripts of Daryl Roberts, P.39, L-18-25, and P. 40, L-1-15.** Despite this glaring denial, Defendant Roberts later admitted that the actual "interval which occurs between the time an investigation is initiated by his department, and when the case is turned over to the state prosecutors' that it is the Major Crimes Detectives responsibility to seek witness protection for any witness at risk of harm." **Exhibit # 18 Deposition Transcripts of Daryl Roberts, P.38, L-1-6, L-9-25, P.39, L-17-22, and P40, L-1-10.** Despite this recognition, Defendant Roberts' failure to train his subordinate detectives was the actual cause of Ms. Glace's death, especially given that they published her name to Anthony Thompson. Concomitantly, Defendant Roberts testified without opposition that "he had never read or saw the Connecticut law on Witness Protection Conn. Gen. Stat. 54-82t before. **Exhibit # 18 Deposition Transcripts of Daryl Roberts, P.53-(57).** This fact is a remarkable revelation especially in light of the fact Defendant Roberts authored his department's Crime Stoppers Program which would have placed members of the Hartford community in harm's way after they had provided names of suspects they knew like in Ms. Glace's case.

Ms. Glace met all the criteria for witness protection, but the lack of training attendant to the HPD major crimes detectives directly caused her death. Defendant Roberts admitted at his deposition that during his tenure as the head of the Major Crimes Unit he "started the crime Stoppers Program which facilitated members of the community passing information to police with respect to suspects involved in major crimes." **Exhibit # 18 Deposition Transcript of Daryl Roberts, P.31, L-1-20.** Defendant

Roberts expressed the known dangers associated with members of the public passing such information, in that he feared for their safety with respect to retaliation." **Exhibit # 18 Deposition Transcripts of Daryl Roberts, P.34, L-9-25, P.35, P.36. P. 37 and P.38.** Despite these fears, he did not accord witness protection to Ms. Glace; and his Major Crimes Unit "served up" Ms. Glace's name, address, and date of birth to Anthony Thompson by publishing her unedited personal statement.

This is clear evidence of the deliberate indifference exhibited by Defendant Roberts; he knew from his own "Crime Stoppers Program the dangers associated with members of the public providing information to the police, and the inevitable retaliation that follows." Had Defendant Roberts read the witness protection law, and provided the necessary training to his detectives, Ms. Glace's name would not have been published; as he testified at his deposition, "she should have been provided witness protection." There is therefore a causal relationship between the Defendant Roberts' failure to train the officers under his charge and Ms. Glace's death. Defendant Roberts admitted at his deposition that Ms. Glace should have been provided witness protection, especially given her closeness to Anthony Thompson. Therefore, by inference, had the detectives under Defendant Roberts' charge been trained on the witness protection law Ms. Glace would not have been killed after her name was published to Anthony Thompson's legal team. Although the witness protection law had been in existence since October 1999, Defendant Roberts, did not take the time to read the law. More specifically, Defendant Roberts as the policymaker at the HPD was properly informed as to his and his department's responsibilities as they pertained to protecting witnesses, especially as here

where members of his Major Crimes Unit provided Ms. Glace's name, address and date of birth to Anthony Thompson.

## Count Two, Substantive Due Process as Defendant Roberts

Defendant Roberts violated Ms. Glace's constitutional rights by causing publication of her name in a document he knew, or should have known would have made its way to the hands of Anthony Thompson.  The Supreme Court has held that the Fourteenth Amendment's due process clause generally does not impose upon states an affirmative duty to protect individuals against private violence.  But, only state action that shocks the conscience can constitute a violation of substantive due process.  County of Sacramento v. Lewis, 533 U.S. 833, 846 (1998) *Citing* Deshaney v. Winnebago County Dep't of Soc. Serv.., 489 U.S, 189 (1989).  In outlining this standard, the Lewis Court ruled that ordinary negligence is never conscience-shocking, but left open . . . that recklessness or gross negligence could be actionable.  Id. at 848-49.

There are two exceptions to the standard as announced in Deshaney, the special relationship exception and the state created danger exception.  The "special relationship exception applies to persons in state custody, such as to foster children, or persons who have their freedom of movement limited by the state.  Doe v. New York Dept. of Social Servs., 649 F.2d 134 (2d Cir. 1981).  On the other hand, the state-created danger exception is applied in limited circumstances by imposing liability on state actors under a substantive due process theory if the state actors affirmatively assist in creating of

increasing the danger to a victim of crime.  Id  In <u>Gan v. City of New York</u>, 996 F.2d 522 (2d Cir. 1993), The Second Circuit Court of Appeals found that a prosecutorial official was required to provide protection to a witness to a robbery after the witness was presented at a face-to-face identification of the assailants.  The assailants later threatened the witness against testifying against them; he refused and was subsequently murdered. In the <u>Gan</u> case, there was no state law mandating witness protection for witnesses at risk at harm as that which existed in Connecticut at the time Ms. Glace was murdered.  The court found that the constitutional right at issue in the case was the special relationship between law enforcement officials and the witness as it pertained to the witness' protection from harm. <u>Gan</u>, at 528.  The court found that the Plaintiff had stated an adequate claim where the prosecutorial official was aware of the existence of a constitutional duty to protect the witness. <u>Id</u>, at 528.

Ms. Glace was entitled to witness protection from the Defendant Roberts after her personal information was published to Anthony Thompson.  Inmates Steven Nelson and Everton Gardner testified at Anthony Thompson's trial and Earl Thompson's Probable Cause Hearing respectively that they both informed the state that Ms. Glace's life was in danger from Anthony Thompson's threatened harm to her.  Defendant Roberts was in charge of the very HPD unit which published her name to Anthony Thompson's legal team.  Defendant Roberts has testified under oath that he was in charge of the Major Crimes Unit which was responsible for investigating serious felonies.  Although Ms. Glace's circumstances met the HPD criteria for witness protection, Defendant Roberts' unit did not refer Ms. Glace for witness protection.  Defendant Roberts testified without rebuttal that as the author of "his Crime Stoppers Program, he was very concerned about

retaliation by suspects identified by members of the community.  **Exhibit # 18**

**Deposition Transcript of Daryl Roberts, P.34, L-9-25, P.35, P.36, P.37, and P.38.**

Here, by publishing Ms. Glace's name to Anthony Thompson, The HPD created

the danger to which she subsequently succumbed.  State law mandated that "all witness

to serious felonies were entitled to a review into the risk of harm, they face."  The state

witness protection law also mandates coordination between local law enforcement

officials and The States' Prosecutorial Officials, yet despite this fact, the warnings issued

by the previously mentioned inmates fell on deaf ears, both at the state level and the HPD

level.  Had the City of Hartford Police Department not published Ms. Glace's name to

Anthony Thompson, she may have survived to testify against him at his trial.

### State Supervisory liability as to Defendants Morano and Kane

Defendants Morano and Defendant Kane failed to train the state personnel

responsible for administering the witness protection program.  Their conduct caused the

death of Ms. Glace at the hands of Anthony Thompson.  "Personal involvement of

defendants in alleged constitutional deprivations is a prerequisite to an award of damages

under Section 1983.'"  Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)

> The personal involvement of a supervisory defendant may
> be shown by evidence that: (1) the defendant participated
> directly in the alleged constitutional violation, (2) the
> defendant, after being informed of the violation through a
> report or appeal, failed to remedy the wrong, (3) the
> defendant created a policy or custom under which
> unconstitutional practices occurred, or allowed the

continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Id.

The standard outlined in Twombly v. Bell Atlantic, 550 U.S. 544 (2008), paused to reject a complaint's allegations that defendants were liable because of their "knowledge and acquiescence in their subordinates' use of discriminatory criteria to make classification decisions among detainees."

In the instant case, Ms. Kelly testified that Defendant Morano was the actual Author of the Connecticut Witness Protection Law. Furthermore, Defendant Morano was the Chief State's Attorney soon after the law was enacted and promulgated procedures to facilitate the witness protection program. As the Chief State's Attorney, Defendants Morano and Kane exhibited deliberate indifference to the rights of Ms. Glace, because two inmates warned the State's Attorneys' Office that Ms. Glace's life was in imminent danger from Anthony Thompson. The state law as written by defendant Morano required a review as to the risk of harm for "all witnesses to a serious felony." Despite this fact, Ms. Kelly testified that "that is not the way we interpret the law." When the mandates of the law were pointed out to Ms. Kelly, she claimed that "that is not our practice or policy." Under the circumstances, the defendants, Kane and Morano created a policy/custom under which the unconstitutional practices occurred, and they allowed the continuance of the policy/custom leading to Ms. Glace's death at the hands of Anthony

Thompson. The conduct of both defendants is grossly negligent given the duty they owed Ms. Glace under the circumstances.


## Count Eleven, Supervisory Liability as Against Defendant Roberts

Defendant Roberts exhibited gross negligence and is liable in his individual capacity for his failure to supervise his subordinates with respect to their publication of Ms. Glace's name, address and date of birth to Anthony Thompson, while failing to refer her for witness protection. Supervisory liability attaches when an official receives actual or constructive notice of unconstitutional practices and demonstrates gross negligence or deliberate indifference by failing to act. Blyden v. Mancusi, 186 F.3d 252 (2d. Cir 1999) The failure to provide, or the inadequacy of, police protection usually does not give rise to a cause of action in tort against a city. Gordon v. Bridgeport Housing Authority, 208 Conn, 161 (1988).

The Defendant erroneously contends that referral or review of Ms. Glace's eligibility for witness protection was discretionary. The fact is that Connecticut law mandates at the least a cursory review of Ms. Glace's risk of harm as a witness to a serious felony. The law may change, or it may have needed changing, but at the time of Ms. Glace's murder, the State of Connecticut and local authorities (Hartford) were mandated to conduct at least a review of her risk of harm. In the instant case, defendant Robert testified that he was the author of the City's "Crime Stoppers Program" and as such he was well aware of the dangers it witnesses who identified persons suspected of

committing crimes in the city.  **Exhibit # 18 Deposition Transcript of Daryl Roberts, P.19, L-2-24 and 20, L-4-8.**  In fact, given that Ms. Glace suffered the very fate forming Defendant Roberts' concern (retaliation), his conduct is especially egregious.  **Exhibit # 18 Deposition Transcript of Daryl Roberts, P.34, L-9-25 and P.35, 36, 37, and 38.** Government immunity does not attach as here where the defendant's conduct exhibits deliberate indifference.  Defendant Roberts was in charge of the Major Crimes Unit and he was present at the scene to see that the "investigators did their jobs properly," Exhibit **# 18 Deposition Transcript of Daryl Roberts, P.30, L-11-25, and P.33, L3-25.**  The harm that befell Ms. Glace was predicted by inmates Everton Gardner and Steven Nelson.  In fact, two detectives from Defendant Roberts' Major Crimes Unit visited with Everton Gardner, but instead resorted to ridiculing him because of his speech impediment.  Despite the imminent danger posed to the safety of Ms. Glace by Anthony Thompson, Defendant Roberts failed to provide witness protection to her, while also failing to supervise his detectives who should have provided witness protection, or at a minimum referred her for witness protection as the state law mandated.

## **CONCLUSION**

For the forgoing reasons, the Defendants have failed to establish that there are not material facts in dispute, and as such the Plaintiffs are entitled to dismissal of the Defendants' motions for summary judgment.


BY Richard C. Gordon, Esq.


Richard C. Gordon, Esq.
Counsel for Plaintiffs
34 Jerome Avenue, Suite 212
Bloomfield, CT 06002
(860) 534-0547
(860) 656-6889 FAX
Juris No.: 27288

## CERTIFICATION OF MAILING

I certify that a copy of the foregoing documents was mailed to the Defendants on

September 3, 2012.

BY Richard C. Gordon, Esq.

Richard C. Gordon, Esq.
Counsel for Plaintiffs
34 Jerome Avenue, Suite 212
Bloomfield, CT 06002
 (860) 534-0547
 (860) 656-6889 FAX
Juris No.: 27288

## LIST OF EXHIBITS

1.   Asher Glace, Voluntary Statement to HPD witnessed by Dets. Bilbo and Sheldon.

2.   Clayton Leroy Anderson (Hollywood) Hartford Police Confirm Identity of Homicide Victim, killed 8/4/2005 (Stabbed Anthony Thompson in the mouth at the Cleveland Café on 2/14/2005.

3.   James Callianti, testified at Anthony Thompson's trial. He was outside the Cleveland Café when Anthony Thompson stated, "hand me the machine and ran back to the club with the pistol in hand."

4.   Earl Thompson's Application for Arrest Warrant witnessed by HPD Det. Christopher Sullivan where he referred to Ms. Glace as the "sole direct/eye witness who identified the shooter."

5.   Inmate Everton Gardner and cellmate of Anthony Thompson who informed Det. Bilbo that Ms. Glace was targeted for death by Anthony Thompson. He also disclosed the person who was to execute the killing of Ms. Glace-Earl Thompson.

6.   Ms. Sandra Elliott, Plaintiff and mother of Asher Glace.

7.   Anthony Thompson's telephone calls submitted at trial as proof of his plan to kill Ms. Glace (3 calls in July 2005, approximately two months after his extradition from Jamaica)

8.   Anthony Thompson's telephone call to Earl Thompson on June 2, 2007, informing that he was on the firm-trial list for his trial to begin in a few days (6/11/2007).

9.   Inmate Steven Nelson's testimony at Anthony Thompson's trial informing that he planned to use his brother-Biggs (Earl Thompson) to kill Ms. Glace.

10.   Inmate Steven Nelson's testimony at Anthony Thompson's trial informing that he planned to use his brother-Biggs (Earl Thompson) to kill Ms. Glace. He also informed that he met with law enforcement on "a few occasions before Ms. Glace was murdered." He testified he did not sign a statement

because he feared for his relatives on the outside because he had "done things with Earl before and he knew how dangerous he is." He signed a written statement on 4/5/2008 only after Earl Thompson was in custody.

11.   Inmate Steven Nelson's testimony at Earl Thompson's Probable Cause Hearing on 8/21/2008, informing that Anthony Thompson had admitted to him that he intended to kill Asher Glace and other witnesses.

12.   Christlynn Semmelrock, employed by DOC Intel Unit testified that Anthony Thompson and Steven Nelson were in the same prison, in the yard, and had chow at the same times, thereby corroboration his testimony that Anthony Thompson admitted to him that he shot Mr. Robinson at the Cleveland café and he planned to kill Ms. Glace and other witnesses prior to his trial.

13.   Earl Thompson's application for prison visits to see his brother. Two applications evidencing differing signatures were submitted and denied by DOC.

14.   HPD Det. Richard Salkeld testified on 8/21/2008 at Earl Thompson's probable cause hearing that Earl Thompson had approached him with an offer to turn in local drug dealers in exchange for an arranged private visit with his brother Anthony in prison. He also testified that he had never gotten a request of that sort before.

15.   Paulette Shelton, civilian witness who was a friend of Hollywood and witnessed Anthony Thompson being stabbed in the mouth by Hollywood.

16.   Senior State's Attorney, David Zagaja's argument before Superior Court Judge, Solomon at Anthony Thompson's trial on May 16, 2008. He argued for admission of Ms. Glace's statement to come in at trial because "Anthony Thompson had made her unavailable."

17.   Judge Solomon's opinion on admitting Asher Glace's statement.

18.   Deposition Transcripts of defendant Daryl Roberts, Chief of the Hartford Police Department dated June 21, 2012.

19.   Deposition Transcripts of Tracey Kelly, Ste Coordinator of the Witness Protection Program, dated June 27, 2012.