## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **SANDRA ELLIOT, Individually and as** | : | **CIVIL NO.: 3:09CV948 (AWT)** |
| **Administratrix of the estate of** | : | |
| **Asher Tamara Glace,** | : | |
| **PLAINTIFFS,** | : | |
| **vs.** | : | |
| | : | |
| **CITY OF HARTFORD, DARYL ROBERTS,** | : | |
| **Individually and in his official capacity as** | : | |
| **Chief of Police of the City of Hartford** | : | |
| **Police Department; CHRISTOPHER** | : | |
| **MORANO, individually and in his official** | : | |
| **capacity as Chief State's Attorney of the** | : | |
| **State of Connecticut; and KEVIN KANE,** | : | |
| **individually and in his official capacity as** | : | |
| **Chief State's Attorney of the State of** | : | |
| **Connecticut,** | : | |
| **DEFENDANTS.** | : | **NOVEMBER 29, 2012** |

### STATE DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

The State Defendants, Former Chief State's Attorney Christopher Morano and Chief State's Attorney Kevin Kane, respectfully submit their Reply Memorandum in response the Plaintiff's Opposition to their Motion for Summary Judgment. (Doc. 76). Opposing counsel has not complied with the provisions outlined in Local Rule 56 (a), which require the plaintiff to file a Local Rule 56(a)(2) Statement that corresponds with the moving party's Rule 56(a)(1) Statement and includes specific citations. The Statement of Material Facts (Doc. 77) is not responsive to the facts presented by the defendants and is void of citations. Thus, the state defendants hereby contend that the facts presented within its Rule 56 (a)(1) Statement, supported by specific citations, are admitted.

In its Memorandum in Opposition to the Defendants Motion for Summary Judgment, Plaintiff alleges that state defendants, Morano and Kane: failed to train; exhibited deliberate indifference; created and/or allowed an unconstitutional policy or custom and were negligent.  (Doc. 76, pp. 25-26).  The plaintiff's understanding of the duties and responsibilities of the Chief State's Attorney is misplaced.   In rebuttal, defendants move for summary judgment as there is no genuine issue of material fact and the plaintiff has failed to establish as matter of law liability by defendants Morano and Kane.

The parties agree that the state defendants, Former Chief State's Attorney Christopher Morano and Chief State's Attorney Kevin Kane, acted in said capacity during the period of time encompassed in the complaint.  Pursuant to the constitution of Connecticut, amendment twenty-three:

> "There shall be established within the executive department a division of criminal justice which shall be in charge of the investigation and prosecution of all criminal matters. Said division shall include the chief state's attorney, who shall be its administrative head, and the state's attorneys for each judicial district, which districts shall be established by law. The prosecutorial power of the state shall be vested in a chief state's attorney and the state's attorney for each judicial district. The chief state's attorney shall be appointed as prescribed by law."

The Chief State's Attorney is, "the chief of the Division of Criminal Justice." *Conn Gen. Stat. § 51-275*.  These defendants serve(d) in a supervisory capacity, as leader of the Division of Criminal Justice.

Each of the thirteen Judicial Districts within the State of Connecticut is led by a State's Attorney.   The Chief State's Attorney has limited authority over State's Attorneys.   The Chief State's Attorney does not have the power appoint State's Attorney.  Pursuant to the constitution of Connecticut, amendment twenty-three:

> "There shall be a commission composed of the chief state's attorney and six members appointed by the governor and confirmed by the general assembly, two of whom shall be judges of the superior court. Said commission shall appoint a state's attorney for each judicial district and such other attorneys as prescribed by law."

"The Criminal Justice Commission shall appoint a state's attorney for each judicial district, who shall act therein as attorney on behalf of the state." *Conn. Gen. Stat. § 51-278(b)(1)(B).* Alternatively, the Chief State's Attorney is not authorized to remove a state's attorney from office. *Conn. Gen. Stat. § 51-278b(b).*

The Chief State's Attorney's powers and duties are codified. *See Conn Gen. Stat. §§ 51-277, 51-279.* Under most circumstances the Chief State's Attorney does not appear or become directly involved with cases. Absent prior consent by the state's attorney for the judicial district, the Chief State's Attorney is not authorized to appear in court to represent the state. *Conn. Gen. Stat. § 51-277(d)(2).* The only exception to the consent provision mandates that "the Chief State's Attorney finds by clear and convincing evidence, misconduct, conflict of interest or malfeasance of a state's attorney" and even under those circumstances the state's attorney can object, which would then require both the Chief State's attorney and the state's attorney to prepare a written statement of their claims. *See Conn. Gen. Stat. § 51-277(d)(3).* "Both statements shall be submitted to the [Criminal Justice] commission to be considered by it at such hearing." *Id.* The Chief State's Attorney rarely litigates cases, within the Judicial Districts, on behalf of the State. These defendants did not participate in any of the criminal proceedings that involved Asher Glace.

A plaintiff may not prevail on a constitutional tort claim against an individual defendant absent proof that the defendant was personally responsible in some way for

the alleged misconduct. It is well settled that, regardless of a defendant's position in the governmental hierarchy, he cannot be held liable under section 1983 for an award of damages absent some form of personal involvement in the constitutional tort. *See, e.g., Scott v. Fischer*, 616 F.3d 100, 110 (2d Cir. 2010) (*quoting McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977)); *Provost v. City of Newburgh*, 262 F.3d 146, 154 (2d Cir. 2001); *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994).

The plaintiff in its opposition brief, relies on the standard for personal involvement by a supervisor articulated in *Colon v. Coughlin*, 58 F.3d 865 (2d Cir. 1995).

> Personal involvement of an official in a supervisory position "may be established by showing that he (1) directly participated in the violation, (2) failed to remedy the violation after being informed of it by report or appeal, (3) created a policy or custom under which the violation occurred, (4) was grossly negligent in supervising subordinates who committed the violation, or (5) was deliberately indifferent to the rights of others by failing to act on information that constitutional rights were being violated."

*Id at 873. (Doc. 76, pp. 25-26).* The *Colon* Court enumerated that an official cannot be held liable merely because he or she occupies a high position in the prison hierarchy, personal involvement is a prerequisite.

However, the United States Supreme Court has called into question and ultimately limited the scope of what qualifies as "personal involvement" by a supervisor. In *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009), the Supreme Court held "[b]ecause vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id. at 1948.* Iqbal explicitly rejected the argument that a "supervisor's mere knowledge of [or acquiescence to] his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." *See Bellamy v. Mount Vernon*

*Hospital,* 2009 U.S. Dist. LEXIS 54141, at *20, *27-28 (S.D.N.Y. 2009) (emphasis added), attached.   "Accordingly … each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."   *Estate of Young v. N.Y. Office of Mental Retardation & Developmental Disabilities,* 2009 U.S. Dist. LEXIS 78049 (S.D.N.Y. Aug. 27, 2009), attached.  "[P]urpose rather than knowledge is required … for an official charged with violations arising from his or her superintendant responsibilities." *Ashcroft v. Iqbal,* 129 S.Ct. at 1949.

Following *Iqbal,* "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster – a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred.  The other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated – situations where the supervisor knew of and acquiesced to a constitutional violation committed by a subordinate." *See Bellamy v. Mount Vernon Hospital at *6.*

In a case against a municipality, the Supreme Court made clear that failure to train and other supervisory claims seeking to impose 1983 liability must include allegations that a supervisory defendant was both deliberately indifferent to a need to train regarding a certain area, and "that the lack of training actually caused" the constitutional violation. *Connick v. Thompson,* 536 U.S. __, 131 S.Ct. 1350, 179 L.Ed.2d 417, 427 (2011).  The Court noted that proving causation by virtue of a policy or failure to train "presents difficult problems of proof," and requires a "stringent standard of fault, lest municipal liability under § 1983 collapse into *respondeat superior." Id.* at *1365.  Defendants submit that, as *respondeat superior* is a theory similarly unavailing

here, the same stringent standard applies, and plaintiffs allegations are so insufficient as to render this claim dismissible.

Without a specific citation, plaintiff seeks to establish personal involvement by alleging a failure to train local law enforcement. "For the state's part it, has never provided any training to local law enforcement officials despite the mandates of the law." *See Doc. 76 Pg. 6.* These defendants do not train, nor are they expected to train, local law enforcement regarding the Leroy Brown, Jr. and Karen Clarke Witness Protection Program. The law does not compel the Chief State's Attorney to train local law enforcement. "He shall establish staff development, training and education programs designed to improve the quality of the division's services and program." *Conn Gen. Stat. § 51-279(8).* The role of the Chief State's Attorney is to provide enrichment and training for employees within the Division of Criminal Justice. Tracey Kelly testified that her responsibility as Witness Protection Coordinator includes training. ***See Doc. 75 Local Rule 56 (a) Statement ¶ 8.*** Tracey Kelly, and the inspectors within her unit, train state's attorneys throughout the state on the witness protection program. ***See Doc. 75 Local Rule 56 (a) Statement ¶ 7.*** Tracey also acknowledged that training material about the Witness Protection Program is also distributed ***See Doc. 75 Local Rule 56 (a) Statement ¶ 8.*** Training is provided in accordance with the law.

Plaintiff attempts to demonstrate a failure to train, by the state defendants, with unsupported claims that the defendants did not review all witnesses. "Although the Connecticut Witness Protection Law requires that "all witnesses to serious felonies be reviewed by the Chief State's Attorney's Office, neither Defendant Kane or Morano conducted, or authorized anyone to review Ms. Glace risk of harm ..." *See Doc. 76, p.7.*

6

This is inaccurate.  The Leroy Brown, Jr. and Karen Clarke Witness Protection Program, does not specifically require the Chief State's Attorney to personally review all witnesses to serious felonies.  *Conn Gen. Stat. § 54-82t(b)* sets forth the following:  "In any investigation or prosecution of a serious felony offense, the prosecutorial official shall review all witnesses and may identify any witness as a witness at risk of harm." The statute requires a prosecutorial official to perform a review, not the Chief State's Attorney.

Tracy Kelly explained the manner in which a person is reviewed for the witness protection program.   The police department makes the initial determination that a witness may need protection.  *See Doc. 75* **Local Rule 56 (a) Statement ¶ 9**.   The procedure for admission into the witness protection unit requires the police department to make the referral to the local state attorney's office.  *See Doc. 75* **Local Rule 56 (a) Statement ¶ 10**.  The State's Attorney for each Judicial District, not the Chief State's Attorney, decides who is eligible for witness protection services within their Judicial District.  *See Doc. 75* **Local Rule 56 (a) Statement ¶ 11**.  The State's Attorney for each Judicial District is responsible for reviewing and certifying a person into the witness protection program.  *See Doc. 75* **Local Rule 56 (a) Statement ¶ 12**.  Thus, these defendants do not interact or review all witnesses, to a serious felony offense, for criminal actions litigated within each of the 13 judicial districts.

The role of the Division of Criminal Justice in providing a witness protective services was outlined by Ms. Kelly.  The purpose of the Witness Protection Program is to assure citizens if they are concerned for their safety there is a program that could help them. *See Doc. 75* **Local Rule 56 (a) Statement ¶ 6**.  Ms. Kelly's explicitly stated

that as the Witness Protection Coordinator Supervisor, her involvement begins after an individual is certified into the program by the state's attorney. *See Doc. 75* **Local Rule 56 (a) Statement ¶ 13**. This is in line with the law. "When a witness is certified ... the Chief State's Attorney shall provide appropriate protective services to such witness" *Conn Gen. Stat. § 54-82t(c)*. As Coordinator, Ms. Kelly receives referrals from all of the state's attorneys in the various judicial districts. *See Doc. 75* **Local Rule 56 (a) Statement ¶ 14**. The Chief State's Attorney has not received referrals. *See Doc. 75* **Local Rule 56 (a) Statement ¶ 15**. Ms. Kelly never received a referral for Asher Glace. *See Doc. 75* **Local Rule 56 (a) Statement ¶ 16**. Furthermore, these defendants never conferred with Ms. Kelly about determining whether, Asher Glace, or any witness is qualified for the Witness Protection Program. *See Doc. 75* **Local Rule 56 (a) Statement ¶¶ 20 – 21.**

Lastly, the plaintiff claims that these defendants exhibited deliberate indifference to the rights of Ms. Glace. The rationale behind this breach is unsupported. Consequently, the speculation advanced by the plaintiff does not amount actionable conduct.

Plaintiff has failed to adequately respond to the Local Rule 56(a)(1) Statement filed by the state defendants. The unsubstantiated allegations raised by the plaintiff do not warrant relief. First, plaintiff has not demonstrated that these defendants were involved. Despite this substantial flaw, plaintiff relies on misinterpretation of the law to argue that these defendants failed to adequately train. That argument lacks merit. Lastly, the unfounded allegations raised by the plaintiff do not amount to deliberate indifference or gross negligence. Absent any evidence to that effect, the claims against

defendants Morano and Kane must be dismissed, and summary judgment granted in their favor.

DEFENDANTS
State of Connecticut
Office of the State's Attorney

GEORGE JEPSEN
ATTORNEY GENERAL

BY: _____/s/_____

Zenobia Graham-Days
Assistant Attorney General
Federal Bar No. ct28802
110 Sherman Street
Hartford, CT 06105
Telephone No.:  (860) 808-5450
Fax No. (860) 808-5591
Email:  zenobia.graham-days@ct.gov

## CERTIFICATION

I hereby certify that on November 29, 2012 a copy of the foregoing was filed electronically.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

_____/s/_____

Zenobia Graham-Days
Assistant Attorney General
Federal Bar No. ct28802
110 Sherman Street
Hartford, CT 06105
Telephone No.:  (860) 808-5450
Fax No. (860) 808-5591
Email:  zenobia.graham-days@ct.gov

# <u>Bellamy v. Mount Vernon Hospital, et al.</u>

## 2009 U.S. Dist. LEXIS 54141



Caution
As of: Nov 29, 2012

JEROME BELLAMY, Plaintiff, - against - MOUNT VERNON HOSPITAL, in its official and individual capacity, DR. MARC JANIS, in his official and individual capacity, NEW YORK STATE DEPARTMENT OF CORRECTIONAL SERVICES, DR. LESTER WRIGHT, in his official and individual capacity, and DR. J. PERELI, in his official and individual capacity, Defendants.

07 Civ. 1801 (SAS)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*2009 U.S. Dist. LEXIS 54141*

**June 26, 2009, Decided**
**June 26, 2009, Filed**

**SUBSEQUENT HISTORY:** Affirmed by *Bellamy v. Mount Vernon Hosp., 2010 U.S. App. LEXIS 14981 (2d Cir. N.Y., July 21, 2010)*

**PRIOR HISTORY:** *Bellamy v. Mount Vernon Hosp., 2008 U.S. Dist. LEXIS 59098 (S.D.N.Y., Aug. 5, 2008)*

**COUNSEL:** [*1] Jerome Bellamy, Plaintiff, Pro se, Alden, New York.

For Defendants: Julinda Dawkins, Assistant Attorney General, New York, New York.

**JUDGES:** Shira A. Scheindlin, United States District Judge.

**OPINION BY:** Shira A. Scheindlin

**OPINION**

**OPINION AND ORDER**

SHIRA A. SCHEINDLIN, U.S.D.J.:

**I. INTRODUCTION**

Jerome Bellamy, presently incarcerated and proceeding pro se, alleges that the New York State Department of Correctional Services ("DOCS") and Dr. Lester Wright, the remaining defendants in this case [1], violated Bellamy's constitutional rights. His claims surround denials of requested testosterone treatment by Wright, a doctor and supervisory official for the DOCS. Wright and the DOCS now move for summary judgment. For the reasons stated below, their motion for summary judgment is granted in its entirety.

[1]   The original and amended complaints were also filed against Mount Vernon Hospital, Dr. Mark Janis, Dr. J. Pereli, in their individual and official capacities. The claims against Mount Vernon Hospital and Dr. Mark Janis were dismissed in *Bellamy I* and the claim against Dr. J. Pereli was dismissed in a subsequent order issued by this Court on January 15, 2009. Wright and the DOCS are the only remaining defendants.

**II. BACKGROUND** [*2] [2]

[2]   For more detailed background, see *Bellamy v. Mount Vernon Hosp., No. 07 Civ. 1801, 2008 U.S. Dist. LEXIS 59098, 2008 WL 3152963*

*(S.D.N.Y. Aug. 5, 2008)* (*"Bellamy I"*). Some of the facts recounted here are drawn from the prior opinion.

## A. Facts

### 1. Parties

Bellamy is presently in the custody of the DOCS at the Wende Correctional Facility in Alden, New York. [3] The DOCS is a state agency responsible for the care, custody and control of inmates convicted of crimes under New York State laws. [4] Wright is both a New York-licensed medical doctor and the Deputy Commissioner and Chief Medical Officer ("CMO") of the DOCS. [5] As CMO, he is responsible for the development and operation of a system to provide necessary medical care for inmates in the custody of the DOCS. [6]

> 3   *See* Defendants' Rule 56.1 Statement of Facts P 1.
> 4   *See id.* P 2.
> 5   *See id.* P 3.
> 6   *See id.*

### 2. Bellamy's Surgery

In August 2004, while in DOCS custody at Sing Sing Correctional Facility in Ossining, New York, Bellamy underwent an epididymectomy. [7] Bellamy was HIV positive at the time of his surgery. [8] Around that time, Bellamy developed hypogonadism (a deficiency in the hormone testosterone) as well as a deficiency in the hormone cortisol. [9] As a result of these conditions,   [*3] Bellamy was prescribed various medications, including a testosterone patch called "Androderm." [10] Bellamy contends that without testosterone treatment, he suffers from mood swings, fatigue, nausea, headaches, and lack of appetite. [11] However, he also experiences similar symptoms even with medication. [12]

> 7   *See Bellamy I, 2008 U.S. Dist. LEXIS 59098, 2008 WL 3152963, at * 1.* An epididymectomy is defined as the surgical removal of the epididymis (the cord-like structure along the posterior border of the testicle). The epididymis is essential to the male reproductive system. *See* Dorland's Illustrated Medical Dictionary 639, 1342, 1770 (31st ed. 2007).
> 8   *See* 3/6/08 Deposition Testimony of Jerome Bellamy ("Bellamy Dep. I") at 139:15-17 (where Bellamy says that, prior to the surgery, he was on HIV medication).
> 9   See *Bellamy I, 2008 U.S. Dist. LEXIS 59098, 2008 WL 3152963, at *2.* These conditions had many side effects, including sexual maladies and

dramatic weight loss. *See id.* While Bellamy contends that the surgery caused the hypogonadism, his treating doctor claims "with a reasonable degree of medical certainty" that the hypogonadism preceded the surgery. *See* 4/22/08 Affidavit of Dr. Harish Moorjani ("Moorjani Aff."), Ex. J to 6/5/09 Supplemental Declaration [*4] of Julinda Dawkins, counsel to defendants, P 4.

> 10   *See, e.g.,* Amended Complaint ("Am. Compl."), Statement of Facts PP 5, 7. Androgel is a similar medication. The Amended Complaint is divided into various parts with overlapping paragraph and page numbers. As a result, references to the Amended Complaint are made by noting first the relevant topic header and then the cited or quoted paragraph number.
> 11   *See* 1/12/09 Deposition Testimony of Jerome Bellamy ("Bellamy Dep. II") at 35:23-24. Bellamy's hypogonadism may have been caused by his HIV. Bellamy complained of similar symptoms before the surgery and, therefore, before any alleged denial of Androgel or similar medications. *See* Moorjani Aff. PP 4-5.
> 12   *See* Bellamy Dep. II at 43:21-24 (where Bellamy admits that some of his symptoms resumed even after using the testosterone patch). *See also* Am. Compl., Statement of Facts P 7 ("[T]his treatment [, Androderm,] still has not proven to be effective in keeping my hormone levels elevated, even after the dosages were increased, and my levels rise high at times then suddenly drops real low.").

### 3. Bellamy's Letters to Wright

Following the surgery, Bellamy wrote to Wright on three pertinent occasions. In   [*5] the first letter, Bellamy provided background into his ailments and asked Wright to provide him with a hormone treatment (Androgel) which had been provided at a previous facility. [13] The second letter asked Wright to force Dr. Gennovese at the Shawangunk facility to provide him with Ensure -- a nutritional supplement which had been provided at a previous facility. [14] Bellamy's third letter to Wright concerned several matters. [15] In particular, Bellamy claimed, *first,* that a female officer entered his cell and retrieved his HIV medication, *second,* that an officer eavesdropped on a medical consultation with his doctor, and, *third,* that he went four days without HIV medication, five days without cortisol treatment, and six days without testosterone treatment, all while undergoing a mental health evaluation. [16]

> 13   *See* Defendants' Rule 56.1 Statement of Facts P 9. *See also* 7/5/05 Grievance Letter from

Bellamy to Wright, Ex. D to 3/30/09 Declaration of Julinda Dawkins, counsel to defendants ("Dawkins Decl.").
14    *See* Defendants' Rule 56.1 Statement of Facts P 10. *See also* 1/22/07 Grievance Letter from Bellamy to Wright, Ex. E to Dawkins Decl.
15    *See* Defendants' Rule 56.1 Statement of Facts P 11. [*6] *See also* 6/5/07 Grievance Letter from Bellamy to Wright, Ex. F to Dawkins Decl.
16    *See* 6/5/07 Grievance Letter from Bellamy to Wright, Ex. F to Dawkins Decl.

Wright's office routinely receives hundreds of letters each year, addressed to him personally from inmates throughout the DOCS system and from individuals writing on behalf of inmates. [17] These letters are screened by staff, who then forward them to the appropriate division or bureau within the DOCS with an instruction to respond or with a notation indicating the appropriate action. [18] Wright never sees the actual letters or their responses. [19] Inmate letters concerning medical care -- such as Bellamy's -- are forwarded to the Regional Health Services Administrator or the Regional Medical Director, as appropriate, that oversees the facility housing the inmate. [20] The concerns are then investigated and addressed by the regional staff. [21]

17    *See* Defendants' Rule 56.1 Statement of Facts P 12.
18    *See id.*
19    *See id.* P 13.
20    *See id.* P 14.
21    *See id.*

All three of Bellamy's letters received responses. Holly A. Collet, the Facility Health Services Administrator at Elmira Correctional Facility, responded to Bellamy's July 5, 2005 letter. [22] Pedro Diaz, [*7] the Regional Health Services Administrator at Shawangunk Correctional Facility, responded to Bellamy's January 22, 2007 letter. [23] Pedro Diaz, also the Regional Health Services Administrator at Sing Sing Correctional Facility, responded to Bellamy's June 5, 2007 letter. [24] Wright and Bellamy have never met each other, nor have they had any other personal contact. [25] Bellamy admits that he has no evidence that Wright was involved in the responses to any of the three letters. [26]

22    *See id.* P 15.
23    *See id.*
24    *See id.*
25    *See id.* P 16. *See also* 3/27/09 Affidavit of Dr. Lester N. Wright ("Wright Aff."), Ex. G to Dawkins Decl., P 9; Bellamy Dep. II at 20:23-25.
26    *See* Bellamy Dep. II at 26:17-20.

### 4. Bellamy's Claims [27]

27    In addition to the claims listed here, Bellamy originally charged both the DOCS and Wright with violations of the Americans with Disabilities Act of 1990 (the "ADA") and the Rehabilitation Act of 1973 (the "RHA"). *See* Am. Compl., Legal Claims P 15. However, Bellamy later conceded that "Plaintiff['s] Americans With Disabilities Act and Rehabilitation [Act] fails because those statutes are not applicable here at this junction." Plaintiff's Reply to Defendants' Summary Judgment ("Bellamy's [*8] Reply") at 7. This Court interprets Bellamy's Reply as a withdrawal of his ADA and RHA claims against the remaining defendants.

Bellamy admits that he has no evidence that Wright denied him testosterone replacement treatment. [28] Nonetheless, Bellamy claims that Wright "was responsible for denying plaintiff's testosterone treatment on different occasions" and "was also made aware of plaintiff's complaints, but failed to abate further injury to the plaintiff." [29] Bellamy charges the DOCS because he was in its custody when his claims arose. [30] Bellamy specifically alleges that Wright -- acting under color of state law -- displayed "deliberate indifference to plaintiff's serious medical needs and violated plaintiff's rights and constituted cruel and unusual punishment under the Eight[h] Amendment of the United States Constitution." [31] A similar claim is lodged against the DOCS. [32] Bellamy also seeks a preliminary and permanent injunction against the DOCS to provide the medical treatment he requests and to comply with various New York State laws. [33] Finally, Bellamy seeks compensatory and punitive damages. [34]

28    *See* Bellamy Dep. II at 33:14 to 34:15 (Question: "Do you have any kind of evidence [*9] that Dr. Wright denied you testosterone treatment?" Answer: "Directly, no.").
29    *See* Am. Compl., Defendants P 6.
30    *See id.* Many of the claims that allegedly occurred under DOCS supervision have since been dismissed.
31    *See id.*, Legal Claims P 13. Bellamy brings his claims pursuant to *section 1983 of Title 42 of the United States Code* ("*section 1983*").
32    *See id.*, Legal Claims P 14 (repeating the same claim but omitting the phrase that the DOCS "violate[d] plaintiff's rights").
33    *See id.*, Legal Claims P 18. Bellamy's original Complaint only requested injunctive relief against the DOCS. However, he later asked for injunctive relief against Wright. *See* Bellamy's Reply at 1. Because Bellamy is proceeding pro se, the *factual* allegations in his Reply Memo-

randa are treated as if they were raised in his Complaints. *See Gill v. Mooney, 824 F.2d 192, 195 (2d Cir. 1987)* (considering a pro se plaintiff's affidavit in opposition to defendant's motion to dismiss in reviewing district court's dismissal of claim). However, it would be improper to allow a plaintiff, even one proceeding pro se, to add a defendant to a claim he had raised more than a year earlier. Thus, Bellamy's claim for injunctive relief [*10] against Wright is dismissed. *See Polanco v. City of New York Dep't of Corr., No. 01 Civ. 759, 2002 U.S. Dist. LEXIS 3108, 2002 WL 272401, at *3 (S.D.N.Y. Feb. 26, 2002)* ("It is well established that a plaintiff may not amend his pleading through papers offered in opposition to a motion to dismiss . . . Plaintiff is bound by the allegations of his Amended Complaint.") (citations omitted).

34   *See Am. Compl., Legal Claims PP 19-21.*

## B. Procedural History

Bellamy's first Complaint was filed on March 2, 2007, and an Amended Complaint followed on July 16, 2007. On August 5, 2008, this Court granted summary judgment to defendants Dr. Janis and Mount Vernon. The DOCS had not been properly served at that point, but it was subsequently served on August 7, 2008. Dr. J. Pereli was dismissed as a defendant on January 15, 2009, for lack of timely service of process.

## III. LEGAL STANDARD

### A. Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." [35] An issue of fact is genuine "if the evidence [*11] is such that a reasonable jury could return a verdict for the nonmoving party.'" [36] A fact is material when it "'might affect the outcome of the suit under the governing law.'" [37] "It is the movant's burden to show that no genuine factual dispute exists." [38]

35   *Fed. R. Civ. P. 56(c).*

36   *Roe v. City of Waterbury, 542 F.3d 31,34 (2d Cir. 2008)* (quoting *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*).

37   *Ricci v. DeStefano, 530 F.3d 88, 109 (2d Cir. 2008)* (quoting *Anderson, 477 U.S. at 248*).

38   *Vermont Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004)* (citing

*Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970)*).

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. [39] "Summary judgment is properly granted when the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" [40] To do so, the non-moving party must do more than show that there is "'some metaphysical doubt as to the material facts,'" [41] and it "'may not [*12] rely on conclusory allegations or unsubstantiated speculation.'" [42] However, "'all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" [43]

39   *Fed. R. Civ. P. 56(c).*

40   *Abramson v. Pataki, 278 F.3d 93, 101 (2d Cir. 2002)* (quoting *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*). *Falkenberg v. AMR Corp. (In re Sept. 11 Litig.), 500 F. Supp. 2d 356, 2007 WL 2332514, at *4 (S.D.N.Y. 2007)* ("Where the nonmoving party bears the burden of proof at trial, the burden on the moving party may be discharged by showing -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case.") (quotation omitted).

41   *Higazy v. Templeton, 505 F.3d 161, 169 (2d Cir. 2007)* (quoting *Matsushita Elec. Indus, v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*).

42   *Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005)* (quoting *Fujitsu Ltd. v. Federal Express Corp., 247 F.3d 423, 428 (2d Cir. 2001)*).

43   *Kessler v. Westchester County Dep't of Soc. Servs., 461 F.3d 199, 206 (2d Cir. 2006)* (quoting *Anderson, 477 U.S. at 248-49*).

In [*13] determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor. [44] However, "[i]t is a settled rule that' [c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'" [45] Summary judgment is therefore "only appropriate when there is no genuine issue as to any material fact, making judgment appropriate as a matter of law." [46]

44   See *Mathirampuzha v. Potter, 548 F.3d 70, 74 (2d Cir. 2008)* (quoting *Allianz Ins. Co. v. Lerner, 416 F.3d 109, 113 (2d Cir. 2005)).*

45   *McClellan v. Smith, 439 F.3d 137, 144 (2d Cir. 2006)* (quoting *Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997)). Accord Anderson, 477 U.S. at 249.*

46   *Karpova v. Snow, 497 F.3d 262, 270 (2d Cir. 2007)* (citing *Tocker v. Philip Morris Cos., 470 F.3d 481, 486-87 (2d Cir. 2006)).*

Further, where the plaintiff is proceeding pro se, his or her pleadings must be considered under a more lenient standard than that accorded to "formal pleadings drafted by lawyers," [47] and his [*14] or her pleadings must be "interpret[ed] . . . to raise the strongest arguments they suggest." [48] However, a pro se plaintiff must still meet the usual requirements of summary judgment. [49] Thus, a pro se plaintiff's "failure to allege either specific facts or particular laws that have been violated renders [his or] her attempt to oppose defendants' motion [for summary judgment] ineffectual." [50]

47   *Haines v. Kerner, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972)* (per curiam). *Accord Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)* ("Because [plaintiff] is a pro se litigant, we read his supporting papers liberally.").

48   *Burgos, 14 F.3d at 790.*

49   See *Maalouf v. Salomon Smith Barney, Inc., No. 02 Civ. 4470, 2004 U.S. Dist. LEXIS 17873, 2004 WL 2008848, at *4 (S.D.N.Y. Sept. 8, 2004).* ("'Proceeding pro se does not otherwise relieve a litigant from the usual requirements of summary judgment, and a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment.'") (quoting *Cole v. Artuz, No. 93 Civ. 5981, 1999 U.S. Dist. LEXIS 16832, 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999)).*

50   *Kadosh v. TRW, No. 91 Civ. 5080, 1994 U.S. Dist. LEXIS 17390, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994).*

## B. Exhaustion of Administrative Remedies

The Prison Litigation [*15] Reform Act (the "PLRA") mandates that a prisoner exhaust all administrative remedies before bringing an action regarding prison conditions. [51] Failure to exhaust is an absolute bar to an inmate's action in federal court: "*[section] 1997e(a)* requires exhaustion of available administrative remedies *before* inmate-plaintiffs may bring their federal claims to court at all." [52] Because the plain language of *section 1997e(a)* states "no action shall be brought," an inmate must have exhausted his claims at the time of the initial

filing, given that "[s]ubsequent exhaustion after suit is filed ... is insufficient." [53] Moreover, the exhaustion of administrative remedies must be proper -- that is, in compliance with a prison grievance program's deadlines and other critical procedural rules -- in order to suffice. [54] The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." [55]

51   See *42 U.S.C. § 1997e(a)* (providing that: "No action shall be brought with respect to prison conditions under *§ 1983* of this title, or any [*16] other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.") ("*section 1997*"). See also *Porter v. Nussle, 534 U.S. 516, 516, 122 S. Ct. 983, 151 L. Ed. 2d 12 (2002); Booth v. Churner, 532 U.S. 731, 739, 121 S. Ct. 1819, 149 L. Ed. 2d 958 (2001).*

52   *Neal v. Goord, 267 F.3d 116, 122 (2d Cir. 2001)* (quotation marks and citation omitted, emphasis in original).

53   *Id.*

54   See *Woodford v. Ngo, 548 U.S. 81, 90-92, 126 S. Ct. 2378, 165 L. Ed. 2d 368 (2006).*

55   *Porter, 534 U.S. at 532.*

While the Second Circuit has recognized that the PLRA's exhaustion requirement is mandatory, it has also recognized three exceptions to the exhaustion requirement:

> when (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as reasonable misunderstanding of the grievance procedure, justify the prisoner's failure to comply with the exhaustion requirement. [56]

56   *Ruggiero v. County of Orange, 467 F.3d 170, 175 (2d Cir. 2006).*

The Second Circuit has held that "'[a]lert[ing] the prison officials as to the nature of the wrong for which redress is sought,' . . [*17] . does not constitute proper exhaustion." [57] "[N]otice alone is insufficient because

2009 U.S. Dist. LEXIS 54141, *

'[t]he benefits of exhaustion can be realized only if the prison grievance system is given fair opportunity to consider the grievance' and '[t]he . . . system will not have such an opportunity unless the grievance complies with the system's critical procedural rules.'" [58]

> 57   *Macias v. Zenk*, 495 F.3d 37, 44 (2d Cir. 2007) (quoting *Braham v. Clancy*, 425 F.3d 177, 184 (2d Cir. 2005) and citing *Woodford*, 548 U.S. at 94-95) (finding plaintiff "cannot satisfy the PLRA's exhaustion requirement solely by filing two administrative tort claims, or by making informal complaints to the MDC's staff").
> 58   *Id.* (quoting *Woodford*, 548 U.S. at 95).

## C. *Eleventh Amendment* Immunity

The *Eleventh Amendment* provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State . . ." [59] "A state's *Eleventh Amendment* protection from suit extends to its agencies and departments." [60] "This [*Eleventh Amendment*] [*18] bar remains in effect when State officials are sued for damages in their official capacity." [61] To determine whether the action is an official or individual capacity suit, this Court must look behind the designation and determine whether "the State is the real, substantial party in interest." [62] State agencies are not immune from suits asking for injunctive relief under the *Eleventh Amendment*. [63]

> 59   *U.S. Const. amend. XI.*
> 60   *Morningside Supermarket Corp. v. New York State Dep't of Health*, 432 F. Supp. 2d 334, 338 (S.D.N.Y. 2006) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100, 104 S. Ct. 900, 79 L. Ed. 2d 67 (1984)). *Accord Bryant v. New York State Dep't of Corr. Servs. Albany*, 146 F. Supp. 2d 422 (S.D.N.Y. 2001) (affirming the dismissal of a *section 1983* claim against the DOCS and a correctional facility because *Eleventh Amendment* immunity abrogated the court's subject matter jurisdiction to hear the claim).
> 61   *Kentucky v. Graham*, 473 U.S. 159, 169, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985) (citation omitted).
> 62   *Ford Motor Co. v. Department of Treasury of Ind.*, 323 U.S. 459, 464, 65 S. Ct. 347, 89 L. Ed. 389 (1945), *overruled in part by Lapides v. Board of Regents of the Univ. Sys. of Ga.*, 535 U.S. 613, 122 S. Ct. 1640, 152 L. Ed. 2d 806 (2002).
> 63   *See, e.g., Perez v. Westchester County Dep't of Corr.*, No. 05 Civ. 8120, 2007 U.S. Dist. LEXIS 32638, 2007 WL 1288579, at *6-8 (S.D.N.Y. Apr.

30, 2007) [*19] (considering, but then denying, injunctive relief against a county's department of corrections).

## D. *Section 1983*

*Section 1983* "does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere." [64] In order to state a claim under *section 1983*, a plaintiff must show that the conduct complained of was committed by a person or entity acting under color of state law, and that the conduct deprived a person of rights, privileges, and immunities secured by the Constitution. [65] "[N]either a State nor its officials acting in their official capacities are 'persons' under [*section*] *1983*." [66] Thus, *section 1983* "does not provide a federal forum for litigants who seek a remedy against a state for alleged deprivation of rights secured by the United States Constitution." [67]

> 64   *Morris-Hayes v. Board of Educ. of Chester Union Free Sch. Dist.*, 423 F.3d 153, 159 (2d Cir. 2005) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 816, 105 S. Ct. 2427, 85 L. Ed. 2d 791(1985)).
> 65   *See Palmieri v. Lynch*, 392 F.3d 73, 78 (2d Cir. 2004) (citation omitted).
> 66   *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989). *Accord Huminski v. Corsones*, 396 F.3d 53, 70 (2d Cir. 2005).
> 67   *Bryant*, 146 F. Supp. 2d at 425.

Furthermore, [*20] "[i]t is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [*section*] *1983*.'" [68] Thus, "[a] supervisory official cannot be liable solely on account of the acts or omissions of his or her subordinates." [69] In 1995, the Second Circuit held that a supervisory official is personally involved only when that official: (1) participates directly in the alleged constitutional violation; (2) fails to remedy the violation after being informed of the violation through a report or appeal; (3) creates or allows the continuation of a policy or custom under which unconstitutional practices occurred; (4) acts with gross negligence in supervising subordinates who commit the wrongful acts; or (5) exhibits deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. [70] However, in 2009, the Supreme Court held, "[b]ecause vicarious liability is inapplicable to . . . [*section*] *1983* suits, a plaintiff must plead that each Government-official defendant, through the official's *own individual actions*, has violated the Constitution." [*21] [71] The Supreme Court explicitly rejected the argument that,

"a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." [72] Thus, "[a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." [73] For example, "[t]he allegation that plaintiff sent defendant [] letters complaining of prison conditions is not enough to allege personal involvement." [74]

> 68   Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)).
> 69   Ford v. Conway, No. 03 Civ. 0927S, 2004 U.S. Dist. LEXIS 8872, 2004 WL 1071171, at *4 (W.D.N.Y. Mar. 16, 2004).
> 70   See Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citation omitted).
> 71   Ashcroft v. Iqbal, _ U.S. _, 129 S.Ct. 1937, 1948, 173 L. Ed. 2d 868 (2009) (emphasis added).
> 72   Id. at 1949.
> 73   Id.
> 74   Laureano v. Pataki, No. 99 Civ. 10667, 2000 U.S. Dist. LEXIS 14221, 2000 WL 1458807, at *4 (S.D.N.Y. Sept. 29, 2000) (granting a motion to dismiss on similar facts). See also Farid v. Goord, 200 F. Supp. 2d 220, 235 (W.D.N.Y. 2002) (dismissing claims of personal involvement against supervisory official who merely sent grievances "down the chain [*22] of command for investigation").

## E. Eighth Amendment Right to be Free from Deliberate Indifference to Serious Medical Needs

The Eighth Amendment prohibits the infliction of cruel and unusual punishment on prisoners. [75] The Supreme Court has held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth Amendment." [76] Because the inadvertent or negligent failure to provide adequate medical care does not rise to the level of deliberate indifference, allegations of medical malpractice or negligent treatment are insufficient to state a claim under section 1983. [77] "Prison officials have a duty to provide prisoners with the 'reasonably necessary medical care which would be available to him or her . . . if not incarcerated.'" [78] However, a prison cannot be required to meet the same standard of medical care found in outside hospitals. [79]

> 75   U.S. Const. amend. XIII.
> 76   Estelle v. Gamble, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976) (quoting Gregg v. Georgia, 428 U.S. 153, 173, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976)). Accord Farmer v. Bren-

nan, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994) ("To violate the Cruel and Unusual Punishments Clause, a prison official must have [*23] a sufficiently culpable state of mind . . . . In prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety . . . .") (quotations and citations omitted).
> 77   See Estelle, 429 U.S. at 105-06.
> 78   Candelaria v. Coughlin, No. 91 Civ. 2978, 1996 U.S. Dist. LEXIS 2298, 1996 WL 88555, at *7 (S.D.N.Y. Mar. 1, 1996) (quoting Langley v. Coughlin, 888 F.2d 252, 254 (2d Cir. 1989)). Accord Edmonds v. Greiner, No. 99 Civ. 1681, 2002 U.S. Dist. LEXIS 3746, 2002 WL 368446, at *8 (S.D.N.Y. Mar. 7, 2002) ("A person who is incarcerated is entitled to receive adequate medical care.").
> 79   See Archer v. Dutcher, 733 F.2d 14, 17 (2d Cir. 1984) ("We have no doubt that the same standards of medical care cannot be imposed upon a prison as are presumed to be realized at a hospital.").

"'The deliberate indifference standard embodies both an objective and a subjective prong.'" [80] "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." [81] "Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state [*24] tort law, not every lapse in prison medical care will rise to the level of a constitutional violation." [82] "[W]hen a prisoner asserts that delay in his treatment constitutes deliberate indifference on the part of a healthcare provider, the Court looks to the severity of the consequences brought about by the alleged delay." [83]

> 80   Morrison v. Mamis, No. 08 Civ. 4302, 2008 U.S. Dist. LEXIS 106416, 2008 WL 5451639, at *5 (S.D.N.Y. Dec. 18, 2008) (quoting Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994)).
> 81   Smith v. Carpenter, 316 F.3d 178, 183-84 (2d Cir. 2003) (quoting Estelle, 429 U.S. at 104)).
> 82   Id. (citing Estelle, 429 U.S. at 105-06).
> 83   Pabon v. Goord, No. 99 Civ. 5869, 2003 U.S. Dist. LEXIS 5359, 2003 WL 1787268, at *11 (S.D.N.Y. Mar. 28, 2003) (citation omitted).

## F. Preliminary and Permanent Injunction

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his

favor, and that an injunction is in the public interest." [84] "A preliminary injunction is an extraordinary remedy never awarded as of right." [85] "When the movant seeks a 'mandatory' injunction -- that is, as in this case, [*25] an injunction that will alter rather than maintain the status quo -- [he or] she must meet the more rigorous standard of demonstrating a 'clear' or 'substantial' likelihood of success on the merits." [86] The standard for a permanent injunction is essentially the same as for a preliminary injunction, except that a plaintiff seeking a permanent injunction must show actual success on the merits rather than a likelihood of success on the merits. [87]

> 84   *Winter v. Natural Res. Def. Council, Inc., U.S.    , 129 S.Ct. 365, 374, 172 L. Ed. 2d 249 (2008). Accord Citigroup Global Markets Inc. v. VCG Special Opportunities Master Fund, No. 08 Civ. 5520, 2009 U.S. Dist. LEXIS 45819, 2009 WL 1528513, at *1-2 (S.D.N.Y. June 1, 2009)* (discussing *Winter* approvingly). *But see Almontaser v. New York City Dep't of Educ., 519 F.3d 505, 508 (2d Cir. 2008)* ("A party seeking a preliminary injunction 'must show irreparable harm absent injunctive relief, and either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in plaintiff's favor.'") (citation omitted).
>
> 85   *Winter, 129 S.Ct, at 376* (citation omitted).
>
> 86   *Mitchell v. New York State Dep't of Corr. Servs., No. 06 Civ. 6278, 2009 U.S. Dist. LEXIS 5109, 2009 WL 185757, at *2 (W.D.N.Y. Jan. 26, 2009)* [*26] (quoting *Doninger v. Niehoff, 527 F.3d 41, 47 (2d Cir. 2008)*).
>
> 87   *See Winter, 129 S.Ct, at 381.*

## IV. DISCUSSION

Bellamy asserts an *Eighth Amendment* deliberate indifference claim against Wright and the DOCS. Defendants respond, first, by asserting *Eleventh Amendment* immunity with respect to all claims against the DOCS and any claims against Wright in his official capacity. As for the claim against Wright in his individual capacity, defendants argue that he was not personally involved in the alleged harm, nor did he create a policy that contributed to that harm. Bellamy also seeks a preliminary and permanent injunction against the DOCS to provide the medical treatment he requests and to comply with several New York State laws. Defendants argue that Bellamy will not win on the merits, nor will he suffer irreparable harm. Defendants urge this Court to decline to exercise supplemental jurisdiction over any remaining New York State law claims. Finally, Bellamy seeks compensatory and punitive damages.

### A. Exhaustion of Administrative Remedies

This Court determined in a previous opinion that "Bellamy did not fail to exhaust his administrative remedies because he was justified in his belief that no [*27] administrative remedy was available to him." [88] Thus, Bellamy's claims are not barred by the PLRA.

> 88   *Bellamy I, 2008 U.S. Dist. LEXIS 59098, 2008 WL 3152963, at *5* (citing *Giano v. Goord, 380 F.3d 670, 678 (2d Cir. 2004)*).

### B. *Eleventh Amendment* Immunity

The *Eleventh Amendment* immunizes state agencies and state officials acting in their official capacity from suit under *section 1983*. Accordingly, Bellamy's deliberate indifference claims against both the DOCS and Wright, in his official capacity, are dismissed.

### C. *Section 1983* Claim of Deliberate Indifference Against Wright in His Individual Capacity

The Supreme Court's decision in *Iqbal v. Ashcroft* abrogates several of the categories of supervisory liability enumerated in *Colon v. Coughlin. Iqbal's* "active conduct" standard only imposes liability on a supervisor through *section 1983* if that supervisor actively had a hand in the alleged constitutional violation. Only the first and part of the third *Colon* categories pass *Iqbal's* muster -- a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred. The other *Colon* categories [*28] impose the exact types of supervisory liability that *Iqbal* eliminated -- situations where the supervisor knew of and acquiesced to a constitutional violation committed by a subordinate.

Bellamy's remaining claim alleges that Wright, in his individual capacity, was deliberately indifferent to Bellamy's medical needs. However, Bellamy offers no evidence that any of Wright's actions fall into any of the remaining exceptions that would permit supervisory liability. *First,* Bellamy admits that Wright was not personally involved in the letter responses. Both parties agree that they have never had any form of contact. *Second,* Bellamy offers no evidence that Wright created or contributed to a policy or custom of unconstitutional practices. Bellamy also admitted that he can provide no evidence that Wright was responsible for making any decisions regarding his testosterone medications. [89] Bellamy's conclusory allegations that Wright must have known about Bellamy's plight is not enough to impute *section 1983* liability. [90]

89    *See, e.g.*, Bellamy Dep. II at 32:19-21 (Question: "Did Dr. Moorjani say anything that Dr. Wright was involved in the April of 2005 denial?" Answer: "No, he did not.")

90    *See Reid v. Artus, 984 F. Supp. 191, 195 (S.D.N.Y. 1997)* [*29] (dismissing an asthmatic prisoner's *section 1983* claim against a supervisory official when the pleadings "fail[ed] to allege, let alone establish, any factual basis upon which a fact finder could reasonably conclude personal involvement by the supervisory official defendant... that [defendant] created or continued a policy or custom which allowed the violation to occur, or that [defendant] was grossly negligent in managing the subordinates who caused the unlawful condition").

Finally, Bellamy offers no evidence that Wright demonstrated deliberate indifference to Bellamy's serious medical needs. Bellamy does not contend that Wright unnecessarily and wantonly inflicted any pain -- indeed Bellamy conceded that Wright was not involved with the alleged denials of treatment. Accordingly, Bellamy's deliberate indifference claim against Wright in his individual capacity is dismissed.

## D. Preliminary and Permanent Injunction

Bellamy asks this Court to order the DOCS -- through an injunction -- to provide him with adequate medical care and to comply with New York State laws. This request is denied.

*First*, Bellamy has not alleged that he is suffering irreparable harm. Instead, he has alleged a number [*30] of unrelated and sporadic problems that can be expected in the normal course of incarceration, especially when transferring from facility to facility. It cannot be inferred from his pleadings, his testimony or his letters to Wright that he has consistently been denied any form of treatment. Indeed, each of his three letters address completely different topics without readdressing prior issues. Bellamy concedes that the disruption of his medication only occurred on a very limited or isolated basis. [91]

91    *See* Bellamy Dep. II at 56-57, 75-76 (demonstrating that, over the course of three-years, Bellamy was denied treatment for one three-week period, for one allegedly three-month period -- while he was transferring facilities -- and a few alleged short-term periods, although those dates are unspecified).

*Second*, Bellamy cannot show a clear or substantial likelihood of success on the merits. Bellamy does not offer evidence that either defendant was deliberately indifferent to his serious medical needs. [92] For the objective

prong, Bellamy offers no evidence that any deprivation of medication was sufficiently serious. Headaches and fatigue do not rise to the level of seriousness necessary to [*31] warrant a preliminary injunction -- especially when Bellamy admits that he still suffers similar side-effects while receiving the requested treatment. [93] For the subjective prong, Bellamy does not offer any evidence that any DOCS employee acted with the requisite state of mind to be deliberately indifferent to his serious medical needs.

92    While the DOCS itself is immune from *section 1983* liability, the following analysis surrounds the DOCS and its employees generally.

93    Further, the defendants' affidavits question many of Bellamy's medical propositions. *See, e.g.*, Moorjani Aff. P 4 (claiming that Bellamy exhibited signs of hypogonadism and many of its symptoms, including weight loss, headaches, and fatigue, prior to the surgery).

This Court need not address the balance of equities nor the public interest factors because Bellamy has not shown irreparable harm or a substantial likelihood of success on the merits. Accordingly, Bellamy's request for both a preliminary and permanent injunction is denied.

## E. Supplemental Jurisdiction

Bellamy asks this Court to compel the DOCS -- through an injunction -- to comply with New York State Public Health Laws. [94] To the extent that there are any remaining [*32] state law claims, this Court declines to exercise supplemental jurisdiction over those claims. [95]

94    *See* Am. Compl., Prayer for Relief P 18.

95    *See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988)* ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine -- judicial economy, convenience, fairness, and comity -- will point toward declining to exercise jurisdiction over the remaining state-law claims."). *See also Kshel Realty Corp. v. City of New York, No. 01 Civ. 9039, 2006 U.S. Dist. LEXIS 62220, 2006 WL 2506389, at *13 (S.D.N.Y. Aug. 30 2006)* ("[T]he Second Circuit instructs that 'absent exceptional circumstances,' where federal claims can be disposed of on *12(b)(6)* or summary judgment grounds, courts should 'abstain from exercising pendent jurisdiction.'") (quoting *Walker v. Time Life Films, Inc., 784 F.2d 44, 53 (2d Cir. 1986)*).

## V. CONCLUSION

2009 U.S. Dist. LEXIS 54141, *

For the foregoing reasons, defendants' motion for summary judgment is granted. The Clerk of the Court is directed to close this motion (Docket # 64) and this case.

SO ORDERED:

/s/ Shira A. Scheindlin

Shira A. Scheindlin

U.S.D.J.

Dated: New York, New York

June 26, 2009

# Estate of Valerie Young, et al. v. State of New York Office of Mental Retardation and Development Disabilities, et al.

## 649 F.Supp. 2d 282; 2009 U.S. Dist. LEXIS 78049





Positive
As of: Nov 29, 2012

ESTATE OF VALERIE YOUNG, et. al., Plaintiffs, -against- STATE OF NEW
YORK OFFICE OF MENTAL RETARDATION AND DEVELOPMENTAL DIS-
ABILITIES, et al., Defendants.

07 Civ. 6241 (LAK)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

*649 F. Supp. 2d 282; 2009 U.S. Dist. LEXIS 78049*

August 27, 2009, Decided
August 31, 2009, Filed

**SUBSEQUENT HISTORY:** Costs and fees proceeding at *Estate of Young v. N.Y. Office of Mental Retardation & Developmental Disabilities, 2009 U.S. Dist. LEXIS 112651 (S.D.N.Y., Nov. 24, 2009)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, the administrator of a decedent's estate and the decedent's two siblings, sought damages under *42 U.S.C.S. § 1983* for the decedent's alleged mistreatment and untimely death while in the care of defendants, a state agency for the mentally disabled and agency employees. Plaintiffs asserted that the decedent's substantive due process rights were violated. Defendants moved for summary judgment.

**OVERVIEW:** The decedent, who was mentally disabled, collapsed in the shower and died later that night. The autopsy report attributed her death to a pulmonary embolism in consequence of deep vein thrombosis (DVT) due at least in part to inactivity. Plaintiffs alleged that the decedent, during the last months of her life, largely was confined to a wheelchair or otherwise kept immobile. The court held that (1) the claims against the department were barred under *U.S. Const. amend. XI*; (2) remaining were the substantive due process claim against the individual defendants in their individual capacities; (3) there was evidence supporting defendants' contention that the decedent was ambulatory and used a wheelchair merely for transport, but there was evidence also suggesting that the decedent may have been kept immobile due to fears that the decedent would fall; and (4) there were material disputed factual issues as to whether sedentariness was a risk factor for DVT and whether the decedent in fact was maintained in a sedentary state, which went to the heart of plaintiffs' claim that the treatment the decedent received fell below professionally accepted minimum standards and shocked the conscience.

**OUTCOME:** The court granted defendants' motion for summary judgment in part, so as to dismiss plaintiffs' *§ 1983* claims against the department and against all individual defendants in their official capacities, as well as to dismiss plaintiffs' abandoned claims for violations of the Americans with Disabilities Act of 1990 and the Rehabilitation Act of 1973.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Evidence*

649 F. Supp. 2d 282, *; 2009 U.S. Dist. LEXIS 78049, **

*Civil Procedure > Summary Judgment > Standards > Appropriateness*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards > Legal Entitlement*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN1] Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants*
[HN2] For the non-moving party to defeat summary judgment, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or a judge to resolve the parties' differing versions of the truth at trial.

*Civil Procedure > Summary Judgment > Opposition > Memoranda in Opposition*
[HN3] Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.

*Civil Procedure > Pleading & Practice > Motion Practice > Opposing Memoranda*
*Civil Procedure > Summary Judgment > Opposition > Memoranda in Opposition*
[HN4] S.D.N.Y. & E.D.N.Y. Civ. R. 7.1 states that all oppositions thereto shall be supported by a memorandum of law, setting forth the points and authorities relied upon in opposition to the motion. Willful failure to comply with this rule may be deemed sufficient cause for the granting of a motion by default.

*Administrative Law > Sovereign Immunity*
*Civil Procedure > Federal & State Interrelationships > Sovereign Immunity > State Immunity*
*Governments > State & Territorial Governments > Claims By & Against*
*Governments > State & Territorial Governments > Employees & Officials*
[HN5] The *Eleventh Amendment* provides that the judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or pros-

ecuted against one of the United States by Citizens of another State. *U.S. Const. amend. XI.* Furthermore, a state's *Eleventh Amendment* protection from suit extends to its agencies and departments, and it applies to suits against State officials in their official capacities.

*Administrative Law > Sovereign Immunity*
*Civil Procedure > Federal & State Interrelationships > Sovereign Immunity > State Immunity*
*Civil Rights Law > Immunity From Liability > Defenses*
*Governments > State & Territorial Governments > Claims By & Against*
[HN6] For *Eleventh Amendment* purposes, the New York Office of Mental Retardation and Developmental Disabilities is to be considered an arm of New York State and thus it cannot be sued under *42 U.S.C.S. § 1983.*

*Civil Rights Law > Immunity From Liability > Local Officials > Deliberate Indifference*
*Civil Rights Law > Immunity From Liability > Local Officials > Direct Causal Links*
*Constitutional Law > Substantive Due Process > Scope of Protection*
*Governments > State & Territorial Governments > Claims By & Against*
*Governments > State & Territorial Governments > Employees & Officials*
[HN7] The substantive component of the Due Process Clause bars certain government actions regardless of the fairness of the procedures used to implement them. To prevail on their substantive due process claims, plaintiffs must show that defendants' actions were arbitrary, conscience-shocking, or oppressive in a constitutional sense, and not merely incorrect or ill-advised. In the context of a state's affirmative duties to individuals in its custody or care, officials may be liable under *42 U.S.C.S. § 1983* only if their omissions were a substantial factor leading to the denial of a constitutionally protected liberty or property interest, and the officials displayed a mental state of deliberate indifference with respect to those rights.

*Civil Rights Law > Immunity From Liability > Local Officials > Deliberate Indifference*
*Constitutional Law > Substantive Due Process > Scope of Protection*
*Healthcare Law > Actions Against Healthcare Workers > Doctors & Physicians*
[HN8] A doctor will not be held liable under *42 U.S.C.S. § 1983* for treatment decisions unless such decisions are such a substantial departure from accepted judgment,

Case 3:09-cv-00948-AWT    Document 78    Filed 11/29/12    Page 24 of 32

Page 3

649 F. Supp. 2d 282, *; 2009 U.S. Dist. LEXIS 78049, **

practice, or standards as to demonstrate that she actually did not base the decision on such a judgment. This standard requires more than simple negligence by the doctor, but less than deliberate indifference. It is not violated if experts merely disagree with care or treatment decisions that actually were made or think that another course of conduct would have been better. Indeed, the issue is not whether the optimal course of treatment was followed, but whether professional judgment in fact was exercised.

*Civil Rights Law > Immunity From Liability > Defenses*
*Governments > State & Territorial Governments > Claims By & Against*
*Governments > State & Territorial Governments > Employees & Officials*
[HN9] Government officials performing discretionary functions are entitled to qualified immunity from federal constitutional claims as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated. A defendant is entitled to qualified immunity if either (1) the defendant's actions did not violate clearly established law or (2) it was objectively reasonable for the defendant to believe that his actions did not do so. The United States Supreme Court has modified this analysis and has held that courts may begin their inquiry by asking whether a constitutional violation is established by the plaintiff's pleading, or simply whether the right in question was clearly established at the time the violation occurred.

*Civil Rights Law > Immunity From Liability > Defenses*
[HN10] While immunity ordinarily should be decided by the court, such questions are only ripe for judgment where there is no dispute as to the material historical facts. The qualified immunity analysis depends upon an individualized determination of the misconduct alleged. Courts should first determine whether a constitutional violation occurred before deciding whether qualified immunity exists.

*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
*Civil Rights Law > Immunity From Liability > Local Officials > Customs & Policies*
*Civil Rights Law > Immunity From Liability > Local Officials > Deliberate Indifference*
*Civil Rights Law > Immunity From Liability > Respondeat Superior Distinguished*

*Civil Rights Law > Section 1983 Actions > Elements > General Overview*
[HN11] Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to a damages award under *42 U.S.C.S. § 1983*. The United States Court of Appeals for the Second Circuit rule was that a supervisory official was personally involved only when that official: (1) participated directly in the alleged constitutional violation; (2) failed to remedy the violation after being informed of the violation through a report or appeal; (3) created or allowed the continuation of a policy or custom under which unconstitutional practices occurred; (4) acted with gross negligence in supervising subordinates who commit the wrongful acts; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. The United States Supreme Court, however, has held that because vicarious liability is inapplicable to *§ 1983* suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution, and has explicitly rejected the argument that a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution. Accordingly, absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct.

COUNSEL:  [**1] For Plaintiffs: Jonathan Bauer, THE CATAFAGO LAW FIRM.

For Defendants: Jose L. Velez, Assistant Attorney General, ANDREW M. CUOMO, ATTORNEY GENERAL OF THE STATE OF NEW YORK.

JUDGES: Lewis A. Kaplan, United States District Judge.

OPINION BY: Lewis A. Kaplan

OPINION

[*285] MEMORANDUM OPINION

LEWIS A. KAPLAN, *District Judge.*

At the time of her demise, Valerie Young was a mentally retarded 49 year-old woman who was in defendants' custody and care. Plaintiffs, Viola Young, individually and in her capacity as administrator of Valerie's estate, and Valerie's two siblings, seek damages for Valerie's alleged mistreatment and untimely death. They assert violations of her substantive due process rights, as well as violations of the Americans with Disabilities Act ("ADA") [1] and the Rehabilitation Act of 1973 ("Rehabilitation Act"). [3] The matter now is before the Court on

649 F. Supp. 2d 282, *; 2009 U.S. Dist. LEXIS 78049, **

defendants' motion for summary judgment dismissing the complaint. [1]

> 1    42 U.S.C. § 12101 et seq.
> 2    29 U.S.C. § 794(a).
> 3    Defendants have not addressed the issue whether the complaint, insofar as it is brought by plaintiffs in their individual capacities, states a claim upon which relief may be granted. The Court therefore expresses no opinion on that question.

## Facts

### Valerie [**2] Young

Valerie Young resided at the Brooklyn Developmental Center ("BDC"), a residential treatment facility operated by the New York Office of Mental Retardation and Developmental Disabilities ("OMRDD"), from 1990 until her death on June 19, 2005. She suffered from severe mental retardation and other maladies. These included (1) a seizure disorder that was controlled with medication, (2) a neurological condition that affected her gait and caused her left foot to drop, and (3) bilateral edema of her feet. Despite these conditions, however, Young's health was generally stable. Her mental condition improved and deteriorated over time, prompting her treatment team to try different medications. [4]

> 4    Plaintiffs' Response to Defendants' Statement of Material Facts Pursuant to Local Civil Rule 56.1 ("Pl. 56.1 St.") PP 74-75.

### [*286]  The Defendants

OMRDD is the New York State agency charged with providing services to persons with mental retardation and developmental disabilities. It provides services through thirteen developmental disabilities services offices ("DDSOs"). The BDC is the DDSO for Kings County, New York. The BDC is not a hospital, but its staff includes psychiatrists, psychologists, physicians, [**3] nurses, dentists, social workers, and physical and occupational therapists. [5]

> 5    Pl. 56.1 St. PP 9-10, 14, 16.

Peter Ushakow was director of the BDC from 2000 until his retirement in 2008 and was responsible for overseeing its daily operations. Jan Williamson, deputy director of operations at the BDC since 2004, supervises its residential units. Suresh Ayra is a former deputy director of the BDC who left in 2004 whose duties included overseeing the business office, discipline coordinators, residential services, housekeeping, maintenance and the power plant. [6]

> 6    See Pl. 56.1 St. PP 3, 4, 5, 36-45.

Defendants Ferdinand, Hayes, and Milos all were part of Young's interdisciplinary treatment team ("ITT"). Every resident of a BDC unit has an ITT, comprised of a psychiatrist and/or psychologist, medical providers, social worker and other staff who provide direct care, recreation, speech, physical therapy and occupational therapy. [7] Ferdinand was Young's treatment team leader beginning in May 2001, Hayes was Young's residential unit supervisor beginning in 2003, and Dr. Milos was Young's treating physician starting in January 2002. All three defendants continued in their respective roles until [**4] Young's death. [8]

> 7    The ITT prepares an Individualized Program Plan for each consumer which contains annual assessments of the various clinical disciplines. The assessments are used to develop a program to address the consumer's needs. A consumer's guardian and/or family is invited to participate in the IPP meetings. Each consumer has also a Developmental Plan that contains all of the consumer's treatment and care records in one comprehensive binder. Def. 56.1 St. PP 29,30 32.
> 8    Pl. 56.1 St. PP 53, 62, 70.

### The Parties' Contentions

On June 19, 2005, at approximately 8:30 p.m., Young collapsed in the shower and was taken to the hospital where she died later that night. The autopsy report attributed her death to a pulmonary embolism in consequence of deep vein thrombosis ("DVT") of the lower extremities due at least in part to inactivity. [9] Plaintiffs allege that Young was denied necessary health care and treatment by defendants, which caused her pain and suffering and ultimately led to her death. [10]

> 9    Pl. Ex. 4 at 1.
> 10   Cpt. PP 26-27

The core of the complaint is the contention that Young, during the last months of her life, largely was confined to a wheelchair or otherwise kept immobile as a result [**5] of sedative medication and untreated and/or inadequately treated conditions. [11] Plaintiffs assert that defendants knew or should have known that inactivity can cause DVT and, in turn, pulmonary emboli and that they caused Young's death by allowing her to remain sedentary without regular standing and walking.. In plaintiffs' view, Young died because defendants failed to take prophylactic measures meeting minimum professional standards and defendants thus violated Young's substantive due process rights. [12]

Case 3:09-cv-00948-AWT   Document 78   Filed 11/29/12   Page 26 of 32

Page 5

649 F. Supp. 2d 282, *; 2009 U.S. Dist. LEXIS 78049, **

11   PTO at 2.
12   *Id.* at 2.

Defendants argue that the oversight, monitoring, evaluation, and treatment of [*287] Young by BDC staff conformed to the accepted standard of care. [13] They deny that inactivity is a risk factor for DVT and assert that Young's care providers could not reasonably have anticipated that she would develop DVT and a fatal pulmonary embolism because she had none of the currently accepted risk factors or symptoms recognized as increasing the likelihood of DVT. Defendants deny also that Young was sedentary or kept immobile and contend that Young received physical therapy, ambulated with assistance, and appeared wholly asymptomatic in the three weeks prior to her death. [14]

13   *Id.* at 3.
14   Def.   [**6] Br. at 8-9; PTO at 3.

*Prior Proceedings - Plaintiffs' Motion for Sanctions*

In November 2004, Young's ITT placed her on fifteen minute checks that required staff to watch her closely because she had suffered an unexplained injury. [15] BDC staff were required to make entries reflecting these checks in special observation logs. Plaintiffs quite understandably sought discovery of those logs in this action but, with the exception of four pages from the logs, they were not produced. [16]

15   Def. 56.1 St. P 76; PX 6; PX 45.
16   *See* Report and Recommendation ("R&R") of Magistrate Judge Debra Freeman dated March 17, 2009, at 4 (DI 58). As Judge Freeman noted, the 24-hour observation of a patient, with notes made very 15 minutes for the roughly six months that Young was under such observation, should generate over 1000 pages of logbook entries. *Id.*

On May 14, 2008, plaintiffs moved for sanctions for the alleged spoliation of the logs. [17] On March 31, 2009, this Court found, *inter alia*, that defendants failed in their duty to preserve the logs, that this failure was at least negligent, and that the logs contained information relevant to plaintiffs' substantive due process claim. [18] Accordingly, the Court   [**7] granted plaintiffs' motion for sanctions to the extent that (1) the Court could draw an adverse inference against defendants on any merits-based dispositive motions that defendants might make before or during trial, and (2) the jury, should the case reach that stage, would be permitted to hear evidence regarding the missing evidence and be given an adverse inference instruction. [19]

17   DI 20.

18   DI 61. The factual findings and reasoning underpinning the Court's decision are set forth in Judge Freeman's R&R. Defendants did not object to the R&R.
19   DI 61.

*Discussion*

*I. Summary Judgment Standard*

[HN1] Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. [20] In deciding a motion for summary judgment, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. [21] [HN2] For the non-moving party to defeat summary judgment, all that is required "'is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or a judge to resolve the parties' differing versions of the truth at trial.'" [22]

20   *E.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986);* [**8] *White v. ABCO Eng'g Corp., 221 F.3d 293, 300 (2d Cir.2000); see also FED. R. CIV. P. 56(c).*
21   *See Anderson, 477 U.S. at 255.*
22   *Kessler v. Westchester County Dep't of Soc. Servs., 461 F.3d 199, 206 (2d Cir. 2006)* (quoting *Anderson, 477 U.S. at 248-49).*

[*288]   *II. ADA and Rehabilitation Act Claims*

Plaintiffs' second and third claims for relief allege that the defendants' acts and omissions in the treatment of Valerie Young violated the ADA and the Rehabilitation Act. Defendants move for summary judgment dismissing both claims on several grounds. [23]

23   *See* Def. Br. at 19-20.

Plaintiffs have failed to address defendants' arguments or even to mention either claim. They thus have abandoned their ADA and Rehabilitation Act claims. [24] Accordingly, defendants are entitled to summary judgment dismissing the second and third causes of action.

24   *See, e.g., Bellegar de Dussuau v. Blockbuster, Inc., No. 03 Civ.6614(WHP), 2006 U.S. Dist. LEXIS 7368, 2006 WL 465374, at *7 (S.D.N.Y. Feb. 28, 2006)* (claim abandoned by plaintiff's failure to address it in opposition to defendant's summary judgment motion) (citing *Douglas v. Victor Capital Group, 21 F. Supp. 2d 379, 393 (S.D.N.Y. 1998)); DeVito v. Barrant, No. 03-CV-1927 (D LI), 2005 U.S. Dist. LEXIS 22444, 2005 WL 2033722, at *10 (E .D.N .Y.*

Case 3:09-cv-00948-AWT   Document 78   Filed 11/29/12   Page 27 of 32

Page 6

649 F. Supp. 2d 282, *; 2009 U.S. Dist. LEXIS 78049, **

*Aug. 23, 2005)*; [**9] *Taylor v. City of New York*, 269 F. Supp.2d 68, 75 (E.D.N.Y. 2003) ([HN3] "Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way."); *National Communications Ass'n, Inc. v. American Tel. & Tel. Co.*, 92 Civ. 1735 (LAP), 1998 U.S. Dist. LEXIS 3198, 1998 WL 118174, at *28 (S.D.N.Y. Mar. 16, 1998) (where plaintiff did not address claim in response to defendant's summary judgment motion, claim deemed "abandoned" and defendant granted summary judgment); *Anti-Monopoly, Inc., v. Hasbro, Inc.*, 958 F.Supp. 895, 907 & n. 11 (S.D.N.Y.) ("failure to provide argument on a point at issue constitutes abandonment of the issue"), *aff'd*, 130 F.3d 1101 (2d Cir.1997); *cert. denied, Anti-Monopoly, Inc. v. Hasbro, Inc.*, 525 U.S. 813, 119 S. Ct. 48, 142 L. Ed. 2d 37. *See also* [HN4] *S.D.N.Y. CIV. R. 7.1* ("[A ]ll oppositions thereto shall be supported by a memorandum of law, setting forth the points and authorities relied upon . . . in opposition to the motion . . . . Willful failure to comply with this rule may be deemed sufficient cause for the . . . granting of a motion by default.").

### III. Claims Against Defendant Ayra

Plaintiffs concede that defendant Suresh [**10] Arya left BDC prior to the alleged conduct at issue here and do not oppose defendants' motion to the extent that it seeks Ayra's dismissal from this action. [25] Accordingly, all claims against Ayra are dismissed.

25   Pl. Br. at 18.

### IV. Due Process Claim

#### A. Eleventh Amendment

[HN5] The *Eleventh Amendment* provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State . . ." [26] Furthermore, "[a] state's *Eleventh Amendment* protection from suit extends to its agencies and departments," [27] and it applies to suits against State officials in their official capacities. [28] Accordingly, defendants are entitled to dismissal of all claims against the OMRDD, which is a State agency, [29] and of the claims against [*289] the individual BDC defendants in their official capacities.

26   *U.S. Const. amend. XI.*

27   *Morningside Supermarket Corp. v. New York State Dep't of Health*, 432 F. Supp. 334, 338 (S.D.N.Y. 2006) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100, 104 S. Ct. 900, 79 L. Ed. 2d 67, (1984)).

28   *Bellamy v. Mount Vernon Hosp.*, No. 07 Civ. 1801 (SAS), 2009 U.S. Dist. LEXIS 54141, 2009 WL 1835939, at *4 (S.D.N.Y. June 26, 2009) [**11] (citing *Kentucky v. Graham*, 473 U.S. 159, 169, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985).

29   *See Komlosi v. New York State Office of Mental Retardation & Development*, 64 F.3d 810, 814-15 (2d Cir. 1995) ([HN6] "For *Eleventh Amendment* purposes, OMRDD is to be considered an arm of New York State" and thus "it cannot be sued under § 1983.")

#### B. Claim Against Individual Defendants in their Personal Capacities

What remains is plaintiffs' substantive due process claim against the remaining individual defendants in their individual capacities. Defendants argue that this claim too must be dismissed because (1) plaintiffs have failed to raise a genuine issue of material fact, (2) the defendants in any case are entitled to qualified immunity, and (3) defendants Uschakow and Williamson were not personally involved in Young's care and treatment.

#### 1. The Substantive Due Process Standard

[HN7] The substantive component of the *Due Process Clause* bars "certain government actions regardless of the fairness of the procedures used to implement them." [30] To prevail on their substantive due process claims, plaintiffs must show that defendants' actions were "'arbitrary, conscience-shocking, or oppressive in a constitutional sense,' and not merely 'incorrect or [**12] ill-advised.'" [31] In the context of a state's affirmative duties to individuals in its custody or care, officials may be liable under *Section 1983* only if their "omissions were a substantial factor leading to the denial of a constitutionally protected liberty or property interest, and the officials displayed a mental state of deliberate indifference with respect to those rights." [32]

30   *Daniels v. Williams*, 474 U.S. 327, 331, 106 S. Ct. 662, 88 L. Ed. 2d 662(1986).

31   *Catanzaro v. Weiden*, 188 F.3d 56, 64 (2d Cir. 1999) (quoting *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995)).

32   *P.C. v. McLaughlin*, 913 F.2d 1033, 1044 (2d Cir. 1990) (citing *Doe v. New York City Dep't of Social Servs.*, 649 F.2d 134, 141 (2d Cir. 1981).

649 F. Supp. 2d 282, *; 2009 U.S. Dist. LEXIS 78049, **

A further note is appropriate in light of the fact that defendant Milos is a physician. [HN8] "A doctor will not be held liable under *Section 1983* for treatment decisions unless such decisions are 'such a substantial departure from accepted judgment, practice, or standards as to demonstrate that [she] actually did not base the decision on such a judgment.'" [33] This standard requires more than simple negligence by the doctor, but less than deliberate indifference. [34] It is not violated if experts [**13] merely disagree with care or treatment decisions that actually were made or think that another course of conduct would have been better. [35] Indeed, the issue is not whether the optimal course of treatment was followed, but whether "'professional judgment in fact was exercised.'" [36]

> 33   *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996) (quoting *Youngberg v. Romeo, 457 U.S. 307, 323, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982)*.
>
> 34   *Id.* (citing *Estate of Porter by Nelson v. Illinois, 36 F.3d 684, 688 (7th Cir. 1994); Shaw by Strain v. Strackhouse, 920 F.2d 1135, 1144-47 (3d Cir. 1990)*.
>
> 35   *Youngberg, 457 U.S. at 321.*
>
> 36   *Society for Good Will to Retarded Children, Inc. v. Cuomo, 902 F.2d 1085, 1089 (2d Cir. 1990)* (quoting *Youngberg, 457 U.S. at 321*).

### 2. Disputed Issues of Material Fact

Defendants' protestations to the contrary notwithstanding, there remain disputed issues of fact material to plaintiffs' substantive due process claim.

First, while it is undisputed that Young suffered from drop foot in her left foot and that she had an unstable gait and difficulty walking prior to her death, [37] the [*290] parties hotly contest whether Young was kept essentially immobilized in the months and weeks prior to her death. [38] Certainly there is [**14] evidence supporting defendants' contention that Young was ambulatory, used a wheelchair merely for transport, and was not kept sedentary. [39] However, as the Court already observed in addressing the sanctions motion, there is evidence also suggesting that Young may have been kept immobile in that time period. [40] For instance, the autopsy report concluded that inactivity contributed to Young's death, [41] and the special observation log entries for the date of her death suggest that she sat in her wheelchair continuously from 3:00 p.m. until 8:00 p.m. [42] Young's mother testified that BDC staff did not regularly walk Young because she was unsteady on her feet, [43] and a log entry from April 20, 2005 stated that Young was "to remain in a wheelchair at all times." [44] Indeed, the BDC's own mortality review commission discussed the fact that "staff who monitored [Young] may not have encouraged her to walk around because of fear of her falling." [45] Furthermore,

there is at least some evidence supporting plaintiffs' contention that Young's medication kept her sedated and contributed to her alleged sedentariness. [46]

> 37   E.g., Def. 56.1 St. PP 79, 82, 85-87. During the first few months of 2005, for [**15] example, Young fell frequently and around April, 2005 she was issued a helmet to protect her head in the case of falls.
>
> 38   *Compare* Def. Br. at 8-9 *with* Pl. Br. at 12-15.
>
> 39   E.g., Def. 56.1 St. P 89, 90, 94.
>
> 40   *See* R&R at 13-14.
>
> 41   Pl. Ex. 4 at 1.
>
> 42   Pl. Ex. 40 at 1.
>
> 43   Pl. Ex. 28 at 56:17-25.
>
> 44   Def. Ex. 38, Bates 9947.
>
> 45   Pl. Ex. 48. The mortality review commission consisted of the BDC's quality assurance coordinator, six physicians, three psychiatrists, a neurologist and the deputy director of operations. Def. 56.1 St. P 98.
>
> 46   E.g., Def. 56.1 St. P 79.

The New York State Commission on the Quality of Care and Advocacy for Persons with Disabilities (the "Commission") also conducted an investigation into Young's death. It found that Young "[d]ied of a PE [pulmonary embolism] from DVT from inactivity" and that the "facility did not adequately address the implications." [47] In a post-investigation letter sent to director Uschakow, the Commission's investigator noted his suspicion that Young "may have spent extended periods of time in her wheelchair." [48] The Commission's report noted also that there was evidence that Young, contrary to defendants' claim, may have been using a wheelchair prior to April 2005. [**16] [49]

> 47   *Id.* at 1.
>
> 48   Pl. Ex. 34 at 1.
>
> 49   Pl. Ex. 49 at 3.

The foregoing evidence would be more than sufficient to demonstrate the existence of genuine issues of material fact without resorting to the spoliation of the observation logs. That spoliation, however, reinforces the conclusion because plaintiffs are entitled to an inference that Young was sedentary in the period leading up to her death.

Defendants attempt to sidestep this factual dispute by asserting that it is immaterial. Specifically, they argue that plaintiffs' claim still would fail even if Young had been kept immobile because plaintiffs "cannot overcome the medical fact that DVT can occur without warning." [50] But the argument is not persuasive.

649 F. Supp. 2d 282, *; 2009 U.S. Dist. LEXIS 78049, **

50   Endorsed Letter, March 29, 2009 at 2 (DI 60)

Defendants' contention that Young's alleged inactivity is immaterial rests on their [*291] broader argument, supported by their expert Diane Sixsmith, that inactivity is not a risk factor for DVT and that Young had neither any of the accepted risk factors for DVT nor symptoms recognized as increasing the likelihood of a DVT diagnosis. [51] But they overlook the fact that the question whether inactivity is a risk factor for DVT is itself a disputed issue [**17] in this case. Plaintiffs' expert contradicts Sixsmith and contends that inactivity is a risk factor for DVT. [52] Moreover, Sixsmith's ultimate conclusion that Young was not at risk for DVT in consequence of inactivity itself is based at least in part on defendants' version of the disputed issue of whether Young was sedentary. [53] Further, the autopsy report's conclusion that Young's death was at least in part the result of DVT caused by inactivity on its face suggests at least a potential causal connection between inactivity and DVT. [54] Indeed, the BDC's own mortality review commission on Young's death "discussed possible preventive measures for consumers who are at a high risk for DVT's (i.e., smokers, *sedentary, non ambulatory*)." [55]

51   *E.g.*, Def. Br. at 11-12; Decl. of Dr. Diane M. Sixsmith ("Sixsmith Decl.") Ex. A at 2. According to Sixsmith, the currently accepted risk factors are "active cancer, recently bedridden for major surgery, unilateral calf tenderness, collateral superficial veins". *Id.*

52   Pl. Ex. 30 at 2 ("Bindie Opinion Letter")

53   *E.g.*, Sixsmith Decl. Ex. A at 2 ("[t]he fact that she [Young] continued to receive physical therapy, continued to ambulate with assistance at her [**18] facility, and appeared to remain completely asymptomatic for the next three weeks until her death would have reinforced the impression that she was not at risk for any serious condition"); Ex. C at 2 (conclusion based in part on the assertion that "while Ms. Young might spent increasing time in a wheelchair for certain of her mobility needs, she continued to be ambulated and go to physical therapy").

54   Pl. Ex. 4 at 1.

Various reputable and readily available medical information sources list inactivity, such as prolonged periods of sitting, as a risk factor for DVT. *See e.g.*, Deep Vein Thrombosis (D V T), *available at* http://mayoclinic.com/health/deep-vein-thrombosis/DS01005/DSECT ION=risk-factors (last visited August 11, 2009).

*See generally McAuley v. Fed. Ins. Co., No. 05 Civ. 1826 (AGF), 2009 U.S. Dist. LEXIS 52899, at *50-52 (E.D. Mo. 2009)* (citing to *Blotteaux v. Qantas Airways, Ltd., 171 Fed. Appx. 566, 568-69 (9th Cir. 2006)* (discussing risk of DVT from prolonged sitting on airplanes), *Adams v. Astrue, No. 07 Civ. 1041 (MLM), 2008 U.S. Dist. LEXIS 56351, at *15-16 (E.D. Mo. July 24, 2008)* (discussing "obesity and the sedentary nature of plaintiff's job" as "probably risk factors [**19] for his DVT").

55   Pl. Ex. 48 at 3 (emphasis added).

Finally, defendants rely on plaintiffs' expert, Dr. Bindie, who stated that "DVT is frequently asymptomatic or the symptoms are not classical" and that the "first sign of DVT can be pulmonary emboli or death." [56] They argue on this basis that plaintiffs essentially have conceded that defendants could not reasonably have anticipated that Young would develop DVT and a fatal pulmonary embolism. But this argument too is insufficient to defeat the motion.

56   Pl. Ex. 30 at 2.

As an initial matter, defendants quote Dr. Bindie out of context, eliding the next sentence in his report in which he concluded that "[a] high index of suspicion is necessary." [57] When read as a whole, it is obvious that Dr. Bindie's point is that a high degree of caution is necessary to prevent DVT precisely because it can be asymptomatic. Together with plaintiffs' core contentions that inactivity is a risk factor for DVT and that a trier of fact would be entitled to conclude that Young [*292] was kept inactive for months and weeks before her death, Dr. Bindie's opinion supports rather than undermines plaintiffs' claim.

57   *Id.*

In sum, there are material disputed factual issues as [**20] to whether sedentariness or inactivity are risk factors for DVT and whether Young in fact was maintained in a sedentary state. These disputed issues go to the heart of plaintiffs' claim that the treatment and care

Case 3:09-cv-00948-AWT  Document 78  Filed 11/29/12  Page 30 of 32

Page 9

649 F. Supp. 2d 282, *; 2009 U.S. Dist. LEXIS 78049, **

Young received fell below professionally accepted minimum standards and shocked the conscience.

### 3. Qualified Immunity

There nevertheless remains the question of whether, as defendants assert, any of the individual defendants on her treatment team is entitled to qualified immunity at this stage of the proceedings.

[HN9] "Government officials performing discretionary functions are entitled to qualified immunity 'from federal constitutional claims . . . as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'" [58] A defendant is entitled to qualified immunity if either (1) the defendant's actions did not violate clearly established law or (2) it was objectively reasonable for the defendant to believe that his actions did not do so. [59]

> 58    5 Borough Pawn, LLC. v. City of New York, No. 08 Civ. 3837 (CM), 640 F. Supp. 2d 268, 2009 U.S. Dist. LEXIS 54069, at *27 (S.D.N.Y. June 22, 2009) (quoting Anderson v. Creighton, 483 U.S. 635, 638, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)).
>
> 59    Moore v. Andreno, 505 F.3d 203, 208 (2d Cir. 2007) [**21] (citing Saucier v. Katz, 533 U.S. 194, 202, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)).

> See Norton v. Town of Islip, No. 04 C iv. 3079 (NGG), 2009 U.S. Dist. LEXIS 27565, *68-71 (summarizing the two step process for assessing qualified immunity elucidated in Saucier and the changes wrought to that process by Pearson v. Callahan, 129 S.Ct. 808, 815-816, 172 L. Ed. 2d 565 (2009). In Pearson, the Supreme Court modified Saucier and held that courts may begin their inquiry by asking whether a constitutional violation is established by plaintiff's pleading, or simply whether the right in question was clearly established at the time the violation occurred. Id.at *69

Defendants assert that defendants Milos, Ferdinand and Hayes are entitled to dismissal on the ground of qualified immunity because their treatment and care of Young was objectively reasonable and that there is "no evidence" that they "were deliberately indifferent to Ms.

Young's care and, therefore, no violation of her constitutional rights." [60] But the facts about defendants' conduct remain in sharp dispute. Indeed, defendants do not argue that they would be entitled to qualified immunity even if they treated and cared for Young as plaintiffs allege they did. On the contrary, [**22] defendants' argument for qualified immunity is predicated on the disputed factual assertions that (1) Young was not kept sedentary, (2) even if she was, sedentariness is not a risk factor for DVT, and (3) "[a]t a minimum, Young received proper treatment and care for her particular medical and mental health conditions." [61]

> 60    Reply Br. at 14.
>
> Defendants do not argue that the right alleged by plaintiffs was not clearly established, either generally or at a sufficiently particularized level, at the relevant time.

> 61    Df. Br. at 20.

Thus, while the Court is cognizant of the important role qualified immunity plays as a shield not just against ultimate liability, but against lawsuits and their attendant costs, [62] resolving the issue at this stage, when the facts are not clear, would be inappropriate. [63]

> 62    E.g., Saucier v. Katz, 533 U.S. at 200.
>
> 63    Accord, Norton, 2009 U.S. Dist. LEXIS 27565, at *70 ([HN10] "'While immunity ordinarily should be decided by the court," such questions are only ripe for judgment "where there is no dispute as to the material historical facts.") (quoting Hunter v. Bryant, 502 U.S. 224, 228, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991) (per curiam) and Kerman v. City of New York, 374 F.3d 93, 108-09 (2d Cir. 2004)); [**23] Poe v. Leonard, 282 F.3d 123, 134 (2d Cir. 2002) ("The qualified immunity analysis depends upon an individualized determination of the misconduct alleged."). See generally Ford v. McGinnis, 352 F.3d 582, 598 (2d Cir. 2003) (citing Stuto v. Fleishman, 164 F.3d 820, 825 (2d Cir. 1999)) (courts should first determine whether a constitutional violation occurred before deciding whether qualified immunity exists); Taylor v. Vt. Dep't of Educ., 313 F.3d 768, 793-794 (2d Cir. 2002) (ruling on the availability of a qualified immunity defense premature because the qualified immunity issue "in this case turns on factual questions that cannot be resolved at this stage of the proceedings"); Abrahams v. Inc. Village of Hemp-

stead, No. 08 Civ. 02584 (SJF), 2009 U.S. Dist. LEXIS 46725, *19-21 (S.D.N.Y. June 2, 2009) (qualified immunity premature because of disputed facts on summary judgment); Toth ex rel. Toth v. Board of Educ., Queens Dist. 25, No. 07 Civ. 3239, 2008 U.S. Dist. LEXIS 77792, 2008 WL 4527833, at *7 (E.D.N.Y. Sept. 30, 2008) (stating that "[b]ecause [the defense of qualified immunity] 'necessarily involves a fact-specific inquiry, [i]t is generally premature to address the defense of qualified immunity in a motion [**24] to dismiss . . .'") (quoting Bernstein v. City of New York, No. 06 Civ. 895, 2007 U.S. Dist. LEXIS 39286, 2007 WL 1573910, at *9 (S.D.N.Y. May 24, 2007)).

[*293] 4. Supervisory Liability and Lack of Personal Involvement

Finally, defendants Uschakow and Williamson argue that the substantive due process claims against them must be dismissed because they were not personally involved in Young's treatment or care. [64]

64  Defendants sought dismissal of Arya on the same grounds. The Court need not address in light Arya's dismissal from the action on other grounds. See supra at 7.

[HN11] "'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite" to a damages award under Section 1983. [65] Until recently, the Second Circuit rule was that a supervisory official was "personally involved" only when that official:

"(1) participate[d] directly in the alleged constitutional violation; (2) fail[ed] to remedy the violation after being informed of the violation through a report or appeal; (3) create[d] or allow[ed] the continuation of a policy or custom under which unconstitutional practices occurred; (4) act[ed] with gross negligence in supervising subordinates who commit the wrongful acts; or (5) exhibit[ed] deliberate [**25] indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." [66]

This Term, however, the Supreme Court in Ashcroft v. Iqbal held that "[b]ecause vicarious liability is inapplicable to . . . [section] 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution," [67] and it explicitly rejected the argument that "'a

supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution.'" [68] Accordingly, "[a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." [69]

65  Bellamy, 2009 U.S. Dist. LEXIS 54141, 2009 WL, at *4 (quoting Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994).
66  Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).
67  Ashcroft v. Iqbal, 129 S.Ct. 1937, 1948, 173 L. Ed. 2d 868 (2009).
68  Bellamy, 2009 U.S. Dist. LEXIS 54141, 2009 WL 1835939, at *4 (quoting Iqbal, 129 S.Ct. at 1949).
69  Iqbal, 129 S.Ct. at 1949.

Precisely what remains of the Second Circuit rule in light of Iqbal is not entirely [*294] clear. While the Circuit has not yet addressed the question, one of my colleagues [**26] has concluded that:

"[o]nly the first and part of the third Colon categories pass Iqbal's muster -- a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred. The other Colon categories impose the exact types of supervisory liability that Iqbal eliminated -- situations where the supervisor knew of and acquiesced to a constitutional violation committed by a subordinate." [70]

70  Bellamy, 2009 U.S. Dist. LEXIS 54141, 2009 WL 1835939, at *6.

Plaintiffs do not contend that Uschakow and Williamson were directly involved in any of the treatment or care at issue. Rather, they assert that they are liable because they failed to failed, either before or after Ms. Young's death, to adopt a policy to prevent DVT . [71]

71  Pl. Br. at 17-18.

As an initial matter, it is difficult to see how either Uschakow or Williamson could be held liable on the theory that he failed, after Ms. Young's demise, to adopt a policy to prevent DVT. Any such failure would bear no

Case 3:09-cv-00948-AWT   Document 78   Filed 11/29/12   Page 32 of 32

Page 11

649 F. Supp. 2d 282, *; 2009 U.S. Dist. LEXIS 78049, **

causal connection to the harm allegedly caused by their alleged constitutional violation.

Plaintiffs' allegations with respect to [**27] the in-action of Messrs. Uschakow and Williamson during the period before Ms. Young's death are exceptionally vague, amounting essentially to a claim that they ultimately were responsible for the proper running of the facility and, in consequence, for any failure to adopt a policy to prevent DVT therefore would suffice to establish supervisory liability even after *Iqbal*.

The Court has considerable doubt that supervisory liability properly could be imposed on such a basis, as it appears that the duty would be far too general. But it would be inappropriate to resolve that issue until the facts concerning the actual responsibilities of Messrs. Uschakow and Williamson, what they did and did not do, and the relationship, if any, of their actions and omissions to Ms. Young's situation are clear. As these defendants have failed to demonstrate the absence of a genuine issue of material fact on an issue as to which they would have the burden of proof at trial, summary judgment on qualified immunity grounds would be inappropriate at this juncture.

*Conclusion*

For the foregoing reasons, defendants' motion and amended motion for summary judgment dismissing the complaint [DI 36, 48] [72] are granted to [**28] the extent that plaintiffs' (1) *Section 1983* claims against the OMRDD and against all individual defendants in their official capacities, and (2) the second and third causes of action are dismissed. They are denied in all other respects.

72    DI 48 is defendants' amended motion for summary judgment. Defendants' first motion for summary judgment dismissing the complaint is DI 36.

SO ORDERED.

Dated: August 27, 2009

/s/ Lewis A. Kaplan

Lewis A. Kaplan

United States District Judge